UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | CASE NO. 25-02821-TOM |
| INDEPENDENT MEDEQUIP, LLC, *et al.*, | ) | |
| | ) | CHAPTER 11 |
| | ) | |
| DEBTOR. | ) | |

_____

**CADENCE BANK'S PRELIMINARY OBJECTION TO DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I)AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO BANKRUPTCY CODE SECTION 364, (B)USE CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STATY, (V) SCHEDULING A FINAL HEARAING, AND (VI) GRANTING RELATED RELIEF ("MOTION FOR DIP FINANCING", OR "MOTION") [DOCKET 9]**

_____

For the emergency hearing on the Debtors' Motion for DIP Financing **[Doc. 9]**, Cadence Bank ("Cadence") provides these preliminary objections (which it reserves the right to supplement), as follows:

### I. Background Facts

1. This case involves a medical supply business which is comprised of several different entities. They provide durable medical equipment ("DME"), such

1

as hospital beds oxygen tanks, out-patient transfer equipment, and other such equipment to patients located generally in the homes. *See* Motion, ¶ 3.

2. Cadence provided a $4.5 Million dollar loan to several of the Debtor entities which is secured by an "all assets" pledge. The Debtor concedes that Cadence holds valid and enforceable liens in the cash collateral and on the Real Estate (defined below) and rents therefrom. *See* Motion, ¶ 18 and Budget.

3. Before filing bankruptcy, the Debtors approached Cadence with an LOI for $1.8MM for the purchase of the real property upon which Cadence holds a first mortgage (the "Real Estate").

4. As part of the proposed budget, the Debtors propose to pay $900,000 in October from the proceeds of this "sale." If this sale is legitimate (and not merely an LOI), there would be no need for DIP financing.

5. As of the Petition date, Cadence is owed the principal sum of $3,128,000.21, together with accrued pre-petition interest, post-petition interest, charges, attorneys' fees and expenses, and all other costs set forth in the Promissory Note and related loan documents (together, the "Pre-Petition Indebtedness").

## II. Overview of the Motion

6. The Debtor filed the Motion on September 18, 2025. The Motion seeks authority to obtain post-petition financing ("Proposed DIP Facility") from Jackson Investment Group, LLC ("Jackson Group") on the terms and conditions set forth in a

2

Case 25-02821-TOM11    Doc 17    Filed 09/22/25    Entered 09/22/25 09:25:10    Desc Main
Document      Page 2 of 8

non-binding Term Sheet attached to the draft Interim Order as **Exhibit 1**. The Motion asserts that the Proposed DIP Facility is for the following purposes: (a) to stabilize IMED's operations; (b) to pay employees; and (c) to pay ordinary course operation expenses. See Motion, ¶ 7.

7. The Motion proposes to pay "adequate protection" to Cadence in the form of monthly interest payments in the amount of $23,000 through the end of 2025. The Motion proposes no principal payments. The Motion proposes to provide Cadence with a replacement lien on its existing collateral.

### III. Objections to the Motion

**A. The Motion Fails to Provide Sufficient Information as to the Terms and Conditions of the Proposed DIP Facility.**

8. The Motion provides that Jackson Group will make an immediate advance of $500,000, but this is not reflected in the DIP Term Sheet.

9. The Motion does not attach the form of loan documents the Court is being asked to approve. Consequently, the Court and Cadence have no ability to analyze the details of the transaction prior to the hearing.

10. The Motion provides for a "non-default" interest rate of 16% with a default rate of 20%. Obviously, a default rate of interest higher than 16% will further jeopardize Cadence's secured position under the Proposed DIP Facility.

### B. Jackson Group Has Not Unconditionally Agreed to Provide Financing.

11. According to the DIP Term Sheet, Jackson Group had not even begun its due diligence for the Proposed DIP Facility as of the date the Motion was filed. Moreover, Jackson Group has reserved the right to not consummate the loan.

### C. The Proposed DIP Facility is not in the Best Interest of the Debtors, the Estate or Cadence.

12. The Proposed DIP Facility is not in the best interest of the Estate. See *in re Premier Entertainment Biloxi LLC (d/b/a Hard Rock Hotel & Casino Biloxi),* 2007 Bankr. LEXIS 3939 at *7 (Bankr. S.D. Miss. 2007) (debtor must show that the financing is in the best interest of estate and creditors). The Proposed DIP Financing is very expensive, with a 16% price tag. Moreover, $210,000 of the Proposed DIP Facility is being used to finance commitment fees and attorneys' fees of Jackson Group (again, at 16% interest). *See* Budget. Also, the DIP Term Sheet provides for a "break-up" fee of $50,000 plus Jackson Group's costs if the Debtor fails to close the Proposed DIP Facility.

13. While the employee payroll is indeed a high priority item, the other outstanding issues facing the Debtor are not as time urgent as the Debtor suggests.

14. Further, without conceding that Cadence is only owed $900,000 from the proposed sale of the Real Estate, if this were true, there would be approximately $900,000 in excess funds for the Estate.

15. If this sale is actually legitimate, why wasn't it closed prior to now? If it had, the Proposed DIP Facility would seem to be unnecessary.

16. Further, in the Term Sheet, Jackson Group acknowledges that, at most it would receive a junior lien on the Real Estate. Yet, the Motion provides otherwise.

17. In exchange for the Proposed DIP Facility, Jackson Group will receive a priming lien (Motion, ¶ 9), with the result that Cadence will be relegated from a consensual first lien position to a second lien position on the Real Estate and all other assets.

18. Jackson Group further will receive a super-priority administrative expense claim under 11 U.S.C. §364(c). Motion, ¶ 9.

**D.    The Debtor Cannot Satisfy the Provisions of 11 U.S.C. §364(d).**

   **1.    The Debtor Cannot Satisfy 11 U.S.C. §364(d)(1)(A).**

19. Section 364(d)(1)(A) of the Code provides that a debtor cannot obtain post-petition financing on a "priming lien" basis unless the debtor has demonstrated that it "is unable to obtain such credit otherwise." The Debtor has presented no evidence in this regard other than more generalities.

20. In *Suntrust Bank v. Den-Mark Construction, Inc.*, 406 B.R. 683, 689-92 (E.D.N.C. 2009), the Court denied DIP financing where the debtors failed to identify any of the alternative sources which did not offer DIP financing.

## 2. The Debtor Cannot Satisfy 11 U.S.C. §364(d)(1)(B).

21. In order to obtain post-petition financing on a "priming" lien basis, the Debtors must demonstrate that "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is to be granted." Section 364(d)(1)(B). The Debtors has the burden of proof on the issue of adequate protection. Section 364(d)(2).

22. Remarkably, the Debtors propose to give priming liens on "substantially all of the Loan Parties' assets. *See* Motion, ¶ 35.

23. Indeed, one authority has noted:

> Therefore, it is more common to prime an existing lien [rather than providing replacement collateral] ***only when the property has sufficient value to secure adequately both lenders. When the effect of the new borrowing with a senior lien is merely to pass the risk of loss to the holder of the existing lien, the request for authorization should be denied.*** The authorization to prime an existing lien should not be read as authorization to increase substantially the risk of the existing lender in order to provide additional protection for a new, post-petition lender.

Collier on Bankruptcy, ¶364.05 ("The ability to prime an existing lien is extraordinary") (emphasis added, footnotes omitted).

24. The Debtor provides no analysis as to how Cadence will be adequately protected.

6

25. Specifically, without limitation, there is no analysis of the value of Cadence's collateral (no analysis as to whether Cadence has an equity cushion), nor does the Debtor propose to provide additional collateral to Cadence.

26. Instead, the Debtors are offering replacement liens on all assets of IMED, which assets are all already pledged to the Debtors' various lenders.

27. Such an offer of adequate protection is illusory. *See In re LTAPUS, LLP,* 65 C.BC. 2d 438, 2011 Bankr. LEXIS 667, *9 (Bankr. D. Feb. 18, 2011).

28. Contrary to the Debtors' assertions, Cadence's interests will not be adequately protected under the Proposed DIP Facility.

29. In addition to seeking a priming lien, Jackson Group is seeking a superpriority administrative expense under 11 U.S.C. §364(c), all of which places Cadence's recovery in jeopardy and denies it the benefit of its bargain.

30. Consequently, the Motion and Proposed DIP Facility improperly shift the risk of loss to Cadence.

31. The DIP Term Sheet also impermissibly prohibits all other creditors from utilizing "marshalling," while reserving the right solely to Jackson Group.

32. This Court should deny the Motion.

DATED: September 22, 2025.

                                              Respectfully submitted,

                                              */s/ C. Ellis Brazeal III*
                                              C. ELLIS BRAZEAL III

                                              ***Attorney for Cadence Bank***

OF COUNSEL:
**JONES WALKER LLP**
420 20th Street North
Suite 1100
Birmingham, AL 35203
(205) 244-5237
ebrazeal@joneswalker.com

## **CERTIFICATE OF SERVICE**

I certify that on September 22, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Alabama.

                                              */s/ C. Ellis Brazeal III*
                                              OF COUNSEL