# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **In re:** | **Case No. 25-02821-TOM** |
| **Independent MedEquip LLC, et al.,**[1] | |
| | **Chapter 11** |
| **Debtors.** | |

### FINAL ORDER (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF

Upon the motion (the "Motion") of Independent MedEquip LLC and its affiliated debtors, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), seeking entry of a final order (together with the Interim Order (defined herein), the "DIP Orders"), pursuant to sections 105, 361, 362(d), 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 503(b), 506, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), that, among other things:

> authorizes on a final basis the Debtors, jointly and severally, to obtain a non-amortizing priming super-priority senior secured postpetition credit facility ("DIP Facility," and the loans issued thereunder, the "DIP Loans") in an aggregate principal amount of up to $2,000,000 (the "DIP Commitment") of which, upon entry of the Interim Order and subject to the terms and conditions set forth therein and in the DIP Term Sheet (as defined in the Interim Order), $500,000 (the "Interim Amount") was made available to the Debtors and drawn in one or more draws (in an aggregate minimum amount of $100,000 or multiples thereof), and the remainder of the DIP Commitment (as defined below), subject to and after entry of this Final Order, will be available through additional draws, of which no single draw shall be more than the amount set forth in the Approved Budget (defined below), in

---

[1] The Debtors in these cases are: Independent MedEquip, LLC (25-02821-TOM11); iMedEquip LLC (25-02823-TOM11); Viking Medical Supply, LLC (25-02824-TOM11); Independent Offices, LLC (25-02826-TOM11); MedAlliance LLC (25-02827-TOM11); Cloud City Medical, LLC (25-02829-TOM11); Physician's Choice Medical, LLC (25-02830-TOM11); Central Mobility and Rehab Equipment, LLC (25-02831-TOM11); Georgia Medical Supply of Richland, LLC (25-02832-TOM11); LifeAid Medical Equipment LLC (25-02834-TOM11); and Life Medical Supply LLC (25-02835-TOM11).

each case subject to the terms and conditions set forth in the *Debtor-in-Possession Term Loan Facility Terms and Conditions* (among the Debtors, as Borrowers, and Jackson Investment Group, LLC or its designees or assignees, as Lender (the "DIP Lender"), which shall be substantially in the form attached hereto as Exhibit 1 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement" and, together with any ancillary, collateral, or related documents and agreements, including the DIP Orders, each as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Documents");[2]

i.     approves on a final basis the terms of the DIP Credit Agreement and the other DIP Documents, and authorizes the Debtors to execute, deliver, and perform under the DIP Documents;

ii.    authorizes the Debtors, on a final basis, to issue, incur, and guarantee all loans, notes, advances, extensions of credit, financial accommodations, reimbursement obligations, fees and premiums (including the Commitment Fee, the Exit Fee, and any other fees payable pursuant to the DIP Documents), and all other obligations due or payable to or for the benefit of the DIP Documents (collectively, the "DIP Obligations"), and to perform such other acts as may be required or appropriate in connection therewith;

iii.   authorizes and directs the Debtors, on a final basis, to use the proceeds of the DIP Facility and the Cash Collateral (as defined below) solely in accordance with the DIP Documents, any Approved Budget, and this Final Order to (a) fund the postpetition working capital needs of the Debtors in accordance with the Approved Budget and the provisions of this Final Order; (b) pay fees, costs and expenses of the DIP Facility on the terms and conditions described in the Interim Order, this Final Order, and the DIP Documents; and (c) pay the allowed administrative costs and expenses of the Chapter 11 Cases, in each case, solely in accordance with the DIP Documents, the Approved Budget, and this Final Order;

iv.    authorizes and approves, on a final basis, the Debtors' grant to the DIP Lender valid, enforceable, non-avoidable, and automatically and fully perfected and priming security interests, liens, and superpriority claims, including (a) allowed superpriority administrative expense claims pursuant to sections 364(c)(1) of the Bankruptcy Code, subject only to the Carve Out (as defined below) and the Permitted Prior Liens (as defined below), and (b) liens in the DIP Collateral (as defined below) and all proceeds thereof, including all property constituting "cash collateral," as defined in section 363(a) of the Bankruptcy Code, ("Cash Collateral"), pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, to secure all DIP Obligations, subject only to the Carve Out and the Permitted Prior Liens;

---

[2] Capitalized terms used but nototherwise defined herein have the meaning set forth in the Motion of the applicable DIP Documents.

v.     authorizes and approves, on a final basis, the Debtors' grant to the Prepetition Secured Parties (as defined below), as adequate protection of their respective interest in the Prepetition Collateral (as defined below), of valid, enforceable, non-avoidable, and automatically and fully perfected security interests and replacement liens in the DIP Collateral and allowed superpriority administrative expense claims pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, solely to the extent of any Diminution (as defined below) of the Prepetition Secured Parties' respective interest in the Prepetition Collateral, as more fully set forth herein, subject and subordinate only to the Carve Out, the Permitted Prior Liens, the DIP Liens (as defined below), and DIP Superpriority Claims (as defined below), without waiver of the Debtors', Creditors' Committee's (defined below), or any other parties' right to assert any and all challenges, causes of action, and claims against the Prepetition Secured Parties;

vi.    authorizes the DIP Lender to take all commercially reasonable actions to implement and effectuate the terms of this Final Order and the DIP Documents;

vii.    authorizes, as applicable, payment of the DIP Fees (as defined below) at the times and in the amounts set forth in the DIP Documents;

viii.    subject to the terms hereof, a waiver of (a) the Debtors' right to surcharge any collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise; and (b) the equitable doctrine of "marshaling" and other similar doctrines with respect to any collateral;

ix.    modifies the automatic stay imposed by section 362(a) of the Bankruptcy Code to the extent set forth herein and as necessary to permit the Debtors and the DIP Lender to implement and effectuate the terms and provisions of the DIP Documents and this Final Order, and authorizes the DIP Lender to deliver any notices and exercise rights and remedies, as contemplated in this Final Order and the DIP Documents; and

x.    waives any applicable stay (including under Bankruptcy Rule 6004) and provides for immediate effectiveness of this Final Order.

This Court, having considered the relief requested in the Motion, the exhibits attached thereto, the First Day Declaration (as defined in the Motion), the "Dorcey Declaration" (as defined in the Motion), the DIP Credit Agreement, the other DIP Documents, the other papers filed with this Court, the evidence submitted and proffered by counsel; and arguments made at the interim hearing held and concluded before this Court held and concluded on September 22, 2025 (the "Interim Hearing") and at the December 3, 2025 hearing on this Final Order (the "Final Hearing");

and due and sufficient notice of the Final Hearing having been given in accordance with Bankruptcy Rules 2002 and 4001(b), (c), and (d) and all applicable Local Rules; and the Final Hearing having been held and concluded; and all objections raised to the relief requested in the Motion having been overruled by the Court; and it appearing that the final relief requested in the Motion is fair and reasonable and in the best interests of the Debtors and their estates, and essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Credit Agreement and the other DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor,

**THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW BASED UPON THE MOTION, THE REPRESENTATIONS OF COUNSEL AND THE EVIDENCE SUBMITTED DURING THE FINAL HEARING:[3]**

a. **Petition Date**. Commencing on September 18, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court, commencing these Chapter 11 Cases.

b. **Debtors in Possession**. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in any of the Chapter 11 Cases.

c. **Jurisdiction and Venue**. The Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 and the *General Order of Reference from the United States District Court for the*

---

[3] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014, and shall take effect and be fully enforceable nunc pro tunc to the Petition Date immediately upon entry hereof. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

*Northern District of Alabama*, dated and filed July 16, 1984 and amended July 17, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

d. **Notice**. The Final Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2). Notice of the Motion has been provided in a manner sufficient under the circumstances and no other or further notice of the Motion or the entry of this Final Order shall be required.

e. **Interim Order**. On September 24, 2025, the Court entered the Interim Order [Docket No. 33] (the "Interim Order"), pursuant to which the Court, *inter alia*, (i) authorized the Debtors to obtain postpetition secured financing from the DIP Lender, on an interim basis, under the terms and condition set forth therein and in the DIP Documents, and (ii) approved the DIP Term Sheet.

f. **Committee Formation**. On October 6, 2025, the Bankruptcy Administrator for the Northern District of Alabama (the "Bankruptcy Administrator") appointed an official committee of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee") [Docket No. 57].

g. **No Credit Available on More Favorable Terms**. Given their current financial condition, financing arrangements, and capital structure, and the circumstances of the Chapter 11 Cases as demonstrated at the Interim Hearing and the Final Hearing, the Debtors are unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Facility. The Debtors are unable to procure sufficient financing in the form of unsecured credit allowable as an administrative expense. The Debtors are also unable to obtain sufficient secured credit without (i) granting to the DIP Lender the DIP Liens and the DIP Superpriority Claims, subject and subordinate to the Carve Out, and (ii) granting the Adequate Protection Liens (as

5

defined below), subject and subordinate to the Carve Out and the Permitted Prior Liens, as set forth herein and in the DIP Documents.

h.      **Good Faith**.  Based upon the papers filed and the proceedings of record in these Chapter 11 Cases, (i) the extension of credit and financial accommodations (including the use of Cash Collateral) under the DIP Facility, as provided by the DIP Documents, are fair, reasonable, in good faith, negotiated at arm's length, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration; (ii) the DIP Facility and the DIP Loans thereunder are being provided by the DIP Lender in "good faith" within the meaning of section 364(e) of the Bankruptcy Code in express reliance on the protections offered thereby; (iii) the liens, claims, and other covenants and payments as set forth in the DIP Orders and the DIP Documents, as well as the protections afforded parties acting in "good faith" under section 364(e) of the Bankruptcy Code are integral, critical and essential components of the DIP Facility provided by the DIP Lender; and (iv) the DIP Facility, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, and all terms, conditions, and relief set forth in and otherwise approved by the DIP Orders shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the DIP Orders (as applicable) or any provision thereof or hereof is vacated, reversed, or modified, on appeal or otherwise.

i.      **Good Cause**.  Good cause has been shown for the entry of this Final Order, and the entry of this Final Order is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.  The relief requested in the Motion is fair and reasonable and in the best interest of the Debtors and their estates, and essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets.

6

j.      **Need for Postpetition Financing and Use of Cash Collateral**.  The Debtors do not have sufficient and reliable sources of working capital to continue to operate their business in the ordinary course without the financing requested in the Motion.  The financing provided pursuant to the DIP Orders and the DIP Documents and the authority to use Cash Collateral granted herein will permit the Debtors to, among other things, (i) pay the fees, costs, and expenses incurred in connection with the Chapter 11 Cases; (ii) fund any obligations benefiting from the Carve Out; (iii) continue the orderly continuation of the operation of their businesses, in an effort to maintain the health and safety of their patients; (iv) maintain business relationships with customers, vendors, and suppliers; (v) make payroll for their employees, including providers essential for patient care; and (vi) satisfy other working capital and operational needs.

k.      **Willingness to Provide Financing**.  The DIP Lender has committed to provide financing to the Debtors subject to: (i) entry of the DIP Orders; (ii) approval of the terms and conditions of the DIP Facility, the DIP Credit Agreement, and the other DIP Documents; (iii) satisfaction of the closing conditions set forth in the DIP Credit Agreement; and (iv) findings by this Court that the DIP Lender is extending credit to the Debtors pursuant to the DIP Orders and the DIP Documents in good faith, and that the DIP Lender's claims, superpriority claims, security interests and liens and other protections granted pursuant to the DIP Orders and the DIP Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

l.      **Priming of Prepetition Liens; Adequate Protection**.  As of the Petition Date, the Debtors allege they were indebted to Cadence Bank, the U.S. Small Business Administration, Leaf Capital, and several other purchase-money and junior lienholders (collectively, the "Prepetition Secured Parties") under various documents (collectively, the "Prepetition Credit Documents") or other applicable law, and such obligations were secured by liens and security interests granted by

7

the Debtors or otherwise arising under applicable law (all such liens and security interests, the "Prepetition Liens") on and in the assets of the Debtors to the extent set forth under the Prepetition Credit Documents or such applicable law (all such assets, the "Prepetition Collateral," and notwithstanding anything to the contrary herein or in the DIP Credit Agreement, Prepetition Collateral as used herein and the DIP Credit Agreement includes only the collateral that constitutes property of the Debtors' estates (as defined in 11 U.S.C. § 541)).[4] The priming of the security interests in and liens on the Prepetition Collateral and any other interests of the Debtors in property under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Credit Agreement and as further described below, will enable the Debtors to obtain the DIP Facility and to continue to operate their business for the benefit of their estates and creditors, and the Debtors would not be able to obtain postpetition financing in a sufficient amount without granting such priming liens. Consistent with the requirements of section 364(d) of the Bankruptcy Code, and without waiving the Debtors', Creditors' Committee's, or any other parties' right to assert any and all challenges, causes of action, and claims against the Prepetition Secured Parties, the Prepetition Secured Parties shall receive adequate protection as set forth in this Final Order, pursuant to sections 361, 363, and 364 of the Bankruptcy Code, solely to the extent of any decrease in the value of its interest, if any, in the Prepetition Collateral resulting from (i) the use, sale, or lease by the Debtors of the Prepetition Collateral during the pendency of the Chapter 11 Cases; (ii) the DIP Liens and the Carve Out, pursuant to this Final Order and the DIP Documents; or (iii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (such actual diminution, collectively, "Diminution"), or as otherwise set forth herein.

---

[4] For the avoidance of doubt, nothing contained herein shall constitute any stipulation or acknowledgement as to the validity, enforceability, priority or perfection of the Prepetition Liens, or the obligations thereunder or the documents related thereto, and all rights, claims, causes of action, objections, defenses and challenges with respect thereto by the Debtors, the Creditors' Committee, or any other party in interest, is hereby expressly preserved.

8

m.     **DIP Budget**.  The Debtors have prepared and delivered to the DIP Lender and its advisors an initial budget, a copy of which is attached to the Interim Order as Exhibit 2 (together with any additional line-item or other detail and supplements as may be provided pursuant to the terms of the DIP Documents, the "Initial DIP Budget"), which has since been updated from time to time.  The Initial DIP Budget reflects, among other things, for the 13-week period commencing on or about the Petition Date, the Debtors' projected operating receipts, operating disbursements, non-operating disbursements, net operating cash flow and liquidity for each one-week period covered thereby.  The Initial DIP Budget may be further modified, amended, extended, and updated from time to time in accordance with the DIP Credit Agreement or the other DIP Documents, and such modified, amended, extended and/or updated budget, once approved (or deemed approved) by the Debtors and the DIP Lender, shall modify, replace, supplement or supersede, as applicable, the Initial DIP Budget for the periods covered thereby (the Initial DIP Budget and each subsequent approved budget (including any additional line-item or other detail and supplements as may be provided pursuant to the terms of the DIP Credit Agreement) shall constitute, without duplication, an "Approved Budget").  A copy of the Approved Budget for purposes of this Final Order is also attached hereto as Exhibit 2.  This Approved Budget has been prepared by the Debtors, their management and their advisors, and the Debtors believe that the Approved Budget is reasonable under the circumstances.  The DIP Lender is relying, in part, upon the Debtors' agreement to comply with the Approved Budget (subject only to Permitted Variances) and the terms of the DIP Documents in determining to enter into the DIP Facility and to consent to the use of Cash Collateral provided for in this Final Order.

n.     **Use of Cash Collateral and Proceeds of DIP Facility**.  As a condition to the Debtors' entry into the DIP Credit Agreement and the other DIP Documents and the extension of

9

credit under the DIP Facility, including the use of Cash Collateral, the Debtors have agreed that the proceeds of the DIP Facility and Cash Collateral shall be used solely in accordance with the terms and conditions of this Final Order, the DIP Documents, and the Approved Budget (subject to Permitted Variances). Except as otherwise set forth in the DIP Orders, all of the Debtors' cash, including the Debtors' cash and other amounts on deposit or maintained in any banking, checking, or other deposit accounts by the Debtors, any amounts generated by the collection of accounts receivable or other disposition of the DIP Collateral or deposited into the Debtors' banking, checking, or other deposit accounts as of the Petition Date, and the proceeds of any of the foregoing, wherever located, is the DIP Lender's Cash Collateral.

o. **Section 506(c) and Marshaling**. As material inducement to the DIP Lender's agreement that the DIP Liens and DIP Superpriority Claims shall be subject to payment of the Carve Out and the Permitted Prior Liens, upon entry of the Final Order, the DIP Lender is entitled to (i) a waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral and the DIP Obligations in favor of the DIP Lender; and (ii) a waiver of the provisions of section 506(c) of the Bankruptcy Code with respect to the DIP Collateral.

p. **Requisite Authority**. Upon entry of this Final Order, each Debtor has all requisite corporate or entity power and authority to execute and deliver the DIP Credit Agreement and the other DIP Documents to which it is a party and to perform its obligations thereunder.

q. **Immediate Entry**. Sufficient cause exists for immediate entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and the applicable Local Rules. Consummation of the DIP Facility and the permitted use of Prepetition Collateral in accordance with this Final Order and the DIP Documents, are therefore in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.

NOW, THEREFORE, based upon the foregoing findings and conclusions, the Motion, and the record before this Court, and after due consideration, and this Court having found good and sufficient cause therefor,

**IT IS HEREBY ORDERED THAT:**

1.     **Motion Granted**.  The relief sought in the Motion is GRANTED on a final basis as set forth herein. Entry into the DIP Credit Agreement and, as applicable, the other DIP Documents is authorized and approved, and the use of Cash Collateral on a final basis is authorized, in each case, subject to the terms and conditions set forth in this Final Order and in the DIP Documents, including the Approved Budget (subject to Permitted Variances). All objections to the Motion are hereby denied and overruled on the merits.

2.     **Authorization of the DIP Facility**. The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Credit Agreement and the other DIP Documents, and to incur and perform the DIP Obligations in accordance with, and subject to, the terms of the DIP Orders and other DIP Documents, and to execute, deliver, and perform under all instruments, certificates, agreements, and documents which may be required or necessary for their performance under the DIP Documents, and the creation, perfection, and continuation (as applicable) of the DIP Liens described in and provided for by the DIP Orders and the DIP Documents.  Each of the Debtors is hereby authorized to pay any principal, interest, fees, expenses, and other amounts subject to and in accordance with the DIP Orders and the other DIP Documents, as such amounts become due and owing, without further Court approval (except as otherwise provided herein or in the DIP Documents), including the Commitment Fee and the Exit Fee, as well as any reasonable and documented fees and expenses of counsel to the DIP Lender, in each case as set forth herein and in the DIP Credit Agreement, and to take any other actions that may be

11

necessary or appropriate, all to the extent provided in this Final Order and the other DIP Documents. Upon execution and delivery, the DIP Credit Agreement and, as applicable, the other DIP Documents shall represent legal, valid, and binding obligations of the Debtors, enforceable against the Debtors and their estates in accordance with their terms. All provisions of the DIP Credit Agreement are incorporated herein and approved in their entirety. Each officer of the Debtors acting individually is hereby authorized to execute and deliver each of the DIP Credit Agreement and the other DIP Documents.

3. **DIP Obligations**. The DIP Orders and the DIP Documents shall constitute and evidence the validity and binding effect of the DIP Obligations. All DIP Obligations shall be enforceable against the Debtors, their respective estates, and any successors thereto, including any trustee appointed in the Chapter 11 Cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of the Chapter 11 Cases, or in any other proceeding superseding or related to any of the foregoing (the "Successor Case"). The DIP Obligations shall include, but not be limited to, (a) the payment by the Debtors of (i) the unpaid principal amount of and interest on the DIP Loans, as and when due, whether at maturity, by acceleration, or otherwise, and (ii) all other monetary obligations of the Debtors to the DIP Lender under the DIP Documents and the DIP Orders, and (b) the payment and performance of all covenants, duties, agreements, obligations and liabilities of the Debtors to the DIP Lender under the DIP Documents and the DIP Orders. The Debtors and their successors shall be jointly and severally liable for repayment of any funds advanced pursuant to the DIP Documents and the DIP Obligations. The DIP Obligations shall become due and payable, without notice or demand, on the Maturity Date (as defined in the DIP Credit Agreement) or as otherwise set forth in the DIP Documents. No obligation, payment, transfer, or grant of collateral as security hereunder or under the DIP Documents (including any

12

DIP Obligation or DIP Liens) to the DIP Lender shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law, or be subject to any disgorgement, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination, claim, counterclaim, charge, assessment, cross-claim, defense, or any other liability or challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for any reason.

4.     **Authorization to Borrow**.  The Debtors are hereby authorized to execute, deliver, enter into and, as applicable, comply with and perform all of their obligations, and to pay all fees, costs, expenses, indemnities, and other amounts contemplated, under the DIP Credit Agreement and the other DIP Documents, and to take such other and further acts as may be necessary, appropriate or desirable in connection therewith.  Upon entry of this Final Order, the Debtors are authorized to borrow up to the aggregate amount of the Commitments (as defined in the DIP Credit Agreement and as used in the DIP Orders, the "DIP Commitment"), of which no single draw shall be more than the amount set forth in the Approved Budget, in each case, in accordance with the DIP Documents and an Approved Budget, and the DIP Obligations are hereby approved on a final basis (as and when such amounts become earned, due, and payable in accordance with the DIP Documents) without the need to seek further Court approval.  The borrowing of DIP Loans under the DIP Orders and the other DIP Documents shall permanently decrease the DIP Commitment and, once repaid, the DIP Loans incurred may not be re-borrowed.

5.     **DIP Collateral**.  The term "DIP Collateral" means, collectively, each Debtor's right, title, and interest in, to and under all such Debtor's assets, including, but not limited to the following, in each case, whether now owned or existing or hereafter acquired, created or arising and wherever located: all assets and property of such Debtor and its estate, real or personal,

13

tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including, without limitation, all contracts, contract rights, licenses, general intangibles, instruments, equipment, accounts, documents, goods, inventory, fixtures, documents, cash, cash equivalents, accounts receivables, chattel paper, letters of credit and letter of credit rights, investment property (including, without limitation, all equity interests owned by such Debtor in its current and future subsidiaries), commercial tort claims, arbitration awards, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, fixtures, all interests in leaseholds and real properties, all patents, copyrights, trademarks, all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), together with all books and records relating to the foregoing, all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (as such terms are defined in the Uniform Commercial Code as in effect from time to time in the State of Georgia) and (i) all causes of actions under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral and any proceeds thereof, and (ii) excluding all Avoidance Actions[5] but including any proceeds or property recovered from Avoidance Actions whether by judgment, settlement, or otherwise.

6.      **Disposition of Collateral**.  Notwithstanding anything otherwise provided herein, it shall be deemed an Event of Default under the DIP Credit Agreement and the other DIP Documents if the Debtors sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, other than in the ordinary course of business or in connection with the payments

---

[5] For the purposes of this Final Order, "Avoidance Actions" means any and all avoidance, recovery, subordination or other claims, actions or remedies that may be brought by or on behalf of the Loan Parties or their estates or other authorized parties in interest under the Bankruptcy Code or other applicable law, including actions or remedies under sections 544, 545, 547, 548, and 550 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws, but not including all causes of actions under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral and any proceeds thereof.

14

contemplated under this Final Order or the Approved Budget (subject to the Permitted Variances), without the prior written consent of the DIP Lender, which consent shall not unreasonably be withheld or delayed, and a copy of any such consent shall be provided to the Creditors' Committee. Notwithstanding anything otherwise provided herein, 100% of any net cash proceeds of any sale of DIP Collateral outside of the ordinary course of business shall, subject to the satisfaction of the Carve Out and the lien priorities set forth herein and in the DIP Documents, be used to immediately satisfy the DIP Obligations.

7. **DIP Liens**. To secure the DIP Obligations, the DIP Lender was granted, effective immediately upon entry of the Interim Order and approved on a final basis in this Final Order, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens on the DIP Collateral (the "DIP Liens") as follows, in each case subject to the Carve Out and Permitted Prior Liens:

a. **Liens Priming the Prepetition Liens**. Pursuant to section 364(d)(1) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable and automatically and fully perfected first-priority senior priming liens and security interests in all the DIP Collateral, regardless of where located, which senior priming liens and security interests in favor of the DIP Lender shall be senior to the Prepetition Liens, except for the Permitted Prior Liens;

b. **Liens on Unencumbered Property**. Pursuant to section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable, and automatically and fully perfected first-priority liens on and security interests in all DIP Collateral that is not otherwise subject to any valid, enforceable, non-avoidable liens and perfected liens on or security interests as of the Petition Date; and

15

c.   **Liens Junior to Certain Other Liens**.   Pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable, and automatically and fully perfected junior liens on and security interests in all DIP Collateral (other than as set forth in clauses 7(a) and 7(b)) junior only to the Permitted Prior Liens (defined below).

d.   **"Permitted Prior Liens"** shall mean the lien of Cadence Bank, NA on the real estate commonly known as 1201 3rd Avenue North, Birmingham, AL 35203, in an amount not to exceed $900,000.

e.   **ERC Credit.**  The Debtors and DIP Lender assert that the DIP Liens prime any offset rights of the Small Business Administration ("SBA") and the Internal Revenue Service ("IRS") based on IRS Employee Retention Credit (ERC) Refunds applied for by PBS ASO LLC on behalf of Debtors for Form 941 Tax Periods ending 30 June 2021(2nd Quarter) and ending 30 September 2021 (3rd Quarter) and  loans the SBA extended to the Debtors.  The SBA is in the process of preparing and filing secured claims for money loaned to Debtors. The SBA asserts its right of setoff of any ERC refunds that may be due from IRS to PBS ASO LLC on behalf of Debtors against Debtors' debts owed to SBA.  Presently, IRS is not aware of any federal tax debt owed by Debtors. The Debtors, DIP Lender, SBA,  IRS, and any other federal agency reserve their rights to argue their positions at a later date, upon motion to the Court and notice of said hearing.  Pending further order of the Court, there shall be no setoff, and PBS ASO LLC shall hold in escrow any ERC refunds and all accrued interest paid by IRS to PBS ASO LLC for the benefit of the Debtors.

16

The IRS is hereby authorized pursuant to 26 U.S.C. § 6103 to disclose to Prim F. Escalona, United States Attorney for the Northern District of Alabama, and Assistant U.S. Attorneys Richard E. O'Neal and Edward Q. Ragland, any tax information related to the IRS Employee Retention Credit (ERC) Refunds applied for by PBS ASO LLC (EIN XX-XXX8284) on behalf of Debtors for Form 941 Tax Periods ending 30 June 2021(2nd Quarter) and ending 30 September 2021 (3rd Quarter) and all IRS Form 941 account transcripts for PBS ASO LLC (EIN XX-XXX8284) for the tax periods ending 31 March 2020; 30 June 2020; 30 September 2020; 31 December 2020; 31 March 2021; 30 June 2021; 30 September 2021; and 31 December 2021.

Other than as set forth herein or in the other DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Case, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Case, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or Successor Case. The DIP Liens shall not be subject to sections 510(c), 549, or 550 of the Bankruptcy Code. To the extent applicable non-bankruptcy law does not permit the DIP Liens to attach directly to any DIP Collateral, the DIP Liens shall be legal, binding, continuing, allowed, enforceable, non-avoidable, properly authorized, and automatically valid, fully and properly perfected and effective priming security interests in and liens on any proceeds from any sale or other disposition of such DIP Collateral and such proceeds shall constitute DIP Collateral.

17

8. **DIP Superpriority Claims**. Subject to and subordinate to only the Carve Out, the DIP Lender was granted, effective immediately upon entry of the Interim Order and approved on a final basis by this Final Order, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims against each Debtor and its estate in the Chapter 11 Cases and any Successor Case (without the need to file any proof of claim) for all DIP Obligations (collectively, the "DIP Superpriority Claims") with priority in payment over any and all administrative expenses at any time existing or arising, of any kind or nature whatsoever, including the kinds set forth or ordered pursuant to any provision of the Bankruptcy Code, including sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 of the Bankruptcy Code or otherwise, including those resulting from the conversion of any Chapter 11 Case pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment. The DIP Superpriority Claims shall have recourse to and be payable from all prepetition and postpetition property and assets of the Debtors and their estates and all proceeds thereof.

9. **No Obligation to Extend Credit**. The DIP Lender shall have no obligation to make any loan or advance under the DIP Documents unless (a) all of the conditions precedent and other terms under the DIP Orders and the other DIP Documents have been satisfied in full or waived by the DIP Lender (in its sole discretion), and (b) no Event of Default under the DIP Credit Agreement or the other DIP Documents (including this Final Order) has occurred and is continuing.

10. **Use of DIP Facility Proceeds**. The Debtors shall be permitted to use loans, extensions of credit, and any other financial accommodations available under the DIP Facility only

18

for the purposes specifically set forth in this Final Order and the other DIP Documents. Notwithstanding anything herein, the extensions of credit under the DIP Facility shall not constitute Cash Collateral of the Prepetition Secured Parties.

11. **No Monitoring Obligation**. The DIP Lender shall not have any obligation or responsibility to monitor any Debtor's use of the DIP Facility, and the DIP Lender may rely upon each Debtor's representation that the use of the DIP Facility at any time is in accordance with the requirements of this Final Order and the other DIP Documents, including the Approved Budget (subject to the Permitted Variances).

12. **Authorization to Use Cash Collateral**. Subject to the terms and conditions of this Final Order and the other DIP Documents, and in accordance with the Approved Budget (subject to the Permitted Variances), the Debtors are authorized to use Cash Collateral until the DIP Termination Declaration Date.

13. **Adequate Protection for Prepetition Secured Parties**. As adequate protection:

a. solely to the extent of any Diminution of the Prepetition Secured Parties' asserted interest in the Prepetition Collateral resulting from the subordination of the Prepetition Liens to the DIP Liens and the Carve Out, the imposition of the automatic stay, and the use, sale or lease by the Debtors of the Debtors' assets that constitute Prepetition Collateral during the pendency of these Chapter 11 Cases, the Prepetition Secured Parties, such as Leaf Financial, were granted:

(i) continuing valid, binding, enforceable and perfected postpetition replacement liens pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the DIP Collateral, which shall be subject and subordinated only to the Carve Out, the DIP Liens, and Permitted Prior

19

Liens (the "Adequate Protection Liens") and which (a) shall otherwise be senior to, maintaining their respective priorities, all other security interests in, liens on, or claims against the DIP Collateral, (b) shall not otherwise be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Case and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Case, and shall not be subject to sections 510(c), 549 or 550 of the Bankruptcy Code, without waiver of any of the Debtors' or any other party's right to assert any and all challenges, causes of action, and claims against the Prepetition Secured Parties, and (c) to the extent applicable non-bankruptcy law does not permit the Adequate Protection Liens to attach directly to any DIP Collateral, the Adequate Protection Liens shall be legal, binding, continuing, allowed, enforceable, non-avoidable, properly authorized and automatically valid, fully and properly perfected and effective security interests in and liens on any proceeds from any sale or other disposition of such DIP collateral and such proceeds shall constitute DIP Collateral;

(i)        subject and junior to the Carve Out, the DIP Liens, the Permitted Prior Liens, the DIP Superpriority Claims, and the indefeasible repayment in full in cash of all DIP Obligations, immediately upon entry of the Interim Order, and approved on a final basis in this Final Order, the Prepetition Secured Parties are hereby granted pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, allowed superpriority administrative expense

20

claims in the Chapter 11 Cases and any Successor Case (without the need to file any proof of claim) (the "Adequate Protection Superpriority Claims") with priority in payment over all administrative claims at any time existing or arising, of any kind or nature whatsoever, including the kinds set forth or ordered pursuant to any provision of the Bankruptcy Code, including sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 of the Bankruptcy Code or otherwise, including those resulting from the conversion of any Chapter 11 Case pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment; and

(iii)    With respect to Cadence Bank, as additional adequate protection, and so long as the Debtors are operating under an Approved Budget, any Budget Variance does not exceed 15%, and no Event of Default shall have occurred that was not cured or waived, the Debtors shall make monthly interest payments to Cadence Bank in the amounts set forth in and in accordance with and subject to an Approved Budget, and shall pay to Cadence Bank an amount not to exceed $900,000 which payment shall satisfy the mortgage in favor of Cadence Bank upon on the real property known as 1201 3rd Avenue North, Birmingham, Alabama 35203 at such time as such property is ever sold pursuant to Section 363 of the Bankruptcy Code.

21

(iv)     With respect to Leaf Financial, as additional adequate protection, it shall be entitled to a payment of $3,500.00 per month from the Debtors, which is to be evenly divided among its five (5) contracts with the Debtors.

b.   the Debtors shall provide to counsel in this case for the Prepetition Secured Parties the Variance Reports, the Updated Budgets and any other reports required to be delivered to the DIP Lender hereunder at the same time such items are provided to the DIP Lender, and counsel for the Prepetition Secured Parties can share such reports with the Prepetition Secured Parties.

c.   For purposes of this Order, the Prepetition Secured Parties are: Cadence Bank, NA, Leaf Financial, the IRS and the SBA.

14.     **Modification of DIP Documents**.  The Debtors and the DIP Lender are hereby authorized to implement, in accordance with the terms of the DIP Documents any non-material modifications of the DIP Documents without further notice, motion, or application to, order of, or hearing before, this Court.  Any material modification or amendment to the DIP Documents shall only be permitted pursuant to an order of this Court, after being submitted to this Court upon five (5) days' notice to the Bankruptcy Administrator and the Prepetition Secured Parties; provided that any forbearance from, or waiver of, (a) a breach by the Debtors of a covenant representation or any other agreement or (b) a default or an Event of Default, in each case under the DIP Documents shall not require an order of this Court.

15.     **DIP Facility Reporting**.  Except as otherwise provided herein or approved by the DIP Lender, the proceeds from the DIP Facility shall be used only in compliance with the terms of the DIP Documents and in accordance with the Approved Budget.  The Debtors shall comply with the reporting requirements and obligations set forth in the DIP Documents.

22

16.     **Perfection of DIP Liens and Adequate Protection Liens**.  Each of the DIP Orders shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted therein and herein, including the DIP Liens and the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, deed of trust, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Adequate Protection Liens or to entitle the DIP Lender and the Prepetition Secured Parties to the priorities granted in the DIP Orders.  Notwithstanding the foregoing, the DIP Lender and the Prepetition Secured Parties are authorized, but not required, to file, as each deems necessary or advisable, such financing statements, security agreements, deposit account control agreements, mortgages, notices of liens and other similar documents to perfect or otherwise evidence the DIP Liens and the Adequate Protection Liens in accordance with applicable non-bankruptcy law, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or the Adequate Protection Liens.  The DIP Lender and the Prepetition Secured Parties may, in their respective sole discretion, file an electronic copy or photocopy of this Final Order as a financing statement with any filing or recording office or with any registry of deeds or similar office in addition to or in lieu of such financing statements, notices of lien or similar instruments. To the extent that a Prepetition Secured Party is, with respect to the DIP Collateral, a secured party under any Prepetition Credit Documents or is listed as loss payee, lenders' loss payee or additional insured under any Debtor's insurance policies, the DIP Lender shall also be deemed to be the

23

secured party or mortgagee, as applicable, under such documents or to be the loss payee or additional insured, as applicable, solely to the extent as the secured party, mortgagee, the loss payee, or additional insured of the DIP Collateral (notwithstanding anything to the contrary in the DIP Documents). For the avoidance of doubt, any deposit account control agreements contemplated by the DIP Credit Agreement shall automatically supersede any preexisting deposit account control agreements, without the necessity of any further action, including by the Debtors, the DIP Lender, or the Prepetition Secured Parties. Upon the request of the DIP Lender, each Debtor, without any further consent of any party, is authorized to take, execute, deliver, and file any such instruments contemplated by the DIP Credit Agreement to enable the DIP Lender to further validate, perfect, preserve, and enforce the DIP Liens and the applicable Adequate Protection Liens respectively.

17.     **Modification of Automatic Stay**.  The automatic stay of section 362 of the Bankruptcy Code is hereby modified to the extent necessary to permit the Debtors, the DIP Lender, and, as applicable, the Prepetition Secured Parties to accomplish the transactions contemplated by this Final Order and the other DIP Documents.

18.     **Proceeds of Subsequent Financing**.  If any of the Debtors, any trustee, any examiner, or any responsible officer subsequently appointed in any of the Chapter 11 Cases or any Successor Case, shall obtain credit or incur debt pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code in violation of the DIP Documents or otherwise at any time prior to the indefeasible repayment in full in cash of all DIP Obligations (other than unasserted contingent obligations that expressly survive termination of the DIP Credit Agreement) and the termination of the DIP Lender's obligation to extend credit under the DIP Facility, then, after satisfaction of the Carve Out, and unless otherwise agreed by the DIP Lender, all cash proceeds derived from

24

such credit or debt shall immediately be turned over to the DIP Lender to be distributed in accordance with this Final Order and the other DIP Documents.

19. **Payments Held in Trust**.  Except as expressly permitted in the DIP Orders, the DIP Credit Agreement, or otherwise ordered by this Court, including in respect of the Carve Out and the Permitted Prior Liens, in the event that any person or entity receives any payment on account of a security interest in the DIP Collateral or receives any DIP Collateral or any proceeds of DIP Collateral prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Documents, and termination of the DIP Facility in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust and shall immediately turn over such proceeds to the DIP Lender, for application in accordance with the DIP Orders or the applicable DIP Documents.

20. **Maintenance of DIP Collateral**.  Until the payment in full of the DIP Obligations, the Debtors shall: (a) insure the DIP Collateral as required under the DIP Documents and applicable law; and (b) maintain the cash-management system consistent with the terms and conditions of any order(s) governing the Debtors' cash-management systems and the DIP Documents.

21. **Right to Credit Bid**.  Subject to the requirements of section 363(k) of the Bankruptcy Code, the DIP Lender may credit bid all or any portion of its claims, including the DIP Obligations and the DIP Superpriority Claim, in connection with any proposed sale of any, all, or substantially all of the Debtors' assets, whether occurring pursuant to section 363 of the Bankruptcy Code or included as part of a reorganization plan under section 1123 of the Bankruptcy Code, including a plan subject to confirmation under section 1129(b)(2)(A)(ii) of the Bankruptcy Code, or a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the

25

Bankruptcy Code. In connection with any such credit bid by the DIP Lender, the Debtors shall, upon reasonable advance notice by the DIP Lender, provide for the assignment of such DIP Lender's right to purchase the acquired assets to one or more of the applicable DIP Lender's sub-agents or a newly formed acquisition vehicle.

22.   **DIP Termination Event; Exercise of Remedies**.

a.   **DIP Termination Event**. For purposes of this Final Order, the term "DIP Termination Event" shall mean: (i) the occurrence of the Maturity Date, (ii) the occurrence of any material uncured breach or Event of Default under the DIP Orders or the other DIP Documents, or (iii) the acceleration of the DIP Obligations or termination of the DIP Commitment in accordance with the terms of the DIP Credit Agreement or the other DIP Documents.

b.   **Exercise of Remedies**. Upon the occurrence of a DIP Termination Event, without further notice to, hearing of, application to, or order from this Court, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to take any of the following actions, at the same or different time: (i) deliver a written notice (which may be via email) to counsel for the Debtors, the Bankruptcy Administrator, counsel for the Prepetition Secured Parties, and counsel for the Creditors' Committee (the "Remedies Notice") declaring the occurrence of a DIP Termination Event (such date, the "DIP Termination Declaration Date") and deliver a Carve Out Trigger Notice; (ii) declare the termination, reduction or restriction of any commitments under the DIP Facility (including the DIP Commitment) to the extent any such commitment remains; (iii) declare all DIP Obligations to be immediately

26

due and payable, without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Debtors; (iv) declare the termination, restriction or reduction of the DIP Facility and the DIP Documents as to any further liability or obligation thereunder, but without affecting the DIP Liens, the DIP Superpriority Claims, or the DIP Obligations; (v) charge default interest at the default rate set forth in the DIP Credit Agreement; and (vi) declare the termination, restriction, or revocation of the ability of the Debtors to use Cash Collateral.

c. **Waiting Period Procedures**. The Debtors may seek an emergency hearing solely during the period beginning on the DIP Termination Declaration Date and prior to the expiration of the five (5) days following the DIP Termination Declaration Date (such period, the "Waiting Period"). If, notwithstanding the foregoing, a hearing cannot be scheduled prior to the expiration of the Waiting Period, the Waiting Period shall be deemed automatically extended until such time as the matter can be heard by the Court. At any hearing regarding a Remedies Notice, the Court may only consider whether an Event of Default has occurred or is continuing. During the Waiting Period, the Debtors shall continue to have the right to use DIP Collateral (including Cash Collateral) in accordance with the terms of this Final Order, the other DIP Documents, and the Approved Budget, solely to pay any expenses which are necessary to (i) preserve the Debtors' going-concern value or (ii) contest, in good faith, the occurrence of the Event of Default (other than, for the avoidance of doubt, the occurrence of the Maturity Date under the DIP Credit Agreement); provided, however, that the payment of professional fees and expenses of the

27

Professional Persons (as defined below) shall be governed by paragraph 24 and subject to the Approved Budget.

    d. **Rights and Remedies Following Termination Date**. Following a DIP Termination Declaration Date and unless this Court has entered an order prior to the expiration of the Waiting Period finding that an Event of Default has not occurred or is not continuing, the DIP Lender shall be entitled to exercise all rights and remedies in accordance with this Final Order, the other DIP Documents, and applicable law, and the automatic stay of section 362 of the Bankruptcy Code shall automatically, without further order of this Court, be lifted, to allow the DIP Lender to pursue all rights and remedies in accordance with this Final Order, the other DIP Documents, and applicable law.

    23. **No Waiver by Failure to Seek Relief**. The rights and remedies of the DIP Lender specified herein are cumulative and not exclusive of any rights or remedies that the DIP Lender may have under this Final Order, the other DIP Documents, applicable law, or otherwise. The failure or delay on the part of the DIP Lender to seek relief or otherwise exercise its rights and remedies under the DIP Orders, the other DIP Documents, or applicable law shall not constitute a waiver of any of its respective rights. Except as expressly set forth herein, none of the rights or remedies of the DIP Lender under the DIP Orders or the other DIP Documents shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the DIP Lender. No consents required hereunder by the DIP Lender shall be implied, including by any inaction or acquiescence by the DIP Lender.

28

24. **Carve Out**.

    a. **Priority of Carve Out**. The DIP Liens and the DIP Superpriority Claims shall be subject and subordinate to payment of the Carve Out. The Carve Out shall be senior to all claims and liens over all assets of the Debtors, including any DIP Collateral, as set forth in the DIP Orders.

    b. **Carve Out**. The term "Carve Out" shall mean the sum of (i) all fees required to be paid to the Clerk of the Court and to the Bankruptcy Administrator under 28 U.S.C. § 1930(a), together with any interest thereon pursuant to 31 U.S.C. § 3717 ("Statutory Fees"), which shall not be subject to the Approved Budget; (ii) Court-allowed fees and expenses of a trustee appointed under section 726(b) of the Bankruptcy Code in an amount not to exceed $25,000, (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") or persons or firms retained by the Creditors' Committee pursuant to sections 328 or 1103 of the Bankruptcy Code in these Chapter 11 Cases (if any) (together with the Debtor Professionals, the "Professional Persons"), at any time before or on the first calendar day following delivery by the DIP Lender of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice (the "Pre-Trigger Date Fees"), subject to the Approved Budget and any limits by the DIP Orders, in an aggregate amount not to exceed $50,000; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $50,000 incurred after

Case 25-02821-TOM11    Doc 198    Filed 12/18/25    Entered 12/18/25 09:34:52    Desc
Main Document      Page 29 of 73

the first calendar day following delivery by the DIP Lender of the Carve Out Trigger Notice (the "Trigger Date"), to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap" or the "Carve Out Cap"); provided, however, that for the purposes of the foregoing, any plan success fee, financing fee, transaction fee, or other similar contingency fee shall not be included in the Post Carve Out Trigger Notice Cap and shall be paid, to the extent allowed, pursuant to any confirmed plan in these Chapter 11 Cases; provided, further, that nothing herein shall be construed to impair the ability of the DIP Lender to object to the fees, expenses, reimbursement or compensation described in clauses (iii) or (iv) above, on any grounds. In the event that Allowed Professional Fees exceed or are expected to exceed the amounts provided in the Approved Budget, the parties will negotiate in good faith (but without further obligation) regarding a proposed amendment to the Approved Budget to address such additional Allowed Professional Fees, and nothing herein shall prohibit any Professional Persons from seeking allowance and payment of fees if and when the Debtors have satisfied their obligations under the DIP Loan. For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender or its counsel to the Debtors, their lead restructuring counsel, the Bankruptcy Administrator, counsel to the Prepetition Secured Parties, and counsel to the Creditors' Committee, which notice may be delivered only following the occurrence and during the continuation of an Event of Default and acceleration of

30

the DIP Loans under and as such terms are defined in the DIP Credit Agreement, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

c.  **Payment of Allowed Professional Fees Prior to the Trigger Date**.  Any payment or reimbursement made prior to the occurrence of the Trigger Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

d.  **No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees**.  The DIP Lender shall not be obligated, liable, or in any way responsible for the direct payment or reimbursement of any fees or disbursements of any of the Professional Persons incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in the DIP Orders or otherwise shall be construed to obligate the DIP Lender in any way to pay compensation to, or to reimburse expenses of, any of the Professional Persons, or to guarantee that the Debtors or their estates has sufficient funds to pay such compensation or reimbursement.  Nothing herein shall be construed as consent to the allowance of any fees and/or expenses of Professional Persons of any of the Debtors, the Creditors' Committee, any other official or unofficial committee in these Chapter 11 Cases or any Successor Cases, or of any other person or entity, or shall affect the right of the DIP Lender to object to the allowance and payment of any such fees and expenses.  Until the DIP Lender is paid in full, the DIP Lender shall have a reversionary interest in the funds held in any fee reserve or Carve Out account, if any, after all Allowed Professional Fees have been paid in full pursuant to a final order of the Court.

31

25. **Approval of DIP Fees**. In consideration for the DIP Facility, the DIP Lender shall be paid all fees, expenses and other amounts payable under the DIP Documents as such become due, including the Commitment Fee (which was deemed fully earned and allowed on a final basis upon entry of the Interim Order and was paid in kind by adding the amount of the fee to the DIP Obligations and the DIP Obligations was increased by the amount of the fee), the Exit Fee, and the reasonable and documented fees and expenses of the DIP Lender in connection with the DIP Facility (all such fees, together, the "DIP Fees"). The DIP Fees were approved, on a final basis, upon entry of the Interim Order and were deemed to be allowed, fully earned, non-refundable, and payable in accordance with the terms of the DIP Term Sheet without the need for any further order of this Court. The DIP Fees and the approval thereof in the Interim Order is hereby ratified and adopted in full and such amounts shall continue to be deemed allowed, fully earned, and non-refundable; provided that, upon entry of this Final Order, the DIP Fees shall be payable in accordance with the terms of the DIP Credit Agreement and any other applicable DIP Documents. The DIP Fees shall be part of the DIP Obligations.

26. **DIP Lender's Professionals' Fees**. Professionals for the DIP Lender (Kilpatrick Townsend & Stockton LLP, any local counsel, and Resurgence Financial Services, LLC, collectively, the "DIP Lender's Professionals"), shall provide summary copies of any invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege, the attorney work product doctrine or any other evidentiary privilege or protection recognized under applicable law) with: (i) a summary of the work performed during the relevant compensation period; (ii) the name of,

32

hourly rate (if applicable) of, and number of hours worked by each professional and paraprofessional who worked on the matter during the relevant compensation period; and (iii) the total fee amount being requested by electronic mail to the Bankruptcy Administrator and counsel to the Creditors' Committee contemporaneously with the delivery of such fee and expense statements to the Debtors. The Debtors shall promptly pay in full all such invoiced fees and expenses at the conclusion of the Review Period (as defined below) other than the Disputed Invoiced Fees (as defined below). Any objections raised by the Debtors, the Bankruptcy Administrator or the Creditors' Committee with respect to such invoices (the "Disputed Invoiced Fees") must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within 10 days of the receipt of such invoice (the "Review Period") (to be followed by the filing with this Court, if necessary, of a motion or other pleading, with at least 10 days' prior written notice by the submitting party of any hearing on such motion or other pleading). Notwithstanding the foregoing, on or about the Closing Date, the Debtors shall pay the fees and expenses of the DIP Lender's Professionals incurred prior to such date (whether incurred prior to the Petition Date or after), without the need to first deliver a copy of its invoice as provided for herein. No DIP Lender's Professionals shall be required to file an application seeking compensation for services or reimbursement of expenses with this Court.

27. **Indemnification**. The DIP Lender (and its affiliates and respective officers, directors, employees, advisors, and agents, solely in such capacity) (each such person, an "Indemnitee") will have no liability for, and will be indemnified and held harmless by the Debtors and their estates against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction

33

to arise from the gross negligence, bad faith or willful misconduct of the relevant indemnified person (or any of its affiliates or any of its or its respective officers, directors, employees, advisors or agents). Such indemnity shall not be available (a) to the extent arising from a material breach of any obligation of such Indemnitee under the DIP Documents or (b) to the extent arising out of any loss, claim, damage, liability or expense that does not involve an act or omission of the Debtors and that is brought by an Indemnitee against another Indemnitee.

28. **Proofs of Claim**. The DIP Lender shall not be required to file a proof of claim in the Chapter 11 Cases or Successor Case, the Interim Order was deemed to constitute a timely filed proof of claim, and the entry of this Final Order shall be deemed to constitute a timely and valid amendment of such proof of claim. Any order entered by this Court in relation to the establishment of a bar date for any claim (including administrative claims) in the Chapter 11 Cases or Successor Case shall not apply to the DIP Lender. Notwithstanding the foregoing, the DIP Lender may, in its sole discretion, file (and amend or supplement) one or more proofs of claim or aggregate proofs of claim in the Chapter 11 Cases for any claim allowed herein.

29. **Limitations on Use of DIP Proceeds, Cash Collateral, the Carve Out and Other Funds**. Except as otherwise permitted in the DIP Documents (including the DIP Orders) and the Approved Budget, the DIP Facility, the DIP Collateral, the Cash Collateral, and the Carve Out may not be used, directly or indirectly, by any of the Debtors, the Creditors' Committee, any other official or unofficial committee, or any trustee or other estate representative appointed in the Chapter 11 Cases (or any Successor Case) or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith) in connection with (a) preventing, hindering, or delaying any of the DIP Lender's enforcement or realization upon any of the DIP Collateral; (b) using or seeking to use Cash Collateral without the permission of the DIP

34

Lender or selling or otherwise disposing of DIP Collateral without the prior written consent of the DIP Lender or as permitted by the DIP Documents; (c) using or seeking to use any insurance proceeds constituting DIP Collateral without the prior written consent of the DIP Lender; (d) seeking to amend or modify any of the rights granted to the DIP Lender under the DIP Orders or the other DIP Documents, including seeking to use Cash Collateral or DIP Collateral on a contested basis; (e) litigating, objecting to, challenging or contesting in any manner in any way the DIP Liens, DIP Obligations, DIP Superpriority Claims, DIP Collateral (including Cash Collateral) or any other claims held by or on behalf of the DIP Lender; (f) litigating, objecting to, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, or any other liens or interests of the DIP Lender; (g) seeking to subordinate, recharacterize, disallow or avoid the DIP Obligations; or (h) any other prohibited or otherwise restricted use of proceeds as set forth in the DIP Documents; provided, however, that, upon an Event of Default or DIP Termination Event, nothing herein shall limit the Debtors' right to move for an order of the Court authorizing the use of Cash Collateral absent the DIP Lender's consent.

30.    **Releases**.  In addition to the releases granted in the Interim Order, the Debtors, on their own behalf and on behalf of their estates, forever and irrevocably: (a) release, discharge, and acquit the DIP Lender and each of its respective former or current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, in each case solely in their capacity as such, from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every type, including any so-called "lender liability" or equitable subordination claims or defenses, solely with

35

respect to or relating to the negotiation of and entry into the DIP Documents; and (b) waive, discharge and release any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and avoidability of the DIP Liens and the DIP Obligations.

31.     **Waivers**.

a.     **Limitation on Charging on Expenses**.  No costs or expenses of administration of the Chapter 11 Cases or any Successor Case shall be charged against or recovered from or against the DIP Lender with respect to the DIP Collateral pursuant to section 105 or section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Lender.

b.     **No Marshaling**.  In no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the DIP Obligations and all proceeds shall be received and applied in accordance with this Final Order and the other DIP Documents.

32.     **No Lender Liability**.  In determining to make any loan or accommodation of any kind (whether under the DIP Documents or otherwise) or to permit the use of Cash Collateral, the DIP Lender shall not owe any fiduciary duty to the Debtors or their respective creditors, shareholders, or estate, and the DIP Lender shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors by virtue of making the DIP Loans.  Furthermore, nothing in the DIP Orders or the other DIP Documents shall impose or allow the imposition upon the DIP Lender of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their affiliates, if any (as defined in section 101(2) of the Bankruptcy Code).

36

33. **Limitation of Liability**. Nothing in the DIP Orders or the other DIP Documents, the Prepetition Credit Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of (a) any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts or (b) any fiduciary duties to the Debtors, their respective creditors, shareholders, or estates. The DIP Lender shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person and all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtors.

34. **No Third-Party Beneficiaries**. Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any Professional Person, third party, creditor, landlord, lessor, equity holder, or any direct, indirect, or incidental beneficiary.

35. **Insurance Proceeds and Policies**. The DIP Lender shall be, and shall be deemed to be, without any further action or notice, named as an additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral (notwithstanding anything to the contrary in the DIP Documents).

36. **No Waivers or Modifications of Interim Order**. The Debtors have agreed not to and shall not seek any modification or extension of the DIP Orders without the prior written consent of the DIP Lender and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Lender.

37

37. **Binding Effect of this Final Order**. Immediately upon entry of this Final Order by this Court, the terms and provisions of this Final Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Lender, the Prepetition Secured Parties, all other creditors of any of the Debtors, the Creditors' Committee, any other official or unofficial committee, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Chapter 11 Cases, any Successor Case, or upon dismissal of any of the Chapter 11 Cases or any Successor Case; <u>provided</u> that the DIP Lender shall not have any obligation to permit the use of DIP Collateral (including Cash Collateral) by or extend any financing to any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the Debtors' estates.

38. **Discharge**. Except as otherwise agreed in writing by the DIP Lender, the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full[6] in cash, on or before the effective date of such confirmed plan.

39. **Survival**. The provisions of this Final Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any chapter 11 plan in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Case; or (d) pursuant to which this Court abstains from hearing the Chapter 11 Cases or Successor Case. The terms and provisions of this Final Order, including the claims, liens, security interests and other

---

[6] As used in this and next paragraph, "Paid in Full" means, with respect to the DIP Obligations, the irrevocable and indefeasible payment in full in cash of all DIP Obligations, other than continuing indemnification and expense reimbursement obligations for which no claim or demand has been asserted, and all commitments thereunder shall have irrevocably, permanently and finally expired or shall have been terminated, cancelled and discharged.

protections granted to the DIP Lender or otherwise approved or set forth in the DIP Orders and the other DIP Documents, and the adequate protection provided to the Prepetition Secured Parties pursuant to this Final Order, shall continue in the Chapter 11 Cases, in any Successor Case, or following dismissal of any of the Chapter 11 Cases or any Successor Case, and shall maintain their priority as provided by this Final Order until, in respect of the DIP Facility, all the DIP Obligations, pursuant to the Final Order and the other DIP Documents, have been paid in full (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms).  The terms and provisions concerning the indemnification of the DIP Lender shall continue in the Chapter 11 Cases, in any Successor Case, following dismissal of any of the Chapter 11 Cases or any Successor Case, following termination of the DIP Facility or the indefeasible repayment of the DIP Obligations.

40.     **Necessary Actions**.  The Debtors are authorized and directed to take such actions as are reasonable or appropriate to implement the terms of this Final Order and the other DIP Documents.

41.     **Enforceability**.  This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon entry thereof.   Notwithstanding Bankruptcy Rules 4001(a)(4), 6004(h), or 7062, any applicable Local Rules, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

42.     **Final Order Controls**.  In the event of any conflict or inconsistency between or among the terms or provisions of the Interim Order, this Final Order, and the other DIP Documents, the terms and provisions of this Final Order shall govern and control to the extent of such conflict

39

or inconsistency. Any reference to "DIP Documents" herein shall be construed to mean, as the case may be, such DIP Documents as modified by this Final Order.

43. **Headings**. All paragraph headings used in this Final Order are for ease of reference only and shall not affect the construction or interpretation hereof.

44. **Retention of Jurisdiction**. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of the DIP Documents or this Final Order.

45. The requirements set forth in Bankruptcy Rule 6003(b) are satisfied. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion under the circumstances, and the requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules are satisfied by such notice.

46. Notwithstanding the applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Final Order shall be immediately effective and enforceable upon its entry.

47. All time periods set forth in this Final Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

 Dated: December 18, 2025

/s/ Tamara O. Mitchell
United States Bankruptcy Judge

Order prepared by:

Stuart H Memory, Esq.
smemory@memorylegal.com
Counsel for the Debtors


Reviewed and Approved By:

Paul Rosenblatt
prosenblatt@ktslaw.com
Counsel for Jackson Investment Group, LLC

40

Scott Allums
scott_allums@alnba.uscourts.gov
Counsel for the Bankruptcy Administrator

Ellis Brazeal
ebrazeal@joneswalker.com
Counsel for Cadence Bank

Richard O'Neal
usaaln.bankruptcy@usdoj.gov
Counsel for the Internal Revenue Service

Bill Bensinger
bdbensinger@csattorneys.com
Counsel for the Unsecured Creditor Committee

Matthew Cahill
mcahill@bakerdonelson.com
Counsel for Leaf Financial

**Exhibit 1 – DIP Credit Agreement**

**Exhibit 2 – Approved Budget**

October 22, 2025

**Independent MedEquip LLC and its debtor affiliates**
**$2,000,000**
**Debtor-in-Possession Term Loan Facility**
**Terms and Conditions**

**This term sheet (together with the exhibits and schedules hereto, the "Term Sheet") sets forth the terms and conditions with respect to the DIP Facility (as defined below) from and after, and subject to, the entry of the Interim Order (as defined below). This Term Sheet shall be a binding agreement from and after, and subject to, the entry of the Interim Order with respect to the DIP Loans (as defined below). The obligation of the DIP Lender (as defined below) to provide financing pursuant to this Term Sheet is conditioned upon the execution and delivery of signature pages to this Term Sheet by each of the parties hereto and shall be subject to the conditions precedent and other terms and conditions set forth herein. In the event of any conflict between this Term Sheet and the terms of the Interim Order or the Final Order (as defined below), the terms of the Interim Order or the Final Order, as applicable, shall govern.**

| 1. | *Borrowers* | • Independent MedEquip LLC, a Delaware limited liability company, *et al.*[1] (the "**Borrower**" and together with all of the Borrower's existing and future, direct or indirect domestic or foreign subsidiaries and affiliates that are or become debtors and debtors-in-possession in the Chapter 11 Cases, the "**Borrowers**", each a "**Loan Party**" and collectively, the "**Loan Parties**"). The Loan Parties are debtors and debtors-in-possession in the chapter 11 cases filed under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") jointly administered under Case No. 25-02821 as *In re Independent MedEquip, LLC, et al.* (such cases, the "**Chapter 11 Cases**", and the Borrower and its applicable subsidiaries and affiliates shall be referred to herein under the Chapter 11 Cases, each as a "**Debtor**" and collectively, as the "**Debtors**") filed on September 18, 2025 (the "**Petition Date**") and pending in the United States Bankruptcy Court for the Northern District of Alabama (the "**Bankruptcy Court**"). |
|---|---|---|
| 2. | *DIP Lender* | • Jackson Investment Group, LLC and/or its designees or its assignees. |
| 3. | *Type and Amount of the DIP Facility* | • In the event that authorization for the DIP Facility is entered only on a final basis and not on an interim basis, whether due to interim relief not being sought or otherwise, all references in this Term Sheet to the Interim Order shall automatically apply with equal effect to the Final Order (as defined below), including all conditions precedent to the Initial Draw, and all references to the Interim Order shall be read as references to the Final Order, except the phrase "the Interim Order or the Final Order, as applicable" shall be read as "the Final Order" only. |
| | | • A non-amortizing priming, super-priority senior secured term loan facility in an aggregate principal amount not to exceed $2,000,000 in term loan commitments (the "**DIP Facility**"; the DIP Lender's commitments under the DIP Facility, the "**DIP Commitments**"; and the loans under the DIP Facility, the "**DIP Loans**"). |

---

[1] Additional borrowers are listed on **Schedule 1**.

| | | |
|---|---|---|
| | | • The borrowing of DIP Loans shall permanently decrease the DIP Commitments, and DIP Loans repaid may not be reborrowed. |
| | | • Initial net proceeds of the DIP Loans shall be funded in accordance with Budget. |
| | | • Subsequent DIP Loan proceeds to be funded into the Borrowers' DIP Bank Account maintained at United Community Bank and, if the DIP Lender requests, the Loan Parties shall obtain a satisfactory control agreement in favor of the DIP Lender to be entered into within 15 business days of the entry of the Final Order subject to a 15-day cure period if the Loan Parties are using commercially reasonable efforts to obtain a satisfactory control agreement. |
| | | • The "**Effective Date**" shall be the date upon which the Conditions Precedent to Initial Draw are satisfied. |
| 4. | *Initial Availability* | • Upon the Bankruptcy Court's entry of the Interim Order, and satisfaction of all applicable conditions precedent described in Section 15 herein, the DIP Lender shall make available an aggregate amount of $500,000 of the DIP Loans and the Borrowers shall be entitled to make draws of the DIP Loans as described in Section 6 below immediately upon entry of the Interim Order (the "**Initial Draws**", the date of such first Initial Draw shall be referred to herein as the "**Closing Date**"). |
| 5. | *Full Availability* | • Upon (i) the Bankruptcy Court's entry of the Final Order (as defined below) and (ii) the satisfaction of all applicable conditions described in Sections 15 and 16 herein (or, as the case may be, the other applicable DIP Documents), the full amount of the DIP Facility shall be available to the Debtors, subject to compliance with the terms, conditions, and covenants described in the DIP Documents, in additional draws in accordance with Section 6 below (each an "**Other Draw**" and collectively, the "**Other Draws**", and together with the Initial Draws, and each Other Draw, each a "**Draw**" and collectively, the "**Draws**"). |
| 6. | *Draws* | • Subject to satisfaction of the conditions precedent to the Initial Draws or Other Draws, as applicable, and availability under the DIP Commitments, the Borrowers shall be entitled to make Draws of the DIP Loans in accordance with the Budget (as defined below). |
| | | • Each Draw shall be made (in an aggregate minimum amount of $100,000 (and multiples thereof) upon two (2) business days' written notice, up to the aggregate amount of the undrawn DIP Commitments at any time prior to two (2) business days before the DIP Termination Date (as defined below). |
| 7. | *Maturity and Termination* | • All DIP Obligations (as defined below) shall be due and payable in full in cash ("**Payment in Full**"[2] or such other form of consideration as the DIP Lender and the Borrowers may mutually agree) on the earliest of: |

---

[2] For purposes hereof, the term "Payment in Full" means, with respect to the DIP Obligations, the irrevocable and indefeasible payment in full in cash of all DIP Obligations, other than continuing indemnification and expense

2

| | | | |
|---|---|---|---|
| | | i. | October 15, 2026 (the "**Maturity Date**"); |
| | | ii. | the effective date of any chapter 11 plan with respect to the Borrowers (a "**Plan**"); |
| | | iii. | the consummation of any sale or other disposition of all or substantially all of the assets of the Borrowers pursuant to section 363 of the Bankruptcy Code, or the sale of the Borrowers' hospice business; |
| | | iv. | the date of the acceleration of the DIP Loans and the termination of the DIP Commitments following the occurrence and during the continuation of an Event of Default in accordance with the DIP Documents; |
| | | v. | dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code; and |
| | | vi. | November 15, 2025 (or such later date as agreed to by the DIP Lender) or as dictated by the availability of the Bankruptcy Court, unless the Final Order has been entered by the Bankruptcy Court on or prior to such date (such earliest date, the "**DIP Termination Date**"). |

- The occurrence of the DIP Termination Date shall terminate the ability of the Borrowers to borrow the Draws and shall terminate any further obligation the DIP Lender has to make any DIP Loans under the DIP Documents.

- For the avoidance of doubt, any of the above conditions from (i) through (vi) automatically triggers the Maturity Date.

| 8. | *Interest Rate* | • The DIP Loans shall bear interest on the outstanding obligations at a per annum rate equal to 16% (the "**Non-Default Interest**").<br><br>• Notwithstanding the foregoing, after the occurrence and during the continuance of an Event of Default (as defined below), the DIP Loans shall bear interest at the per annum rate of 20%. |
|---|---|---|
| 9. | *Commitment Fee, Exit Fee and Other Fees* | • All fees and expenses due or to be paid under the DIP Loan, including but not limited to the legal fees and expenses of the DIP Lender, shall be paid in cash when due.<br><br>• The Borrowers shall pay to the DIP Lender a commitment fee equal to 4.0% of the total amount of the DIP Commitments (the "**Commitment Fee**"). The Commitment Fee shall be fully earned, non-refundable, and allowed upon entry of the Interim Order, and shall be payable out of the proceeds of the Initial Draw. |

---

reimbursement obligations for which no claim or demand has been asserted, and all commitments thereunder shall have irrevocably, permanently and finally expired or shall have been terminated, cancelled and discharged.

3

|   |   | • The Borrowers shall pay to the DIP Lender an exit fee equal to the sum of 2.0% of (i) upon entry of the Interim Order and before entry of the Final Order, the total amount of DIP Loans then outstanding, and (ii) upon entry of the Final Order, the total amount of the DIP Commitments, which, in each case, shall be fully earned, non-refundable, and allowed upon the Bankruptcy Court's entry of the Interim Order (the "**Exit Fee**"). The Exit Fee shall be due and payable upon the earliest of (x) the DIP Termination Date, (y) Payment in Full of the DIP Obligations, and (z) on a *pro rata* basis for any Voluntary Prepayment of the DIP Obligations; provided, however, that, if the DIP Termination Date has occurred solely as a result of the occurrence and continuation of an Event of Default under the DIP Documents, then the Exit Fee shall not be payable until the DIP Obligations have been accelerated by the DIP Lender. |
|   |   | • The Commitment Fee and the Exit Fee shall be approved on a final basis by the Bankruptcy Court as part of the Interim Order. If such fees are not approved on a final basis by the Bankruptcy Court, this Term Sheet shall automatically terminate and be of no further force and effect. |
| 10. | ***Use of Proceeds*** | • The proceeds of the DIP Facility shall be used only for the following purposes and, excluding payments pursuant to clauses (ii), (iii), and (iv) below, subject to the Budget:<br><br>    i.   working capital and other general corporate purposes of the Debtor Borrowers;<br><br>    ii.   professional fees and expenses of administering the Chapter 11 Cases (including fees incurred prior to the Closing Date) in accordance with the Bankruptcy Code and any orders of the Bankruptcy Court, as applicable;<br><br>    iii.   fees and expenses payable under the DIP Facility, including, without limitation, the Commitment Fee, the Exit Fee, and legal and financial advisor fees and expenses of the DIP Lender (including fees and expenses incurred by the DIP Lender prior to the Closing Date and related to the DIP Loan, and after the Closing Date and related to the DIP Loan or the Bankruptcy Case); and<br><br>    iv.   interest and other amounts payable under the DIP Facility.<br><br>• Notwithstanding any other provision of this Term Sheet, from and after the Closing Date, no DIP Loans or DIP Collateral (as defined below), or any portion of the Carve-Out, may be used directly or indirectly by any Debtor, any official committee appointed in the Chapter 11 Cases, or any trustee or examiner appointed in the Chapter 11 Cases or any successor cases, including any chapter 7 cases, or any other person, party or entity:<br><br>    i.   in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation: |

4

| | | | a. | against the DIP Lender, or its respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens (as defined below), or DIP Claims (as defined below); or |
| --- | --- | --- | --- | --- |
| | | | b. | challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the DIP Obligations and/or the liens, claims, rights, or security interests granted under the Orders (as defined below), the DIP Documents, including, in each case, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; |
| | | ii. | | to prevent, hinder, or otherwise delay the DIP Lender's enforcement or realization on the DIP Obligations, DIP Collateral, and the liens, claims, and rights granted to such parties under the Interim Order or the Final Order, as applicable, each in accordance with the DIP Documents and the Interim Order or the Final Order, as applicable; provided, however, that this shall not apply to (x) objections to the Final Order and (y) any challenge to whether a DIP Termination Event has occurred and/or the propriety of the DIP Lender's termination of the DIP Commitments and/or acceleration of the DIP Obligations or calculation of the amounts owed thereunder; |
| | | iii. | | to seek to modify any of the rights and remedies granted to the DIP Lender under the Orders (other than with the consents contemplated thereunder), or the DIP Documents, as applicable; or |
| | | iv. | | to apply to the Bankruptcy Court for authority to approve superpriority claims or grant liens (other than the Carve-Out and liens permitted pursuant to the DIP Documents) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Claims, unless permitted under the DIP Documents or unless all DIP Obligations and claims granted to the DIP Lender under the Interim Order or the Final Order, as applicable, have been refinanced or Paid in Full in cash or otherwise agreed to in writing by the DIP Lender. |
| 10a. | *Letters of Credit* | • | | Borrowers may use the proceeds of the DIP Facility, in an amount not to exceed $100,000, to provide cash collateral for the issuance of one or more letters of credit ("**Letter of Credit**"), subject to the terms and |

5

| | | conditions set forth in the DIP Documents and the Orders. The cash collateral shall be deposited in a segregated account designated for such purpose ("**Collateral Account**"), and shall be used solely to secure the Borrowers' reimbursement and payment obligations in connection with such Letter of Credit. |
|---|---|---|
| | | • Borrowers shall not withdraw or otherwise transfer funds from the Collateral Account except as permitted by the DIP Lender and in accordance with the DIP Documents and the Orders. |
| | | • The Collateral Account shall be maintained with a financial institution acceptable to the DIP Lender. |
| | | • If DIP Lender requests, the Collateral Account shall be subject to a control agreement in favor of the DIP Lender, in form and substance satisfactory to the DIP Lender. |
| | | • Prior to the use of any DIP Facility proceeds for cash collateralizing a Letter of Credit, the Borrowers shall deliver to the DIP Lender: |
| | |     i.   A copy of the proposed Letter of Credit and all related agreements. |
| | |     ii.   Evidence that the Collateral Account has been established and, if required, is subject to the required control agreement. |
| | |     iii.   Any other documentation reasonably requested by the DIP Lender to confirm the proper use of proceeds and the enforceability of the cash collateral arrangement. |
| | | • Upon satisfaction of all obligations under the Letter of Credit, and provided no Event of Default has occurred and is continuing, any remaining cash collateral shall be released to the Borrowers, subject to the terms of the DIP Documents, the Orders, and any control agreement. |
| 11. | ***Voluntary Prepayments*** | • Voluntary prepayments of the DIP Loans shall be permitted at any time, subject to (i) payment of the ratable portion of the Exit Fee due thereon, which shall be due and payable on the date of such voluntary prepayment; (ii) accrued interest on the amount prepaid; and (iii) in minimum amounts of at least $100,000 of principal. |
| 12. | ***Security*** | • As security for the DIP Obligations, subject to the Carve-Out and the Permitted Prior Liens, each Loan Party shall grant to the DIP Lender a priming first lien security interest ("**Priming First Lien**") on all of such Loan Party's right, title and interest in, to and under all the Loan Parties' assets, including, but not limited to the following, in each case, whether now owned or existing or hereafter acquired, created or arising and wherever located: all assets and property of such Loan Party and its estate, real (both leasehold and fee) or personal, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including, without limitation, all contracts, contract rights, licenses, general intangibles, instruments, equipment, accounts, documents, goods, inventory, fixtures, documents, cash, cash equivalents, accounts receivables (including healthcare insurance receivables), chattel paper, |

| | | letters of credit and letter of credit rights, investment property (including, without limitation, all equity interests owned by any Loan Party in its current and future subsidiaries), commercial tort claims, arbitration awards, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, fixtures, all interests in leaseholds and real properties, all patents, copyrights, trademarks, all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), all governmental and private grants, all claims, rights, interests, proceeds, products, accessions, additions, improvements, substitutions, rents and profits, and books and records, of or in respect of any of the foregoing (as such terms are defined in the Uniform Commercial Code as in effect from time to time in the State of Georgia) and (i) effective upon entry of the Interim Order, all causes of actions under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral and any proceeds thereof and (ii) effective upon entry of the Final Order, all avoidance actions, including any claims and causes of actions arising under sections 544, 545, 547, 548, and 550 of the Bankruptcy Code and similar such claims and causes of action under applicable non-bankruptcy law, and the proceeds thereof (collectively, the "**DIP Collateral**" or "**Collateral**").
|---|---|---|
| | | • Negative pledge on all assets of the Loan Parties subject to permitted liens to be agreed upon by the Final Order. |
| | | • In addition to appropriate orders of the Bankruptcy Court granting and perfecting such liens, the Loan Parties shall take all other commercially reasonable steps (including the execution and filing of UCC financing statements, intellectual property security agreements, deposit account control agreements and leasehold mortgages) reasonably requested by DIP Lender. |
| 13. | *Priority and Security* | • Subject to the Carve-Out and Permitted Prior Liens, all obligations of the Loan Parties under the DIP Documents, including, without limitation, all principal, accrued interest, costs, fees and premiums provided for therein, and all obligations of the Loan Parties under the DIP Facility (the "**DIP Obligations**") shall be entitled to (a) senior secured priming lien and (b) superpriority claim status pursuant to section 364(c)(1) and section 364(d)(1) of the Bankruptcy Code, with priority over any and all secured liens, administrative expense claims and unsecured claims, of any kind or nature whatsoever, now existing or hereafter arising under the Bankruptcy Code (the "**DIP Claims**"). |
| | | • Subject to the Carve-Out and the Permitted Prior Liens (as defined in **Schedule 2**), all DIP Obligations in respect of the DIP Facility shall be: |
| | | i. pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority claim status in the Chapter 11 Cases (which claims shall be payable from and have recourse to all DIP Collateral); and |

7

| | | |
|---|---|---|
| | | ii. secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic first-priority lien on the DIP Collateral; and |
| | | iii. senior secured priming first liens on the DIP Collateral, pursuant to section 364(d)(1) of the Bankruptcy Code. |
| | | • The liens securing the DIP Facility (the "**DIP Liens**") shall mean the liens described above and in the priority set forth in the Interim Order and Final Order, as applicable. The DIP Liens described herein shall, to the fullest extent permitted by applicable law, be effected and perfected upon entry of the Interim Order and without the necessity of the execution or filing of mortgages, landlord agreements, security agreements, pledge agreements, control agreements, financing statements, leasehold mortgages or other agreements. |
| 14. | *Remedies* | • Upon the occurrence and during the continuation of an Event of Default under the DIP Documents, all remedies customarily available in the Chapter 11 Cases including, without limitation, those remedies customarily available to a senior secured, administrative expense claim of a debtor-in-possession lender, including, without limitation: |
| | | i. declare that the DIP Commitments are terminated, reduced or restricted, whereupon the DIP Commitments shall be terminated, reduced, or restricted on account of any further Draws; |
| | | ii. declare the unpaid amount of the DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties; |
| | | iii. charge interest at the default rate under the DIP Documents; |
| | | iv. declare the termination, restriction, or revocation of the ability of the Debtors to use Cash Collateral (as defined in the Orders); |
| | | v. obtain and liquidate the DIP Collateral; or |
| | | vi. take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the DIP Lender) permitted under the DIP Documents or by applicable law. |
| | | Any exercise of remedies by the DIP Lender shall be subject in all respects to the terms of the Orders. |
| 15 | *Conditions Precedent to Initial Draw* | • Subject to the availability of the Bankruptcy Court, entry of the Interim Order no later than September 30, 2025, which order shall not be stayed or subject to appeal; |

8

| | | |
|---|---|---|
| | | • Delivery of the Initial Budget acceptable to the DIP Lender in its reasonable discretion; |
| | | • All out-of-pocket costs, fees and expenses required to be paid to the DIP Lender pursuant to this Term Sheet, the DIP Documents, or the Interim Order shall be paid (provided that the Commitment Fee and the DIP Lender's legal fees and expenses shall be paid out of or offset against the proceeds of the Initial Draw); |
| | | • The representations and warranties of the Loan Parties under the DIP Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects); |
| | | • No Material Adverse Effect (as defined below) shall have occurred and be continuing; |
| | | • The Debtors shall be in compliance in all respects with the Interim Order; |
| | | • No Event of Default shall have occurred and be continuing under this Term Sheet; |
| | | • No order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner adverse to the DIP Lender the Interim Order; and |
| | | • The entry of the Interim Order shall constitute the borrowing notice for the Initial Draw. |
| 16. | *Conditions Precedent to Availability of Other Draws; Milestones* | • The Bankruptcy Court shall have entered a Final Order approving the DIP Facility not later than November 15, 2025, which Final Order shall be in the form of the Interim Order with such changes as are customary for a final order or otherwise are acceptable to the DIP Lender. |
| | | • Lender shall not be required to fund any DIP Loans or fund any amounts unless and until all of the conditions set forth below (in addition to any other conditions herein) shall have been satisfied or waived in writing by Lender in its sole discretion: |
| | |     i.    All Conditions Precedent to Initial Draw shall be satisfied and remain true; |
| | |     ii.    no trustee, examiner, or receiver shall have been appointed or designated with respect to the Loan Parties' business, properties or assets and no motion shall be pending seeking similar relief or any other relief, which, if granted, would result in a person other than the Loan Parties exercising control over their assets; |
| | |     iii.    the representations and warranties of the Loan Parties under the DIP Documents shall be true and correct in all material respects (or in the case of representations and warranties |

9

with a "materiality" qualifier, true and correct in all respects);

iv. the Borrowers shall have delivered to the DIP Lender a customary borrowing notice and compliance certificate in form satisfactory to the DIP Lender in its sole discretion;

v. the Debtors shall be in compliance in all respects with the Final Order and the Loan Parties shall be in compliance in all respects with the DIP Documents;

vi. no default or event of default shall have occurred and be continuing under the DIP Documents;

vii. no order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner adverse to the DIP Lender the Interim Order or the Final Order, as applicable;

viii. since the Petition Date, other than the Chapter 11 Cases, there shall not have occurred or there shall not exist any event, condition, circumstance or contingency that, individually, or in the aggregate, (a) has had or could reasonably be expected to have a material adverse effect on the business, operations, properties, assets, performance or financial condition of the Loan Parties taken as a whole, (b) has resulted in, or could reasonably be expected to result in, a material adverse effect on the validity or enforceability of, or the rights, remedies or benefits available to the DIP Lender, or (c) has had or could reasonably be expected to have, a material adverse effect on the ability of the Loan Parties to perform their obligations under any DIP Document (each of the foregoing being a "**Material Adverse Effect**");

ix. the Debtors shall have all insurance policies maintained by Loan Parties name the DIP Lender as additional insured;

x. all costs, fees, expenses (including, without limitation, legal fees and expenses) set forth in the DIP Documents or otherwise to be paid to the DIP Lender shall have been paid when due; and

xi. a granting to the DIP Lender of a Priming First Lien for all DIP Obligations pursuant to section 364(d)(1) of the Bankruptcy Code.

- The DIP Documents shall contain the following milestones (the "**Milestones**") relating to the Chapter 11 Cases, which may be extended by

10

|   |   |   | the DIP Lender in its sole discretion, failure to comply with shall constitute an Event of Default: |
|---|---|---|---|
|   |   |   | (i) November 15, 2025 – entry of the Final Order; |
|   |   |   | (ii) June 30, 2026 – closing of sale of the Borrowers' hospice business; |
|   |   |   | (iii) August 15, 2026 – approval of Disclosure Statement; |
|   |   |   | (iv) September 30, 2026– entry of the order confirming the Plan; |
|   |   |   | (v) October 15, 2026– the effective date of the Plan. |
| 17. | *Documentation* | • | The DIP Documents and all other definitive financing documentation (including the Orders) with respect to the DIP Facility shall be satisfactory to the DIP Lender in its sole discretion. For the avoidance of doubt, DIP Documents (other than this Term Sheet and the Interim Order) shall be documented prior to entry of the Final Order. |
| 18. | *Representations and Warranties* | • | *See* Schedule 18 attached hereto. |
|   |   | • | Each Loan Party represents and warrants that none of its assets and properties are subject to any liens, security interests or encumbrances as of the Petition Date except for liens set forth on Schedule 2 attached hereto and no Loan Party will grant or consent to liens, security interests or encumbrances on or after the Petition Date except to the extent expressly permitted by the DIP Documents. |
| 19. | *Affirmative Covenants* | • | *See* Schedule 19 attached hereto. |
| 20. | *Negative Covenants* | • | *See* Schedule 20 attached hereto. |
| 21. | *DIP Budget / Variance Reporting* | • | The DIP Lender shall receive an extended budget every 2 weeks commencing with the week during which the Interim Order is entered, containing line items of sufficient detail to reflect the consolidated operating cash flow of the Debtors for the period from the Petition Date through and including the end of the thirteenth (13th) calendar week thereafter (the "**Initial Budget**") (the Initial Budget, as modified from time to time in accordance herewith, shall be the "**Budget**"). |
|   |   | • | The Budget shall be updated and provided to the DIP Lender on the fourth Wednesday following the prior Budget's approval and every fourth Wednesday thereafter, or more frequently at the reasonable discretion of both the Borrowers and DIP Lender, with such updated Budget extending the term thereof and the DIP Lender, in its reasonable discretion, shall have the right to approve any such updates (or any amendments) by providing the Borrowers specific notice thereof within 5 business days after the delivery by the Borrowers of any such update or amendment ("**Updated Budget**") and, (ii) to the extent the DIP Lender provides written notice rejecting the updates (or any amendments), the then |

Case 25-02821-TOM11   Doc 198   Filed 12/18/25   Entered 12/18/25 09:34:52   Desc
Main Document   Page 52 of 73

| | | |
|---|---|---|
| | | existing Budget shall continue to constitute the applicable Budget until such time as an update or amendment is approved by the DIP Lender. In the event the DIP Lender does not provide written notice of its rejection of the proposed Updated Budget within such five business day period, such Updated Budget shall become effective as the Budget. |
| | | • On a bi-weekly basis after the delivery of the first Updated Budget, the Borrowers shall deliver to the DIP Lender a variance report for the four-week period ending the prior Friday comparing the difference/variance, expressed as a percentage (each, a "**Budget Variance**"), between actual net operating cash flow for such period to projected net operating cash flow for such period as set forth in the Budget on a cumulative 4 week rolling basis (each a "**Measuring Period**") and explaining in reasonable detail all material variances, it being understood that any Net Operating Variance (as defined below) solely with respect to net operating cash flow that exceeds 15% shall be material and shall constitute an Event of Default under the DIP Documents (each such report, a "**Variance Report**," which shall be in a form reasonably satisfactory to the DIP Lender). For the avoidance of doubt, net operating cash flow shall not include professional fees and restructuring charges (including trustee fees or other statutory fees) related to the Chapter 11 Cases. |
| | | • For purposes of each Measuring Period, the Borrowers shall calculate: the numerical difference between "net operating cash flow" (such terms reflecting those line items illustrated in the Budget) for such period to "net operating cash flow" for such period as set forth in the Budget on a cumulative 4-week rolling basis, and to the extent the difference is a positive number, the percentage such difference is of the cumulative budgeted amount for such period (the "**Net Operating Variance**"). For purposes herein, a "**Permitted Variance**" shall be limited to not greater than 15% for budget variances with respect to the Net Operating Variance, each as set forth in the applicable Variance Report. |
| 22. | *Interim Order* | • The interim order approving the DIP Facility, which shall be in form and substance acceptable to the DIP Lender and its counsel (the "**Interim Order**"), shall, among other things, authorize and approve: |
| | |     i.    the Initial Draws; |
| | |     ii.    the making of the DIP Loans; |
| | |     iii.    the granting of the superpriority claims and liens against the Debtors and their assets in accordance with this Term Sheet and the DIP Documents with respect to the DIP Collateral; |
| | |     iv.    the payment of all fees and expenses (including the fees and expenses of outside counsel and any financial advisors) required to be paid to the DIP Lender as described herein under the heading "Indemnification and Reimbursement of expenses" by the Debtors; |

Case 25-02821-TOM11   Doc 198   Filed 12/18/25   Entered 12/18/25 09:34:52   Desc
Main Document    Page 53 of 73

| | | |
|---|---|---|
| | | v.      the payment of the Commitment Fee upon the Closing Date and the payment of the Exit Fee as set forth in Section 9 of this Term Sheet, which Commitment Fee payment shall not be subject to reduction, setoff or recoupment for any reason, and shall be fully earned and allowed upon entry of the Interim Order; and<br><br>vi.      upon entry of the Final Order, the Debtors' waiver of (a) any right to surcharge the DIP Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, and (b) the equitable doctrine of marshaling and other similar doctrines, in each case, with respect to the DIP Collateral and the DIP Obligations. |
| 23. | *Final Order* | •   The final order approving the DIP Facility, which shall be substantially in the same form as the Interim Order (with such modifications as are necessary to convert the Interim Order into a final order) and otherwise in form and substance reasonably acceptable to the DIP Lender (the "**Final Order**" and together with the Interim Order, the "**Orders**"), shall, among other things, authorize and approve the DIP Facility on a final basis and the total amount of the DIP Commitments, and the payment of the Exit Fee, which Exit Fee payment shall not be subject to reduction, setoff or recoupment for any reason, and shall be fully earned and allowed upon entry of the Interim Order. |
| 24. | *Carve-Out* | •   The liens and security interests in the DIP Collateral, and the superpriority administrative claims shall be subject in all respects to the Carve-Out, which shall be defined in the Orders and shall be on customary terms. |
| 25. | *Events of Default* | •   Any one or more of the following events shall constitute an event of default upon giving any applicable notice (if required) and the expiration of the applicable cure period (if any) (each, an "**Event of Default**") under this Agreement:<br><br>i.      Non-payment, non-compliance with covenants set forth herein, judgements in excess of $50,000, and any impairment of security interest in the DIP Collateral;<br><br>ii.      the entry of the Final Order shall have not occurred, subject to the availability of the Bankruptcy Court, by November 15, 2025;<br><br>iii.      the failure of the Loan Parties to comply with any of the Milestones and the DIP Lender has not, in its sole discretion, extended such Milestone;<br><br>iv.      the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; |

13

| | | | v. | non-compliance, subject to any applicable grace and/or cure periods, by any Loan Party with the terms of the Interim Order or the Final Order; |
| --- | --- | --- | --- | --- |
| | | | vi. | the entry of an order staying, reversing, vacating or otherwise modifying the Interim Order or the Final Order, in each case without the prior written consent of the DIP Lender; |
| | | | vii. | the entry of an order appointing a trustee, responsible officer, or an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) under section 1104 of the Bankruptcy Code (other than a fee examiner) in the Chapter 11 Cases, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the DIP Lender in its sole discretion; |
| | | | viii. | the entry of an order in any of the Chapter 11 Cases granting relief from any stay or proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure against any material assets of the Loan Parties, the fair market value of which, individually or in the aggregate, exceeds $50,000; |
| | | | ix. | the entry of an order (a) surcharging any of the DIP Collateral under sections 105, 506(c), or any other section of the Bankruptcy Code, (b) allowing any administrative expense claim having priority over or ranking in parity with the DIP Claims or the rights of the DIP Lender (subject to the Carve-Out), or (c) otherwise adversely impacting the DIP Lender's liens and priority in the DIP Collateral as set forth in this Term Sheet; |
| | | | x. | any action by any Debtor to (a) challenge the rights and remedies of the DIP Lender under the DIP Facility in any of the Chapter 11 Cases or acting in a manner inconsistent with the DIP Documents or (b) avoid or require disgorgement by the DIP Lender of any amounts received in respect of the obligations under the DIP Facility; |
| | | | xi. | entry of an order without the express written consent of the DIP Lender obtaining additional financing from a party other than the DIP Lender under section 364(d) of the Bankruptcy Code except if such financing provides for the Payment in Full of the DIP Obligations; |
| | | | xii. | the making of any material payments in respect of prepetition obligations other than (a) as permitted by the |

14

| | | | Interim Order or the Final Order, (b) as permitted by any "first day" or "second day" orders reasonably satisfactory to the DIP Lender, (c) as permitted by any other order of the Bankruptcy Court reasonably satisfactory to the DIP Lender, (d) as permitted under the DIP Documents in accordance with the Budget, or (e) as otherwise agreed to by the DIP Lender; |
| | | xiii. | entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Debtor to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the DIP Lender; |
| | | xiv. | the Debtors shall seek to, or support any other person's motion to, (a) disallow in whole or in part the DIP Obligations, (b) challenge the validity and enforceability of the DIP Liens, or (c) contest any material provision of any DIP Document; |
| | | xv. | the Debtors file a Plan that is not in form and substance satisfactory to the DIP Lender in its sole discretion, it being understood that a Plan will be satisfactory to the DIP Lender if it provides for the Payment in Full of the DIP Obligations pursuant to a signed commitment acceptable to the DIP Lender to lend from a recognized lender or another source of funding sufficient to allow for the indefeasible payment in cash of the full amount of the outstanding DIP Obligations on the Plan effective date; |
| | | xvi. | the Debtors file a motion seeking to settle a controversy or claim on account of the DIP Collateral without the prior written consent of the DIP Lender; |
| | | xvii. | the Debtors file a motion for the Bankruptcy Court to approve a sale of the DIP Collateral pursuant to section 363 of the Bankruptcy Code which proposed sale is not acceptable to the DIP Lender in its sole discretion; or |
| | | xviii. | the Debtors shall fail to execute and deliver to the DIP Lender any agreement, financing statement, trademark filing, copyright filing, notices of lien or similar instruments or other documents that the DIP Lender may reasonably request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP Liens created in favor of the DIP Lender, subject to the time periods and terms set forth in this Term Sheet. |
| 26. | ***Indemnification and*** | • | The Borrowers shall indemnify the DIP Lender, and its related parties, against losses, claims, damages, liabilities or expenses incurred in respect |

Case 25-02821-TOM11    Doc 198    Filed 12/18/25    Entered 12/18/25 09:34:52    Desc
Main Document      Page 56 of 73

| | | |
|---|---|---|
| | ***Reimbursement of Expenses*** | of the financing contemplated by the DIP Documents or the use or the proposed use of proceeds thereof. |
| | | • All documented out-of-pocket accrued and unpaid fees, costs, disbursements, and expenses of the DIP Lender, including the fees and expenses of Kilpatrick Townsend & Stockton LLP as counsel to the DIP Lender, and Resurgence Financial Services, LLC, as financial advisor to the DIP Lender, incurred in connection with the DIP Facility (whether incurred prior to the bankruptcy filing or after) shall be paid by the Debtor to the DIP Lender when due. |
| 27. | ***Release*** | • The Orders shall include a customary release of the DIP Lender, with respect to any and all claims and causes of action arising from or related to the DIP Facility. |
| 28. | ***Waivers*** | • The Final Order shall include terms and conditions customary for final DIP financing orders and shall be reasonably acceptable to the DIP Lender, including, without limitation, waiver of the automatic stay, credit-bidding rights, "no marshaling" provisions and other similar doctrines, and waivers of the imposition of costs or right to surcharge the DIP Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, in each case, to the extent applicable. |
| 29. | ***Press Releases*** | • Neither party shall issue a press release that mentions the other party's name (or its representatives, affiliates or related parties' names) without first obtaining that party's written consent. |
| 30. | ***Governing Law*** | • Georgia (and to the extent applicable, the Bankruptcy Code). |

16

**IN WITNESS WHEREOF,** the parties hereto have caused this Term Sheet to be executed as of the date first set forth above.

**Independent MedEquip LLC, Cloud City Medical Inc., Central Mobility & Rehab Equipment Inc., Georgia Medical Supply of Richland Inc., Viking Medical Supply Inc., Life Medical Supply LLC, Independent Offices LLC, iMedEquip LLC, LifeAid Medical Equipment LLC, Physicians Choice Medical LLC, and Med Alliance LLC, as Borrowers**

By: *Lonnie Dorcey*
    _____
    Name: Lonnie Dorcey
    Title: President and Chief Executive Officer

**Jackson Investment Group, LLC., as DIP Lender**

By: _____
    Name: Richard L. Jackson
    Title: Chief Executive Officer

17

US2008 31985467 6

**Schedule 1 – Borrowers**

| | Borrower/Debtor | State of Organization | EIN |
|---|---|---|---|
| 1. | Independent MedEquip LLC | Delaware | 84-3106994 |
| 2. | Cloud City Medical Inc. | Colorado | 20-5856992 |
| 3. | Central Mobility & Rehab Equipment Inc. | Florida | 51-0474658 |
| 4. | Georgia Medical Supply of Richland Inc. | Georgia | 58-2187441 |
| 5. | Viking Medical Supply Inc. | Alabama | 63-1241098 |
| 6. | Life Medical Supply LLC | Texas | 51-0525096 |
| 7. | Independent Offices LLC | Alabama | 46-3649522 |
| 8. | iMedEquip LLC | Alabama | 46-1870301 |
| 9. | LifeAid Medical Equipment LLC | Tennessee | 62-1532703 |
| 10. | Physicians Choice Medical LLC | Colorado | 84-1347587 |
| 11. | Med Alliance LLC | Alabama | 11-3813716 |

Schedule Page 1

## Schedule 2 – Petition Date Liens

As of the Petition Date, the Debtors' rights and interests in their respective assets are subject to the liens evidenced, secured or perfected by the instruments listed below. The inclusion of any lien, claim, encumbrance, agreement or other instrument in this Schedule shall not be deemed an admission of the validity, perfection, or priority thereof, or the amount secured thereby. For purposes of this Schedule 2:

**Parties:**

| | |
|---|---|
| "ODK" | means ODK Capital, LLC |
| "KCG" | means Kalamata Capital Group, LLC |
| "IOU" | means IOU Central Inc. |
| "GMC" | means Global Merchant Cash Inc. d/b/a Wall Street Funding |
| "PIRS" | means PIRS Capital LLC |
| "CELTIC" | means Celtic Bank/OnDeck |
| "RCS" | means Retail Capital LLC d/b/a Credibly |
| "PFG" | means Parkside Funding Group LLC |
| "NCG" | means NewCo Capital Group VI LLC |
| "CDN" | means Cadence Bank |

## Permitted Prior Liens

Cadence Bank, NA on the real estate commonly known as 1201 3rd Avenue North, Birmingham, AL 35203, in an amount not to exceed $900,000.

Schedule Page 2

**Schedule 18 – Representations and Warranties**

In order to induce Lender to enter into this Agreement, each Borrower hereby makes the following representations and warranties to Lender. Each Borrower hereby further represents that such representations and warranties shall be true, correct, and complete, in all respects, as of the Effective Date, and shall be true, correct, and complete, in all respects, as of the date of the making of each Draw (or other extension of credit) made thereafter, as though made on and as of the date of such Draw (or other extension of credit) (except to the extent that such representations and warranties relate solely to an earlier date) and such representations and warranties shall survive the execution and delivery of this Agreement until all DIP Obligations have been indefeasibly paid in full in cash:

1.      Due Organization and Qualification. Such Borrower (a) is duly formed and existing and in good standing under the laws of the jurisdiction of its formation, (b) where the ownership of Collateral requires such qualification, is qualified to do business in any state where the failure to be so qualified would reasonably be expected to result in a Material Adverse Change,[3] and (c) subject to the Bankruptcy Court's entry of the Orders, and any limitation under the Bankruptcy Code or other debtor relief law, has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby.

2.      Due Authorization. Subject to the Bankruptcy Court's entry of the Final Order, the execution, delivery, and performance by such Borrower of the Loan Documents to which it is a party have been duly authorized by all necessary corporate or limited liability company action on the part of such Borrower and, with respect to such Borrower.

3.      Binding Obligations. Each Loan Document has been duly executed and delivered by each Borrower that is a party thereto and, subject to the entry of the Orders, as applicable, is the legally valid and binding obligation of such Borrower, enforceable against such Borrower in accordance with its respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally (regardless of whether such enforceability is considered in a proceeding at law or in equity).

4.      Title to Properties. Borrowers have good, sufficient, and legal title to (and in the case of real property marketable title to), all of Borrowers' right, interest, and title in the Collateral, subject to Permitted Liens.

5.      Jurisdiction of Formation. The name (within the meaning of Section 9-503 of the UCC), jurisdiction of organization, type of entity, direct equity owner and, to the extent required to be set forth in a financing statement under the UCC, organizational identification number (if

---

[3] "Material Adverse Change" means the occurrence of any event, condition or change in circumstance subsequent to the Petition Date which (a) would reasonably be expected to have a material adverse effect on the business, operations, properties, assets, performance, or financial condition of the Borrowers, taken as a whole, (b) has resulted in or would reasonably be expected to result in a material adverse effect on the validity or enforceability of, or the rights, remedies or benefits available to the Lender under, this Agreement or the other Loan Documents, or (c) has resulted in or would reasonably be expected to result in a material adverse effect on the ability of the Borrowers to perform their obligations under any Loan Documents.

Schedule Page 3

any) of such Borrower is as set forth on Schedule 2 (as such Schedule may be updated from time to time by notice from such Borrower to Lender).

6.     <u>Litigation</u>. Other than the Chapter 11 Cases and except as stayed by the filing of the Chapter 11 Cases, there are no actions, suits, proceedings, claims, or disputes pending or, to the actual knowledge of such Borrower, threatened in writing, at law, in equity, in arbitration, or before any governmental authority, by or against such Borrower or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby (other than objections or pleadings that may have been filed in the Chapter 11 Cases with respect to such Borrower seeking authorization to enter into the Loan Documents and incur the DIP Obligations under this Agreement), or (b) either individually or in the aggregate, would reasonably be expected to cause a Material Adverse Change if determined adversely to the interests of any Borrower.

7.     <u>Fraudulent Transfer</u>. No transfer of property is being made by such Borrower and no obligation is being incurred by such Borrower in connection with the transactions contemplated by this Agreement or the Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of such Borrower.

8.     <u>Full Disclosure</u>. The representations, warranties and other written statements made by any Borrower to Lender in connection with this Agreement and the other Loan Documents, taken as a whole, do not contain any untrue statement of a material fact, or omit to state any material fact necessary in order to make the statements contained herein or therein not materially misleading in light of the circumstances in which they were made.

9.     <u>Payment of Taxes</u>. Except as disclosed in the Borrowers' bankruptcy schedules or as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Change and subject to the terms of the Orders and any required approval by the Bankruptcy Court, all United States federal, state, and other material tax returns and reports of the Borrowers required to be filed by the Borrowers with respect to the Collateral have been timely filed, and all taxes due with respect to the period covered by such tax returns and all material assessments, fees, and other governmental charges upon any Collateral that are due and payable have been paid when due and payable, other than taxes that are the subject of a Permitted Protest.

10.     <u>Approved Budget</u>. Attached to this Agreement as <u>Exhibit A</u> is a true and complete copy of the Initial Budget as of the Effective Date. The Approved Budget may be amended or otherwise modified from time to time in accordance with the procedures set forth in this Agreement; provided that, the total amount of DIP Loans provided pursuant to the Approved Budget shall not exceed the total amount of the DIP Commitments.

11.     <u>Permits</u>. Each Borrower has all Permits required for the operation of its business and for the execution, delivery, and performance by, and enforcement against, such Borrower of each Loan Document. Such Borrower is not in breach of or default under the provisions of any such Permit, nor is there any event, fact, condition, or circumstance which, with notice or passage of time or both, would constitute or result in any of the foregoing, which in each case would reasonably be expected to have a Material Adverse Change.

Schedule Page 4

## Schedule 19 – Affirmative Covenants

Each Borrower hereby covenants and agrees that, until termination of the DIP Commitments and indefeasible payment in full in cash of the DIP Obligations (other than continuing DIP Obligations with respect to indemnification), it shall comply with each of the following, as applicable:

1.     <u>Notice of Certain Events</u>. The Borrowers shall deliver to Lender (a) promptly, but in any event within three (3) business days, upon becoming aware of any default or Event of Default, notice of such default or Event of Default; (b) promptly upon becoming aware of any litigation threatened in writing against any Borrower or filed (other than any adversary proceeding or other pleading filed in the Chapter 11 Cases), or any event (other than events of public knowledge in the Chapter 11 Cases), in each case which would reasonably be expected to result in a Material Adverse Change, notice of such litigation or event; and (c) at the time a borrowing notice is furnished to Lender in connection with any requested Draw, a compliance certificate. In addition, the Borrowers hereby agree to maintain a system of accounting that enables the Borrowers to produce unaudited financial statements in accordance with GAAP.

2.     <u>Reporting; Conference Calls</u>.
   a.   The Borrowers shall comply with the agreements, requirements, covenants, and undertakings applicable to it hereunder, in accordance with the terms thereof.
   b.   The Borrowers shall participate in a conference call occurring every week, if requested by Lender, commencing on the first week following the Effective Date regarding the Budget, the Chapter 11 Cases and other financial matters.

3.     <u>Existence</u>. At all times, each Borrower shall (a) maintain and preserve in full force and effect its existence (including being in good standing in its jurisdiction of incorporation or formation) and (b) maintain all its rights and franchises, licenses and permits, except where the failure to be in good standing or maintain any such rights and franchises, or licenses and permits would not reasonably be expected to result in a Material Adverse Change.

4.     <u>Maintenance of Properties; Permits</u>. The Borrowers shall maintain and preserve the Collateral that is necessary to the proper conduct of its business in a condition and state of repair no worse than existed on the Petition Date, with ordinary wear, tear, and casualty excepted, and maintain, comply with, and keep in full force and effect its permits with respect to the Collateral pledged by it. Such Borrower shall comply with and maintain all permits required for the operation of its business.

5.     <u>Taxes</u>. Except to the extent such payment is excused by, or is otherwise prohibited by, the provisions of the Bankruptcy Code or an order of the Bankruptcy Court, the Borrowers shall, and shall cause each Subsidiary to pay in full or discharge all assessments and taxes imposed, levied, or assessed after the Petition Date against any Collateral to be paid in full, before delinquency (giving effect to any extension period).

6.     <u>Insurance</u>. At the Borrowers' sole costs and expense, the Borrowers shall maintain insurance with respect to the Collateral in which the Borrowers have any right, interest, or title, covering loss or damage by fire, theft, explosion, and all other hazards and risks as ordinarily are insured against by other persons engaged in the same or similar businesses and consistent with the Borrowers' insurance policies in effect on the Petition Date. The Borrowers shall maintain general liability, director's and officer's liability insurance, fiduciary liability insurance, employment practices liability insurance, title insurance as well as insurance against

larceny, embezzlement, and criminal misappropriation, consistent with the Borrowers' insurance policies in effect on the Petition Date. All such policies of insurance shall be with responsible and reputable insurance companies and in such amounts as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located. The Borrowers shall use their commercially reasonable efforts to cause, within fifteen (15) days following the Effective Date, all property insurance policies covering the Collateral to be made payable to the Lender, in case of loss, pursuant to a standard lender loss payable endorsement with a standard non-contributory "lender" or "secured party" clause and are to contain such other provisions as the Lender may reasonably require to fully protect the Lender's interest in the Collateral and any payments to be made under such policies. The Borrowers shall use their commercially reasonable efforts to cause, within fifteen (15) days following the Effective Date, all certificates of property and general liability insurance are to be delivered to the Lender, with the loss payable (but only in respect of Collateral) and additional insured endorsements in favor of the Lender and shall provide for not less than thirty (30) days (ten (10) days in the case of non-payment) prior written notice to Lender of the exercise of any right of cancellation. If the Borrowers fail to maintain the insurance required by this Section, the Lender may arrange for such insurance, but at the Borrowers' sole cost and expense and without any responsibility on the Lender's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims. The Borrowers shall give the Lender prompt notice of any loss covered by their casualty or business interruption insurance. Upon the occurrence and during the continuance of an Event of Default, the Lender shall have the sole right to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt, and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise, or settlement of any claims under any such insurance policies.

7.      <u>Inspection</u>. Borrowers shall permit Lender and each of its duly authorized representatives or agents, to visit any of its properties and inspect any of its Collateral or books and records, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees at such reasonable times during regular business hours and intervals as Lender may require, in each case other than information subject to confidentiality obligations and/or attorney client or other privilege, provided, that all such visits and inspections shall be made in accordance with the standard safety, visit, and inspection procedures of the Borrowers and their tenants, as applicable, and no such visit or inspection shall unreasonably interfere with the normal business operation of the Borrowers and their tenants, and provided, further that absent the existence of a default or Event of Default, Lender shall provide Borrowers with reasonable prior notice before any such inspections.

8.      <u>Environmental</u>. The Borrowers shall:

    a.    Keep the Collateral owned or operated by it free of any environmental liens.

    b.    Comply with all applicable environmental laws, except where the failure to so comply would not reasonably be expected to result in a Material Adverse Change.

    c.    Promptly notify Lender of any release of which any Borrower has knowledge of a hazardous material in any reportable quantity from or onto

Schedule Page 6

property owned or operated by such Borrower that would reasonably be expected to result in a Material Adverse Change.

    d.   Promptly, but in any event within five (5) Business Days of its receipt thereof, provide Lender with written notice of any of the following: (i) written notice that an environmental lien has been filed against any of the Collateral, (ii) commencement of any environmental action or written notice that an environmental action will be filed against such Borrower, and (ii) written notice of a violation, citation, or other administrative order from a governmental authority concerning violations or alleged violations of environmental laws, which seeks to impose liability therefor or otherwise would reasonably be expected to cause a Material Adverse Change.

    9.   <u>Compliance with Laws</u>. Each Borrower shall comply with the requirements of all applicable laws, rules, regulations, and orders of any governmental authority, other than laws, rules, regulations, and orders the non-compliance with which, individually, would not reasonably be expected to result in a Material Adverse Change.

    10.   <u>Disclosure Updates</u>. The Borrowers shall promptly, but in any event within five (5) Business Days after obtaining actual knowledge thereof, notify Lender of any written information, exhibit, or report (other than materials marked as drafts and forward-looking information, projections, estimates, and information of a general economic nature and general information about the Borrowers' industry) furnished (after giving effect to any supplements thereto and when taken as a whole) to Lender contained, at the time it was furnished, any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein (taken as a whole) not materially misleading in light of the circumstances in which made. Any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules or reports hereto.

    11.   <u>Further Assurances</u>. Upon written notice from Lender, the Borrowers shall promptly execute and/or deliver to Lender any and all security documents, financing statements, fixture filings, endorsements of certificates of title, mortgages, deeds of trust, leasehold mortgages, and all other documents that Lender may request in form and substance reasonably satisfactory to Lender, to create, perfect, and continue Lender's Liens in all the Collateral (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal).

    12.   <u>Approved Budget</u>. The Borrowers shall comply with the Budgets (as updated and supplemented in accordance with this Agreement), subject to the Permitted Variances.

    13.   <u>Deposit Account Control Agreements</u>. The Borrowers shall use commercially reasonable efforts to cause each relevant financial institution or other person at which each Deposit Account that constitutes Collateral is maintained to, enter into a Deposit Account Control Agreement with respect to such Deposit Account, in each case, promptly, and in no later than thirty (30) days, following the request of Lender at any time after the Effective Date.

    14.   <u>Material Contracts; Sale Offers</u>. Other than defaults existing as of the Effective Date which have already been disclosed to Lender or events of public knowledge in the Chapter 11 Cases, any Borrower shall deliver to Lender (a) promptly (but in any event within five (5) Business Days) of a Borrower becoming aware of any default (other than the filing of the Chapter 11 Cases) or other material breach under any material contract to which any Borrower is

Schedule Page 7

a party, notice of such defaults or breaches, and (b) prompt notification of any written offer by a third party to purchase all or substantially all of the assets of any Borrower or a segment thereof, or to purchase all or substantially all of the equity interests of any Borrower, or otherwise explore or enter into a transaction to acquire a material portion of the assets or equity of the Borrowers outside the ordinary course of business.

Schedule Page 8

## Schedule 20 – Negative Covenants

Each Borrower hereby covenants and agrees that, until termination of the DIP Commitments and the indefeasible payment in full in cash of the DIP Obligations (other than continuing DIP Obligations with respect to indemnification), such Borrower will not do any of the following without the prior written consent of Lender:

1.     Indebtedness. Create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any indebtedness with respect to the Collateral, except for the following ("Permitted Indebtedness"):

    a. indebtedness evidenced by this Agreement and the Loan Documents (including the Carve Out);

    b. indebtedness outstanding as of the Petition Date;

    c. unsecured obligations (contingent or otherwise) of any Borrower or any of its Subsidiaries existing or arising under any swap contract, provided, that (i) such obligations are (or were) entered into by such person in the ordinary course of business for the purpose of directly mitigating risks associated with liabilities, commitments, investments, assets, or property held or reasonably anticipated by such person, or changes in the value of securities issued by such person, and not for purposes of speculation or taking a "market view," and (ii) such swap contract is not for speculative purposes;

    d. obligations under any cash management agreement and other indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs, and other cash management and similar arrangements incurred in the ordinary course of business;

    e. unsecured indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, incurred in the ordinary course of business;

    f. unsecured indebtedness incurred by any Borrower or any of its subsidiaries in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts, or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability, or other employee benefits or property, casualty, or liability insurance or self-insurance, or other indebtedness with respect to reimbursement-type obligations regarding workers compensation claims, provided, that upon the drawing of such letter of credit, the reimbursement of obligations in respect of bankers' acceptances and the incurrence of such indebtedness, and such obligations are reimbursed promptly (but no more than five (5) business days) following such drawing, reimbursement obligation or incurrence;

    g. indebtedness in respect of surety bonds, performance bonds and other similar obligations incurred in the ordinary course of business;

    h. indebtedness incurred to finance the acquisition, development, construction, restoration, replacement, rebuilding, maintenance, upgrade or improvement of any fixed or capital assets, including real property, as a lessee under capital leases and any indebtedness assumed in connection with the acquisition of any such assets; provided that such Indebtedness is incurred prior to or within 90

Schedule Page 9

days after such acquisition or the completion of such development, construction, restoration, replacement, rebuilding, maintenance, upgrade or improvement; provided that aggregate principal amount of all such indebtedness shall not exceed $50,000 (or such greater amount approved in writing by the Lender in its sole discretion) at any time outstanding;

    i. indebtedness representing deferred compensation or similar arrangements to current, future or former officers, directors, employees, members of management, or consultants of the Borrowers in the ordinary course of business consistent with past practice;

    j. indebtedness representing any taxes to the extent such taxes are permitted to not be paid or discharged at such time in accordance with Section;

    k. other indebtedness permitted by the Budget (including any Permitted Variance);

    l. indebtedness permitted by the Orders, including adequate protection claims;

    m. all premiums (if any), interest (including post-petition interest), fees, expenses, charges, and additional or contingent interest on obligations described in clauses (a) through (l) above; or

    n. guarantees with respect to Indebtedness permitted under this Section 6.1.

2. <u>Lien</u>
    a. Create, incur, assume, or suffer to exist on or after the date of this Agreement, directly or indirectly, any len on or with respect to any of the Collateral, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens; or

    b. Create, incur, assume, or suffer to exist on or after the date of this Agreement, directly or indirectly, any lien that is equal to or superior to the priority of any liens granted by this Agreement and the Orders to or in favor of the Lender on or with respect to any of the Collateral, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for the Carve Out.

3. <u>Restrictions on Fundamental Changes</u>. Except in connection with an acceptable chapter 11 plan or acceptable 363 Sale approved by the Bankruptcy Court or otherwise with the prior written consent of Lender, no Borrower shall:
    a. enter into any merger, consolidation, reorganization, or recapitalization, or reclassify its equity interests;

    b. liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution); or

    c. take any actions that could have a negative impact on the Borrower's tax attributes; or

    d. suspend or close a substantial portion of its business.

4. <u>Disposal of Assets</u>. Except in connection with an acceptable chapter 11 plan or acceptable 363 sale, convey, sell, lease, license, assign, transfer, or otherwise dispose of (or enter into an agreement to convey, sell, lease, license, assign, transfer, or otherwise dispose of) any Collateral pledged by the Borrowers.

5. <u>Change Name</u>. Change any Borrower's name, state of organization, or organizational identity.

Schedule Page 10

6. <u>Nature of Business</u>. Make any change in the nature of any Borrower's business or acquire any properties or assets that are not reasonably related to the conduct of such business activities; provided, that the foregoing shall not prevent any Borrower from (a) engaging in any business that is reasonably related or ancillary to its business, or (b) complying with any requirement of the Bankruptcy Code.

7. <u>Material Leases or Contracts; Amendments</u>. Change or modify (a) the material terms of any material lease or contract in connection with the Collateral except in a manner that would not reasonably be expected to result in a Material Adverse Change or (b) any of its organizational documents in a manner that is adverse to Lender.

8. <u>Change of Control</u>. Except in connection with an acceptable chapter 11 plan or acceptable 363 sale, cause, permit, or suffer, directly or indirectly, any change of control.

9. <u>Accounting Methods</u>. Modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP).

10. <u>Transactions with Affiliates</u>. Directly or indirectly enter into or permit to exist any transaction with any affiliate of any Borrower, except for transactions (a) that are in the ordinary course of business of such Borrower, (b) otherwise approved by the Bankruptcy Court pursuant to an order in form and substance reasonably satisfactory to Lender, (c) pursuant to arrangements or agreements in effect on the Petition Date, or (d) permitted pursuant to the Budget (including any Permitted Variance).

11. <u>Use of Draws</u>. Use the proceeds of the Draws for any purpose other than to fund payments, subject in all respects to the Budget and the Permitted Variances, related to the: (a) working capital and other general corporate purposes of the Borrowers, and any other subsidiaries, if applicable, if such subsidiaries are Borrowers; (b) professional fees and expenses of administering the Chapter 11 Cases (including fees incurred prior to the Effective Date) in accordance with the Bankruptcy Code and any orders of the Bankruptcy Court, as applicable; (c) fees and expenses payable under this Agreement, including, without limitation, the legal fees and expenses of the Lender (including fees and expenses incurred prior to the Effective Date); and (d) interest and other amounts payable under this Agreement.

12. <u>Limitation on Capital Expenditures</u>. Except permitted by the Budget (including any Permitted Variance), make or incur any capital expenditure.

13. <u>Chapter 11 Cases</u>. Directly or indirectly, seek, consent, or suffer to exist, without the prior written consent of the Lender, (a) any modification, stay, vacation, or amendment to the Orders, (b) in connection with the Collateral, a priority claim for any administrative expense or unsecured claim against any Borrower (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of any kind set forth in Section 503(b), 506(b) or (c) or 507(b) of the Bankruptcy Code) equal to or superior to the priority claim of Lender in respect to the Collateral or otherwise, other than those permitted by the Order (including the Carve Out), and (c) any lien on the Collateral having a priority equal or superior to the liens in favor of Lender in respect of the DIP Obligations other than as required under a purchase agreement with respect to the good faith deposit thereunder and the Carve Out.

14. <u>Certain Transactions</u>. Propose or support any chapter 11 plan that is not an acceptable to the Lender in its sole discretion, or any sale of all or substantially all of the assets or equity of the Borrowers that is not a 363 sale acceptable to the Lender in its sole discretion.

15. <u>Acquisitions, Loans, or Investments</u>. Make any acquisition, advance, loan or any other investment of any kind or nature except for the following:

Schedule Page 11

a. acquisitions of, and advances made in connection with, inventory, equipment, goods or services in the ordinary course of business;

b. intercompany loans and advances in the ordinary course of business or consistent with past practice;

c. investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business;

d. investments in receivables owing to any Borrower created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms; provided, however, that such trade terms may include such concessionary trade terms as any Borrower deems reasonable under the circumstances; and

e. investments in payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business consistent with past practice.

16. <u>Payments on Indebtedness</u>. Other than with respect to the DIP Obligations or pursuant to the Budget (including any Permitted Variance), make any payment with respect to any indebtedness.

17. <u>Distributions or Redemptions</u>. Pay any dividends or distributions on, or make any redemptions of, any equity interest of any Borrower; provided that the foregoing shall not prevent any wholly-owned subsidiary from making any distribution to its direct parent.

18. <u>Formation of Subsidiaries</u>. Form any direct or indirect subsidiary or acquire any direct or indirect subsidiary after the Effective Date, without the prior written consent of Lender in its sole discretion, unless such subsidiary is joined as a Borrower under this Agreement.

Schedule Page 12

**<u>Exhibit A</u>**


Initial Budget

See Interim Order [Docket No. 33]

**Cash Receipts and Disbursements**
**Independent MedEquip LLC and Subsidiaries**
**POST-PETITION**

| | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | Cumulative | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Secured equipment lender payment scenario → | | | | | | | | | | | | | | | | |
| Post-petition week number → | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | | | |
| Actual or Forecast → | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Actual | Forecast | Forecast |
| Week beginning → | 12/07/25 | 12/14/25 | 12/21/25 | 12/28/25 | 01/04/26 | 01/11/26 | 01/18/26 | 01/25/26 | 02/01/26 | 02/08/26 | 02/15/26 | 02/22/26 | 03/01/26 | | | |
| Week ending → | 12/13/25 | 12/20/25 | 12/27/25 | 01/03/26 | 01/10/26 | 01/17/26 | 01/24/26 | 01/31/26 | 02/07/26 | 02/14/26 | 02/21/26 | 02/28/26 | 03/07/26 | Total: Weeks 1-12 | Total: Weeks 13-25 | Total: Weeks 1-25 |
| **Operating cash receipts** | | | | | | | | | | | | | | | | |
| Total operating cash receipts | 255,792 | 280,792 | 705,792 | 205,792 | 205,792 | 205,792 | 705,792 | 237,042 | 237,042 | 237,042 | 237,042 | 705,792 | 237,042 | 3,319,799 | 4,456,546 | 7,776,345 |
| **Operating cash disbursements** | | | | | | | | | | | | | | | | |
| **Critical vendors** | | | | | | | | | | | | | | | | |
| Total critical vendors | 4,062 | 47,083 | - | 7,889 | 4,062 | 47,083 | - | - | 4,062 | - | 47,083 | - | 4,062 | 20,000 | 165,389 | 185,389 |
| **Recurring operating costs** | | | | | | | | | | | | | | | | |
| **COGS-related** | | | | | | | | | | | | | | | | |
| Total COGS-related | 204,256 | 89,601 | 139,601 | 89,601 | 209,601 | 89,601 | 139,601 | 89,601 | 209,601 | 89,601 | 139,601 | 89,601 | 139,601 | 799,454 | 1,719,468 | 2,518,923 |
| **Wages and benefits** | | | | | | | | | | | | | | | | |
| Total wages and benefits | 7,187 | 216,389 | 7,187 | 233,800 | 7,187 | 218,800 | 7,187 | 218,800 | 22,000 | 217,835 | 7,000 | 217,835 | 22,000 | 1,426,489 | 1,403,206 | 2,829,695 |
| **Facilities** | | | | | | | | | | | | | | | | |
| Total facilities | 7,020 | 2,550 | 8,300 | 52,550 | 2,550 | 2,550 | 8,300 | 2,550 | 52,550 | 2,550 | 8,300 | 2,550 | 52,550 | 199,051 | 204,870 | 403,921 |
| **Insurance** | | | | | | | | | | | | | | | | |
| Total insurance | - | - | - | 40,000 | - | - | - | - | 40,000 | - | - | - | 40,000 | 160,456 | 120,000 | 280,456 |
| **General corporate** | | | | | | | | | | | | | | | | |
| Total general corporate | 41,190 | 41,190 | 47,084 | 41,190 | 41,190 | 41,190 | 41,190 | 41,190 | 41,190 | 41,190 | 41,190 | 41,190 | 41,190 | 265,839 | 541,364 | 807,203 |
| Total operating costs | 263,716 | 396,813 | 202,172 | 465,030 | 264,590 | 399,224 | 196,278 | 352,141 | 349,403 | 351,176 | 243,174 | 351,176 | 299,403 | 2,871,289 | 4,154,297 | 7,025,586 |
| Cash flows from operating activities | (7,924) | (116,021) | 503,620 | (259,238) | (58,798) | (193,432) | 509,514 | (115,099) | (132,361) | (114,134) | (6,132) | 354,616 | (62,361) | 448,510 | 302,249 | 750,759 |
| **Non-operating activities** | | | | | | | | | | | | | | | | |
| Total non-operating receipts | - | - | - | - | 3,713 | - | - | - | 3,713 | - | - | - | 3,713 | 11,141 | 11,139 | 22,280 |
| **Non-operating disbursements** | | | | | | | | | | | | | | | | |
| **Debtor's bankruptcy-related costs** | | | | | | | | | | | | | | | | |
| 900551 BK Counsel | - | - | - | - | 50,000 | - | - | - | 40,000 | - | - | - | - | 78,782 | 90,000 | 168,782 |
| 900553 Independent CPAs | - | - | - | - | 45,000 | - | - | - | 20,000 | - | - | - | - | - | 65,000 | 65,000 |
| 900555 DIP Accountant | - | - | - | - | 20,000 | - | - | - | 15,000 | - | - | - | - | 27,666 | 35,000 | 62,666 |
| 900557 General Counsel | - | 19,863 | - | - | 20,000 | - | - | - | 20,000 | - | - | - | - | 59,863 | 59,863 | |
| 900563 Counsel (NY) | - | - | - | - | 2,500 | - | - | - | 2,500 | - | - | - | - | 4,210 | 5,000 | 9,210 |
| Credit Committee Counsel | - | - | - | - | 20,000 | - | - | - | 20,000 | - | - | - | - | - | 40,000 | 40,000 |
| 900559 Reorganization Consultants | - | - | - | - | 40,000 | - | - | - | 40,000 | - | - | - | - | 15,000 | 80,000 | 95,000 |
| Fees and costs and quarterly fees to court | - | - | - | - | - | 32,000 | - | - | - | - | - | - | - | - | 32,000 | 32,000 |
| Total debtor's case professionals and expenses | - | 19,863 | - | - | 197,500 | 32,000 | - | - | 157,500 | - | - | - | - | 125,658 | 406,863 | 532,522 |
| **DIP lender-related costs** | | | | | | | | | | | | | | | | |
| Commitment fee (2% of $2M) (PIK non-cash settlement) | | | | | | | | | | | | | | | | |
| Diligence and ongoing monitoring | - | 5,000 | - | - | 5,000 | - | - | - | 5,000 | - | - | - | - | 7,029 | 15,000 | 22,029 |
| Counsel | - | 15,000 | - | - | 15,000 | - | - | - | 15,000 | - | - | - | - | 68,328 | 45,000 | 113,328 |
| Costs and expenses | | | | | | | | | | | | | | | | |
| Total DIP lender-related costs | - | 20,000 | - | - | 20,000 | - | - | - | 20,000 | - | - | - | - | 75,357 | 60,000 | 135,357 |
| **Other non-operating disbursements** | | | | | | | | | | | | | | | | |
| Total other non-operating disbursements | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 22,068 | 52,000 | 74,068 |
| Total non-operating disbursements | 4,000 | 43,863 | 4,000 | 4,000 | 221,500 | 36,000 | 4,000 | 4,000 | 181,500 | 4,000 | 4,000 | 4,000 | 4,000 | 223,083 | 518,863 | 741,946 |
| **Secured lender debt service (excluding MCA obligations)** | | | | | | | | | | | | | | | | |
| Total secured lender debt service | - | 4,088 | 19,719 | 25,000 | - | 3,500 | 12,578 | 7,729 | 25,000 | 3,500 | 11,290 | 11,061 | 25,000 | 79,872 | 148,465 | 228,336 |
| Net weekly cash flow | (11,924) | (163,972) | 479,901 | (288,238) | (276,585) | (232,932) | 492,936 | (126,828) | (335,148) | (121,634) | (21,423) | 339,555 | (87,648) | 156,696 | (353,940) | (197,243) |
| **Cash flow summary** | | | | | | | | | | | | | | | | |
| Beginning cash balance | 804,444 | 792,520 | 628,548 | 1,108,448 | 820,211 | 543,625 | 310,694 | 803,630 | 676,802 | 591,654 | 470,020 | 448,597 | 788,152 | 147,747 | 804,444 | 147,747 |
| Net weekly cash flow | (11,924) | (163,972) | 479,901 | (288,238) | (276,585) | (232,932) | 492,936 | (126,828) | (335,148) | (121,634) | (21,423) | 339,555 | (87,648) | 156,696 | (353,940) | (197,243) |
| DIP loan, cash proceeds | - | - | - | - | - | - | - | - | 250,000 | - | - | - | - | 500,000 | 250,000 | 750,000 |
| Ending cash balance | 792,520 | 628,548 | 1,108,448 | 820,211 | 543,625 | 310,694 | 803,630 | 676,802 | 591,654 | 470,020 | 448,597 | 788,152 | 700,504 | 804,444 | 700,504 | 700,504 |
| **DIP loan activity and balance** | | | | | | | | | | | | | | | | |
| Beginning DIP loan balance | 580,000 | 580,000 | 580,000 | 580,000 | 580,000 | 580,000 | 580,000 | 580,000 | 580,000 | 830,000 | 830,000 | 830,000 | 830,000 | - | 580,000 | - |
| DIP loan cash proceeds | - | - | - | - | - | - | - | - | 250,000 | - | - | - | - | 500,000 | 250,000 | 750,000 |
| DIP loan commitment fee PIK | - | - | - | - | - | - | - | - | - | - | - | - | - | 80,000 | - | 80,000 |
| DIP loan principal payments (placeholder) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending DIP loan balance | 580,000 | 580,000 | 580,000 | 580,000 | 580,000 | 580,000 | 580,000 | 580,000 | 830,000 | 830,000 | 830,000 | 830,000 | 830,000 | 580,000 | 830,000 | 830,000 |
| DIP loan interest expense (16% APR) | - | - | 7,729 | - | - | - | - | 7,729 | - | - | - | 11,061 | - | - | 26,519 | 26,519 |

**Variance Report**
**INDEPENDENT MEDEQUIP LLC et al.**
**Section 21 of Debtor-in-Possession Term Loan Facility**
**Executed in Final Form on October 22, 2025**

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Post-petition week number → | | | | | | | | | | | | |
| Actual or Forecast → | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Actual |
| Week beginning → | 09/19/25 | 09/21/25 | 09/28/25 | 10/05/25 | 10/12/25 | 10/19/25 | 10/26/25 | 11/02/25 | 11/09/25 | 11/16/25 | 11/23/25 | 11/30/25 |
| Week ending → | 09/20/25 | 09/27/25 | 10/04/25 | 10/11/25 | 10/18/25 | 10/25/25 | 11/01/25 | 11/08/25 | 11/15/25 | 11/22/25 | 11/29/25 | 12/06/25 |
| **ACTUAL RESULTS** | | | | | | | | | | | | |
| Weekly net cash flow | $ 268,737 | $ 22,078 | $ 50,074 | $ (143,391) | $ 67,495 | $ 123,796 | $ 37,485 | $ (198,692) | $ 33,998 | $ 302,739 | $ (68,741) | $ (339,081) |
| Add professional fees and costs associated with bankruptcy proceedings | - | - | - | - | - | - | - | - | - | - | - | 125,658 |
| Weekly net cash flow, as adjusted per loan agreement | $ 268,737 | $ 22,078 | $ 50,074 | $ (143,391) | $ 67,495 | $ 123,796 | $ 37,485 | $ (198,692) | $ 33,998 | $ 302,739 | $ (68,741) | $ (213,422) |
| Cumulative 4-week rolling weekly net cash flow, as adjusted per loan agreement | | | | $ 197,498 | $ (3,744) | $ 97,974 | $ 85,585 | $ 30,284 | $ (3,213) | $ 175,729 | $ 69,303 | $ 54,573 |
| | | | | | | | | | | | | |
| **INITIAL BUDGET** | | | | | | | | | | | | |
| Weekly net cash flow | $ 225,081 | $ (55,074) | $ 38,212 | $ (167,028) | $ 172,896 | $ (86,365) | $ 965,714 | $ (167,028) | $ 193,790 | $ (54,835) | $ 42,259 | $ (529,311) |
| Add professional fees and costs associated with bankruptcy proceedings | - | - | - | - | - | - | - | - | - | - | - | 186,000 |
| Add planned mortgage debt refunding to Cadence Bank (**Note 1**) | - | - | - | - | - | - | 900,000 | - | - | - | - | - |
| Less expected cash receipt from sale, net of planned expenses (**Note 1**) | - | - | - | - | - | - | (1,865,460) | - | - | - | - | - |
| Weekly net cash flow, as adjusted to exclude real estate sale | $ 225,081 | $ (55,074) | $ 38,212 | $ (167,028) | $ 172,896 | $ (86,365) | $ 254 | $ (167,028) | $ 193,790 | $ (54,835) | $ 42,259 | $ (343,311) |
| Cumulative 4-week rolling weekly initial budget | | | | $ 41,189 | $ (10,995) | $ (42,286) | $ (80,244) | $ (80,244) | $ (59,349) | $ (27,819) | $ 14,186 | $ (162,096) |
| | | | | | | | | | | | | |
| **DIFFERENCE BETWEEN ACTUAL AND INITIAL BUDGET** | | | | | | | | | | | | |
| Cumulative 4-week rolling difference | | | | $ 156,308 | $ 7,251 | $ 140,260 | $ 165,829 | $ 110,528 | $ 56,136 | $ 203,548 | $ 55,117 | $ 216,669 |
| Favorable (unfavorable) variance, as adjusted to exclude real estate sale | | | | 379.5% | 65.9% | 331.7% | 206.7% | 137.7% | 94.6% | 731.7% | 388.5% | 133.7% |
| Maximum allowed negative variance that triggers an Event of Default | | | | -15.0% | -15.0% | -15.0% | -15.0% | -15.0% | -15.0% | -15.0% | -15.0% | -15.0% |
| Pass or fail on negative variance compliance metric | | | | Pass | Pass | Pass | Pass | Pass | Pass | Pass | Pass | Pass |

**Note 1:** On 6/26/2025, IMED signed a letter of intent ("LOI") to sell IMED's corporate headquarters located at 1201 3rd Avenue North, Birmingham, Alabama 35203 for approximately $1,899,000 before the deduction of routine closing expenses and the retirement of the Cadence Bank mortgage totaling $900,000. On 9/17/2025, the LOI was memorialized into a contractual arrangement with the Buyer. IMED had good reason to believe that the transaction would close on or about 11/1/2025, and the net amount totaling approximately $965,000 would inure to IMED's benefit. These amounts were included in the initial budget as filed with the court on 9/18/2025. In mid-October 2025, the Buyer withdrew from the agreement, and this condition negated IMED's expectation of receiving the net proceeds totaling about $965,000. Subsequent to the Buyer withdrawing, IMED placed the property for sale with recognized and reputable real estate broker. IMED believes the property will sell, but most likely a closing would be beyond the period covered by the onward 13-week forecast.