## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| In re:<br><br>INDEPENDENT MEDEQUIP LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br>Case No. 25-02821-TOM11<br><br>SUBSTANTIVELY CONSOLIDATED |

**JOINT PLAN OF REORGANIZATION FOR (1) INDEPENDENT MEDEQUIP, LLC, (2) IMEDEQUIP LLC, (3) VIKING MEDICAL SUPPLY, LLC, (4) INDEPENDENT OFFICES, LLC, (5) MEDALLIANCE LLC, (6) CLOUD CITY MEDICAL, LLC, (7) PHYSICIAN'S CHOICE MEDICAL, LLC, (8) CENTRAL MOBILITY AND REHAB EQUIPMENT, LLC, (9) GEORGIA MEDICAL SUPPLY OF RICHLAND, LLC, (10) LIFEAID MEDICAL EQUIPMENT LLC, AND (11) LIFE MEDICAL SUPPLY LLC**

**July 15, 2026**

Presented By:
Stuart H. Memory
MEMORY MEMORY & CAUSBY, LLP
ASB 2214-Y36V
Post Office Box 4054
Montgomery, Alabama 36103
T: 334-834-8000
E: smemory@memorylegal.com
Counsel for Debtor

---

[1] The Debtors in these cases are: Independent MedEquip, LLC (25-02821-TOM11); iMedEquip LLC (25-02823-TOM11); Viking Medical Supply, LLC (25-02824-TOM11); Independent Offices, LLC (25-02826-TOM11); MedAlliance LLC (25-02827-TOM11); Cloud City Medical, LLC (25-02829-TOM11); Physician's Choice Medical, LLC (25-02830-TOM11); Central Mobility and Rehab Equipment, LLC (25-02831-TOM11); Georgia Medical Supply of Richland, LLC (25-02832-TOM11); LifeAid Medical Equipment LLC (25-02834-TOM11); and Life Medical Supply LLC (25-02835-TOM11).

PURSUANT TO SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE, NOTHING CONTAINED IN THIS PLAN OF REORGANIZATION (THE "**PLAN**") SHOULD BE CONSTRUED AS CONSTITUTING A SOLICITATION OF ACCEPTANCES OF THE PLAN UNTIL SUCH TIME AS THE DEBTOR'S DISCLOSURE STATEMENT (AS DEFINED HEREIN) HAS BEEN APPROVED BY AN ORDER OF THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF ALABAMA, BIRMINGHAM DIVISION, AND DISTRIBUTED, WITH APPROPRIATE BALLOTS, TO ALL HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTOR, WHO ARE ENTITLED TO VOTE ON THE PLAN. THE DEBTOR RESERVES THE RIGHT TO FILE AN AMENDED OR AN AMENDED AND RESTATED PLAN AND AN AMENDED OR AN AMENDED AND RESTATED DISCLOSURE STATEMENT FROM TIME-TO-TIME HEREAFTER. REFERENCE IS MADE TO SUCH DISCLOSURE STATEMENT FOR A DISCUSSION OF THE DEBTOR'S HISTORY, BUSINESS, PROPERTIES, AND OPERATIONS, THE PROJECTIONS FOR THE DEBTOR'S FUTURE OPERATIONS, A SUMMARY OF SIGNIFICANT EVENTS WHICH HAVE OCCURRED TO DATE IN THE REORGANIZATION CASE, A SUMMARY OF THE MEANS OF IMPLEMENTING AND FUNDING THE PLAN, AND THE PROCEDURES FOR VOTING ON THE PLAN. ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR ARE HEREBY ADVISED AND ENCOURAGED TO READ THE DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THE PLAN AND THE DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED AS AN ADMISSION OR STIPULATION, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

<u>**INDEX TO EXHIBITS TO PLAN**</u>

**Exhibit A –**        Assumed Contracts

**Exhibit B –**        Rejected Contracts

Case 25-02821-TOM11    Doc 368    Filed 07/15/26    Entered 07/15/26 17:18:37    Desc
Main Document       Page 3 of 60

# ARTICLE 1
## INTRODUCTION

Independent MedEquip, LLC ("**Independent MedEquip**"), iMedEquip LLC ("**iMed Equip**"), Viking Medical Supply, LLC ("**Viking**"), Independent Offices, LLC ("**Offices**"), MedAlliance LLC ("**MedAlliance**"), Cloud City Medical, LLC ("**Cloud City**"), Physician's Choice Medical, LLC ("**Physician's Choice**"), Central Mobility and Rehab Equipment, LLC ("**Central Mobility**"), Georgia Medical Supply of Richland, LLC ("**Georgia Medical**"), LifeAid Medical Equipment LLC ("**LifeAid Equipment**"), and Life Medical Supply LLC ("**Life Medical**; and collectively with Independent MedEquip, iMedEquip, Viking, Offices, MedAlliance, Cloud City, Physician's Choice, Central Mobility, Georgia Medical, and LifeAid Equipment as the "**Debtor**," "**Debtors**," or "**IMED**"), as Debtor and Debtor in Possession in the Bankruptcy Case, hereby proposes the following Plan for the reorganization of the Debtor and the resolution of the outstanding Claims against and Equity Interests in the Debtor pursuant to the provisions of Chapter 11 of the Bankruptcy Code, and requests Confirmation of the Plan pursuant to Section 1129 of the Bankruptcy Code. In summary, but subject to more specific details provided herein, the Plan provides for the reorganization of the Debtor and payment of Allowed Claims in the manner set forth herein. Capitalized terms used in the Plan shall have the meanings ascribed to such terms in Article 2.1 of the Plan. The Debtor is the proponent of the Plan within the meaning of Section 1129 of the Bankruptcy Code.

Under Section 1125(b) of the Bankruptcy Code, a vote to accept or reject the Plan cannot be solicited from the Holder of a Claim or Equity Interest until such time as the Debtor's Disclosure Statement has been approved by the Bankruptcy Court and distributed to Holders of Claims and Equity Interests. The Debtor's Disclosure Statement was approved by the Bankruptcy Court in the Disclosure Statement Approval Order and has been distributed simultaneously with the Plan to all Holders of Claims and Equity Interests whose votes are being solicited. The Disclosure Statement contains, among other things, (a) a discussion of the Debtor's history, business, properties, and operations, (b) the Projections for the Debtor's future operations, (c) a summary of significant events which have occurred to date in the Reorganization Case, (d) a summary of the means of implementing and funding the Plan, and (e) the procedures for voting on the Plan. Unless otherwise ordered by the Bankruptcy Court, no materials, other than the Plan and the accompanying Disclosure Statement, Disclosure Statement Approval Order, and Ballot, have been approved by the Debtor or the Bankruptcy Court for use in soliciting acceptances or rejections of the Plan. ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT, AND ANY EXHIBITS ATTACHED THERETO, IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

Subject to certain restrictions and requirements set forth in Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications to the Plan set forth in Article 13 of the Plan, the Debtor expressly reserves the right to alter, amend, modify, revoke or withdraw the Plan, one or more times, prior to the Plan's substantial consummation.

THE PLAN HAS BEEN APPROVED BY THE DEBTOR. IN THE OPINION OF THE DEBTOR, THE TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

4

CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTOR. ACCORDINGLY, THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND HOLDERS OF EQUITY INTERESTS, AND THE DEBTOR RECOMMENDS THAT CREDITORS AND HOLDERS OF EQUITY INTERESTS VOTE TO ACCEPT THE PLAN.

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, UNLESS OTHERWISE STATED, ALL STATEMENTS IN THE PLAN AND IN THE ACCOMPANYING DISCLOSURE STATEMENT CONCERNING THE HISTORY OF THE DEBTOR'S BUSINESS, THE PAST OR PRESENT FINANCIAL CONDITION OF THE DEBTOR, THE PROJECTIONS FOR THE FUTURE OPERATIONS OF THE DEBTOR, TRANSACTIONS TO WHICH THE DEBTOR WAS OR IS PARTY, OR THE EFFECT OF CONFIRMATION OF THE PLAN ON HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR ARE ATTRIBUTABLE EXCLUSIVELY TO THE DEBTOR AND NOT TO ANY OTHER PARTY.

THE PLAN AND THE DISCLOSURE STATEMENT HAVE NOT BEEN REQUIRED TO BE PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING OR SELLING OR TRANSFERRING SECURITIES OF THE DEBTOR SHOULD EVALUATE THE PLAN AND THE DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

**ARTICLE 2**
**DEFINED TERMS; RULES OF CONSTRUCTION**

2.1     **Defined Terms**.

As used in the Plan, the following terms (which appear in the Plan as capitalized terms) shall have the meanings set forth below:

"**Administrative Expense**" means (a) any cost or expense of administration of the Bankruptcy Case under Section 503(b) or 507(a)(1) of the Bankruptcy Code, to the extent the party claiming any such cost or expense files an application, motion, request or other Bankruptcy Court-approved pleading seeking such expense in the Bankruptcy Case on or before the applicable Administrative Expense Claim Bar Date, including (i) any actual and necessary costs and expenses of preserving the Estate or operating the business of the Debtor (including wages, salaries, or commissions for services rendered) incurred on or after the Petition Date, (ii) any Postpetition cost, indebtedness, or contractual obligation duly and validly incurred or assumed by the Debtor in Possession in the ordinary course of its business, (iii) any Claim granted administrative priority status by a Final Order of the Bankruptcy Court, (iv) any Claim by a Governmental Unit for taxes (and for interest and/or penalties related to such taxes) due from the Debtor for any Postpetition tax year or period, and (v) compensation or reimbursement of expenses of Professionals awarded or allowed pursuant to an order of the Bankruptcy Court under Section 330(a) or 331 of the Bankruptcy Code (including any amounts held back pursuant to an order of the Bankruptcy Court);

5

(b) any Superpriority Claim; (c) all fees and charges assessed against the Estate under Chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911- 1930; and (d) any and all other costs or expenses of administration of the Bankruptcy Case that are allowed by a Final Order of the Bankruptcy Court; provided, however, that, when used in the Plan, the term "Administrative Expense" shall not include any Priority Tax Claim, any Cure Claim, any Environmental Claim, any Disallowed Claim, or, unless otherwise expressly provided in the Plan, any of the Claims in Classes 1 through 22. In no event shall any Claim set out in a Proof of Claim be deemed to be an Administrative Expense (except for any Claim by a Governmental Unit for taxes (and for interest and/or penalties related to such taxes) due from the Debtor for any Postpetition tax year or period).

"**Administrative Expense Claim**" means any Claim for the payment of an Administrative Expense.

"**Administrative Expense Claim Bar Date**" means the date(s) established by one or more orders of the Bankruptcy Court as the deadline for the filing by any Creditor or other party in interest of an application, motion, request or other Bankruptcy Court-approved pleading for allowance of any Administrative Expense Claim, including as established in the Disclosure Statement Approval Order; provided, however, that (a) unless otherwise ordered by the Bankruptcy Court, the Administrative Expense Claim Bar Date for the filing by any Professional of an application for any Administrative Expense Claim not yet filed as of the date of the Plan shall be no later than fourteen (14) days after the date of entry of the Disclosure Statement Approval Order, and (b) to the extent the Bankruptcy Court has entered an order establishing a different and specific deadline for a Creditor or other party in interest to file an Administrative Expense Claim, the date set forth in such order shall be deemed to be the Administrative Expense Claim Bar Date as to such Creditor or other party in interest. Any Holder of an Administrative Expense Claim (including a Holder of a Claim for Postpetition federal, state or local taxes) that does not file an application, motion, request or other Bankruptcy Court-approved pleading by the applicable Administrative Expense Claim Bar Date shall be forever barred, estopped and enjoined from ever asserting such Administrative Expense Claim against the Debtor, the Reorganized Debtor, any of its Properties, or the Estate, and such Holder shall not be entitled to participate in any Distribution under the Plan on account of any such Administrative Expense Claim.

"**Affiliate**" means, with respect to any Person (other than the Debtor), (a) any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person, (b) any other Person that, directly or indirectly, owns or controls, whether beneficially, or as trustee, guardian or other fiduciary, twenty-five percent (25%) or more of the equity interests having ordinary voting power in the election of directors of such Person, or (c) any other Person who is a director, officer, joint venturer or partner (i) of such Person, (ii) of any subsidiary of such Person, or (iii) of any Person described in clause (a) above. For the purposes of this definition, control of a Person shall mean the power (direct or indirect) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise. When used in the Plan as relating to the Debtor, the term "Affiliate" has the meaning ascribed to such term in Section 101(2) of the Bankruptcy Code.

"**Alliance Funding**" means Alliance Funding Group.

6

"**Allowed Amount**" means the dollar amount in which a Claim is allowed.

"**Allowed Claim**" means a Claim or that portion of a Claim which is not a Disputed Claim or a Disallowed Claim and (a) as to which a Proof of Claim was filed with the Clerk's Office on or before the Bar Date or the Governmental Unit Bar Date, as applicable, or, by order of the Bankruptcy Court, was not required to be so filed, or (b) as to which no Proof of Claim was filed with the Clerk's Office on or before the Bar Date or the Governmental Unit Bar Date, as applicable, but which has been or hereafter is listed by the Debtor in the Schedules as liquidated in amount and not disputed or contingent, and, in the case of subparagraph (a) and (b) above, as to which either (i) no objection to the allowance of such Claim has been filed within the time allowed for the making of objections as fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court, or (ii) any objection as to the allowance of such Claim has been settled or withdrawn or has been overruled by a Final Order. "Allowed Claim" shall also include a Claim that is allowed by the Bankruptcy Court in a Final Order. "Allowed," when used as an adjective herein (such as Allowed Administrative Expense Claim, Allowed Priority Tax Claim, Allowed Priority Claim, Allowed Secured Claim, and Allowed Unsecured Claim), has a corresponding meaning.

"**Allowed Class … Claim**" means an Allowed Claim in the particular Class described.

"**Ameris**" means Ameris Bank.

"**Assumed Contracts**" has the meaning ascribed to such term in Article 7.1 of the Plan. A list of Assumed Contracts is set forth on **Exhibit A** attached to the Plan (which list is not intended to be a complete list).

"**Avoidance Actions**" means any and all actions to avoid or recover a transfer of Property of the Debtor's Estate or an interest of the Debtor in Property, which a trustee, debtor in possession or other appropriate party in interest may assert on behalf of the Debtor's Estate under Chapter 5 of the Bankruptcy Code, including actions under one or more provisions of Section 542, 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code or under any other similar applicable federal, state or common law, regardless of whether or not such action has been commenced prior to the Effective Date.

"**Ballot**" means the Ballot, accompanying the Disclosure Statement and the Plan, on which Holders of Impaired Claims entitled to vote on the Plan may indicate their acceptance or rejection of the Plan in accordance with the Voting Instructions.

"**Bankruptcy Administrator**" means the Office of the Bankruptcy Administrator for the Northern District of Alabama.

"**Bankruptcy Case**" means the case of the Debtor currently pending and substantively consolidated before the Bankruptcy Court under Chapter 11 of the Bankruptcy Code, which case was commenced by the Debtor on the Petition Date and presently bears Case No. 25-02821-TOM11.

7

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Bankruptcy Case.

"**Bankruptcy Counsel**" means Memory Memory & Causby, LLP.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Northern District of Alabama, or, as the context requires, any other court of competent jurisdiction exercising jurisdiction over the Bankruptcy Case.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as promulgated under Section 2075 of title 28 of the United States Code, and the Local Rules, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Bankruptcy Case.

"**Bar Date**" means March 17, 2026, the date set by the Bankruptcy Court as the last day for filing a Proof of Claim against the Debtor in the Bankruptcy Case, excluding (a) a Prepetition Claim of a Governmental Unit, for which a Proof of Claim must be filed with the Bankruptcy Court by the Governmental Unit Bar Date, (b) an Administrative Expense Claim, for which a request for payment of an Administrative Expense must be filed with the Bankruptcy Court by the Administrative Expense Claim Bar Date, (c) a Claim for which a bar date may have been otherwise established by a Final Order of the Bankruptcy Court, for which a Proof of Claim must be filed with the Bankruptcy Court by the date set forth in such Final Order, and (d) a Claim with respect to an executory contract or unexpired lease that is assumed or rejected pursuant to the Plan (as to which the bar date shall be as set forth in Article 7.4 or 7.5, respectively, of the Plan) or a Final Order of the Bankruptcy Court (as to which the bar date shall be as set forth in such Final Order).

"**Business Day**" means any day other than (a) a Saturday, (b) a Sunday, (c) a "legal holiday" (as "legal holiday" is defined in Bankruptcy Rule 9006(a)), or (d) a day on which commercial banks in Birmingham, Alabama are required or authorized to close by law.

"**Cadence Bank**" means Cadence Bank, NA, which was recently merged with Huntington National Bank.

"**Cash**" means cash, cash equivalents and other readily marketable direct obligations of the United States, as determined in accordance with generally accepted accounting principles, including bank deposits, certificates of deposit, checks and similar items. When used in the Plan with respect to a Distribution under the Plan, the term "Cash" means lawful currency of the United States, a certified check, a cashier's check, a wire transfer of immediately available funds from any source, or a check from the Reorganized Debtor drawn on a domestic bank.

"**Causes of Action**" means any and all of the Debtor's or the Estate's actions, claims, demands, rights, defenses, counterclaims, suits and causes of action, whether known or unknown, in law, equity or otherwise, against any Creditor or other third party, including (a) the Avoidance Actions, and (b) any and all other claims or rights or proceedings of any value whatsoever, at law or in equity, turnover actions and claims of the type referred to in the Disclosure Statement or in

8

the Plan. The Causes of Action shall vest in the Reorganized Debtor on the Effective Date. When used in the Plan, the term "Causes of Action" shall not include any claims, obligations, suits, judgments, damages, rights, remedies, causes of action, charges, costs, debts, indebtedness, or liabilities released or waived by the Debtor pursuant to a Final Order of the Bankruptcy Court.

"**Causes of Action Recoveries**" means the proceeds, benefits and other recoveries of any Causes of Action received by the Reorganized Debtor.

"**Claim**" has the meaning ascribed to such term in Section 101(5) of the Bankruptcy Code. Notwithstanding anything to the contrary contained herein, when used in the Plan, the term "Claim" shall be given the broadest possible meaning permitted by applicable law and shall include all manner and type of claim, whenever and wherever such claim may arise, including Administrative Expense Claims, Environmental Claims, and claims based upon or arising under any federal or state securities laws.

"**Class**" means a category of Claims or Equity Interests classified together as described in Article 4 of the Plan.

"**Clerk**" means the Clerk of the Bankruptcy Court.

"**Clerk's Office**" means the Office of the Clerk of the Bankruptcy Court located at 1800 5th Avenue North, Birmingham, Alabama 35203.

"**Collateral**" means Property in which the Estate has (or had) an interest and that secures (or secured), in whole or part, whether by agreement, statute, or judicial decree, the payment of a Claim.

"**Confirmation**" or "**Confirmation of the Plan**" means the approval of the Plan by the Bankruptcy Court at the Confirmation Hearing.

"**Confirmation Date**" means the date on which the Confirmation Order is entered on the Docket by the Clerk pursuant to Bankruptcy Rule 5003(a).

"**Confirmation Hearing**" means the hearing which will be held before the Bankruptcy Court to consider Confirmation of the Plan and related matters pursuant to Section 1128(a) of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time. The date of the Confirmation Hearing is set forth in the Disclosure Statement Approval Order.

"**Confirmation Order**" means the order of the Bankruptcy Court in the Reorganization Case confirming the Plan pursuant to Section 1129 and other applicable sections of the Bankruptcy Code, as such order may be amended, modified or supplemented.

"**Creditor**" means the Holder of a Claim, within the meaning of Section 101(10) of the Bankruptcy Code, including Secured Creditors, Unsecured Creditors, and Creditors with Administrative Expense Claims, Priority Tax Claims, Priority Claims, Cure Claims, and Environmental Claims.

9

"**Cure Claim**" means any Claim of any nature whatsoever, including any Claim for any cure payment, cost or other amount, if any, due and owing by the Debtor pursuant to Section 365(b) of the Bankruptcy Code or otherwise and any Claim for a default (monetary or non-monetary), arising from, relating to or in connection with the assumption by the Debtor of any Assumed Contract (provided such Claim is filed with the Bankruptcy Court by the Cure Claim Submission Deadline). In no event shall any Claim set out in a Proof of Claim be deemed to be a Cure Claim.

"**Cure Claim Submission Deadline**" means, and shall occur on the same day as, the Voting Deadline.

"**Debt**" has the meaning ascribed to such term in Section 101(12) of the Bankruptcy Code.

"**Debtor**" collectively means Independent MedEquip, LLC, iMedEquip LLC, Viking Medical Supply, LLC, Independent Offices, LLC, MedAlliance LLC, Cloud City Medical, LLC, Physician's Choice Medical, LLC, Central Mobility and Rehab Equipment, LLC, Georgia Medical Supply of Richland, LLC, LifeAid Medical Equipment LLC, and Life Medical Supply LLC.

"**Debtor in Possession**" collectively means Independent MedEquip, LLC, iMedEquip LLC, Viking Medical Supply, LLC, Independent Offices, LLC, MedAlliance LLC, Cloud City Medical, LLC, Physician's Choice Medical, LLC, Central Mobility and Rehab Equipment, LLC, Georgia Medical Supply of Richland, LLC, LifeAid Medical Equipment LLC, and Life Medical Supply LLC, as debtor in possession in the Bankruptcy Case.

"**Determination Date**" means the later of (i) the Effective Date and (ii) the date the order of the Bankruptcy Court allowing a Claim becomes a Final Order (if applicable).

"**DIP Lender**" means Jackson Investment Group, LLC.

"**Disallowed Claim**" means any Claim which has been disallowed by an order of the Bankruptcy Court, which order has not been stayed pending appeal.

"**Disclosure Statement**" means the *Disclosure Statement for Joint Plan of Reorganization for (1) Independent MedEquip, LLC, (2) ImedEquip LLC, (3) Viking Medical Supply, LLC, (4) Independent Offices, LLC, (5) MedAlliance LLC, (6) Cloud City Medical, LLC, (7) Physician's Choice Medical, LLC, (8) Central Mobility and Rehab Equipment, LLC, (9) Georgia Medical Supply Of Richland, LLC, (10) Lifeaid Medical Equipment LLC, and (11) Life Medical Supply LLC*, dated as of July 15, 2026, including all Exhibits attached thereto, as submitted and filed by the Debtor pursuant to Section 1125 of the Bankruptcy Code in respect of the Bankruptcy Case and approved by the Bankruptcy Court in the Disclosure Statement Approval Order, and as such Disclosure Statement may be amended, supplemented, modified or amended and restated from time to time.

"**Disclosure Statement Approval Order**" means the Order Approving Disclosure Statement, Fixing Time to File Applications for Administrative Expenses, Setting Hearing on

10

Confirmation of Plan, and Setting Deadlines with Respect to Confirmation Hearing, to be entered by the Bankruptcy Court.

"**Disputed Claim**" means any Claim or portion thereof (other than a Disallowed Claim) that is not an Allowed Claim and (a) as to which a Proof of Claim has been filed with the Clerk's Office or is deemed filed under applicable law or order of the Bankruptcy Court, or (b) which has been scheduled in the Schedules, and, in the case of subparagraph (a) and (b) above, as to which an objection has been or may be timely filed or deemed filed under the Plan, the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court and any such objection has not been (i) withdrawn, (ii) overruled by an order of the Bankruptcy Court, or (iii) sustained by an order of the Bankruptcy Court. In addition to the foregoing, a Disputed Claim shall mean a Claim that is not an Allowed Claim, whether or not an objection has been or may be timely filed, if (a) the amount of the Claim specified in the Proof of Claim exceeds the amount of any corresponding Claim scheduled in the Schedules, (b) the classification of the Claim specified in the Proof of Claim differs from the classification of any corresponding Claim scheduled in the Schedules, (c) any corresponding Claim has been scheduled in the Schedules as disputed, contingent or unliquidated, (d) no corresponding Claim has been scheduled in the Schedules, or (e) such Claim is reflected as unliquidated or contingent in the Proof of Claim filed in respect thereof. To the extent an objection relates to the allowance of only a part of a Claim, such Claim shall be a Disputed Claim only to the extent of the amount subject to objection. "Disputed," when used as an adjective herein (such as Disputed Administrative Expense Claim, Disputed Priority Tax Claim, Disputed Priority Claim, Disputed Secured Claim, and Disputed Unsecured Claim), has a corresponding meaning.

"**Distribution**" means distribution of Cash to a Creditor on account of an Allowed Claim pursuant to the terms of the Plan.

"**Distribution Date**" means, when used with respect to an Allowed Administrative Expense Claim (including Allowed Administrative Expense Claims of Professionals) or an Allowed Priority Claim in Class 1, subject to the provisions of Article 9.1, with respect to the Initial Distribution, the date which is as soon as reasonably practicable (as determined by the Reorganized Debtor) after the Determination Date, but in no event more than ten (10) days after the Determination Date. "Distribution Date," when used with respect to an Allowed Priority Tax Claim or Allowed Claims in Classes 2-22, means the date or dates for any Distribution to Holders of Allowed Priority Tax Claims or Allowed Claims in Classes 2-22 as provided in the Plan, unless such date or dates have been otherwise established by an order of the Bankruptcy Court.

"**Docket**" means the docket or dockets in the Reorganization Case maintained by the Clerk.

"**Effective Date**" means, and shall occur on, the first Business Day that occurs after the expiration of sixty days from the date that all of the conditions precedent to the occurrence of the Effective Date contained in Article 10.2 of the Plan have been satisfied or waived by the Debtor.

"**Effective Date Notice**" has the meaning ascribed to such terms in Article 10.3 of the Plan.

11

"**Entity**" has the meaning ascribed to such term in Section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means the equity interests in the Debtor held by all Holders of Preferred Stock and all Holders of Common Stock, including (a) any and all options, warrants, rights, grants, or similar instruments for the acquisition of such equity interests, (b) any and all rights to subscribe to shares of such equity interests, and (c) any and all obligations and instruments convertible into shares of such equity interests, and options, warrants or rights to acquire such convertible obligations and instruments.

"**Estate**" means the estate created for the Debtor by Section 541 of the Bankruptcy Code upon the commencement of the Bankruptcy Case.

"**Estimation Hearing**" means a hearing for the estimation of Claims under Section 502(c) of the Bankruptcy Code.

"**Exculpated Parties**" has the meaning ascribed to such term in Article 11.2 of the Plan.

"**Exhibit**" means an exhibit annexed to the Plan or to the Disclosure Statement, as the context requires.

"**Final Decree**" means the final decree for the Bankruptcy Case entered by the Bankruptcy Court after the Effective Date pursuant to Bankruptcy Rule 3022.

"**Final Decree Date**" means the date on which the Final Decree, obtained after a hearing on notice to the Notice Parties and to such other Persons and Entities as the Bankruptcy Court may direct, is entered on the docket for the Bankruptcy Case.

"**Final Order**" means (a) an order, judgment, ruling or other decree (or any revision, modification or amendment thereto) issued and entered by the Bankruptcy Court or by any state or other federal court as may have jurisdiction over any proceeding in connection with the Bankruptcy Case for the purpose of such proceeding, which order, judgment, ruling or other decree has not been reversed, vacated, stayed, modified or amended and as to which (i) no appeal, petition for review, reargument, rehearing, reconsideration or certiorari has been taken and is pending and the time for the filing of any such appeal, petition for review, reargument, rehearing, reconsideration or certiorari has expired, or (ii) such appeal or petition has been heard and dismissed or resolved and the time to further appeal or petition has expired with no further appeal or petition pending; or (b) a stipulation or other agreement entered into which has the effect of any such aforesaid order, judgment, ruling or other decree with like finality.

"**Financial Pacific Leasing**" means Financial Pacific Leasing, Inc.

"**First Citizens Bank**" means First Citizens Bank and Trust.

"**FMCC**" means Ford Motor Credit Company, LLC.

12

"**Governmental Unit**" has the meaning ascribed to such term in Section 101(27) of the Bankruptcy Code.

"**Governmental Unit Bar Date**" means March 17, 2026, the date set by Section 502(b)(9) of the Bankruptcy Code as the last day for a Governmental Unit to file a Proof of Claim against the Debtor in the Bankruptcy Case.

"**Guarantors**" means Lonnie B. Dorcey.

"**Holder**" means (a) as to any Claim, (i) the owner or holder of such Claim as such is reflected on the Proof of Claim filed with respect to such Claim, or (ii) if no Proof of Claim has been filed with respect to such Claim, the owner or holder of such Claim as such is reflected on the Schedules or the books and records of the Debtor or as otherwise determined by order of the Bankruptcy Court, or (iii) if the owner or holder of such Claim has assigned or transferred the Claim to a third party and the Debtor or the Reorganized Debtor, as the case may be, have received sufficient written evidence of such assignment or transfer, the assignee or transferee; and (b) as to any Equity Interest, the record owner or holder of such Equity Interest as shown on the register that is maintained by the Debtor or as otherwise determined by order of the Bankruptcy Court.

"**Huntington Bank**" means Huntington Bank, NA

"**iMed**" collectively means Independent MedEquip, LLC, iMedEquip LLC, Viking Medical Supply, LLC, Independent Offices, LLC, MedAlliance LLC, Cloud City Medical, LLC, Physician's Choice Medical, LLC, Central Mobility and Rehab Equipment, LLC, Georgia Medical Supply of Richland, LLC, LifeAid Medical Equipment LLC, and Life Medical Supply LLC.

"**Impaired**" refers to any Claim or Equity Interest that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

"**Indemnification Rights**" means any obligations or rights of any of the Debtor to indemnify, reimburse, advance, or contribute to the losses, liabilities or expenses of an Indemnitee pursuant to the Debtor's articles or certificate of incorporation, articles of organization, bylaws, operating agreement, or policy of providing indemnification, applicable law, or a specific agreement in respect of any claims, demands, suits, causes of action or proceedings against an Indemnitee based upon any act or omission related to an Indemnitee's service with, for, or on behalf of the Debtor.

"**Indemnitee**" means all present and former directors, officers, employees, agents or representatives of the Debtor who are entitled to assert Indemnification Rights.

"**Independent MedEquip, LLC, iMedEquip LLC, Viking Medical Supply, LLC, Independent Offices, LLC, MedAlliance LLC, Cloud City Medical, LLC, Physician's Choice Medical, LLC, Central Mobility and Rehab Equipment, LLC, Georgia Medical Supply of Richland, LLC, LifeAid Medical Equipment LLC, and Life Medical Supply LLC**" collectively mean the Debtor or the Debtors or iMed.

13

"**Insider**" has the meaning ascribed to such term in Section 101(31) of the Bankruptcy Code.

"**Invaserv**" means Invaserv, LLC.

"**Jackson Investment Group**" means Jackson Investment Group, LLC.

"**JB&B**" means JB&B Capital, LLC.

"**Liabilities**" means any and all liabilities, obligations, judgments, damages, charges, costs, Debts, and indebtedness of any and every kind and nature whatsoever, whether heretofore, now or hereafter owing, arising, due or payable, direct or indirect, absolute or contingent, liquidated or unliquidated, known or unknown, foreseen or unforeseen, in law, equity or otherwise, of or relating to the Debtor or any predecessor, successor or assign thereof, or otherwise based in whole or in part upon any act or omission, transaction, event or other occurrence taking place prior to the Effective Date in any way relating to the Debtor or any predecessor, successor or assign thereof, any Property of the Debtor, the business or operations of the Debtor, the Bankruptcy Case, or the Plan, including any and all liabilities, obligations, judgments, damages, charges, costs, Debts, and indebtedness based in whole or in part upon any Claim of or relating to successor liability, transferee liability, or other similar theory; provided, however, that, when used in the Plan, the term "Liabilities" shall not include any obligations of the Reorganized Debtor expressly set forth in the Plan.

"**Lien**" means, with respect to any Property, any mortgage, pledge, security interest, lien, right of first refusal, option or other right to acquire, assignment, charge, claim, easement, conditional sale agreement, title retention agreement, defect in title, or other encumbrance or hypothecation or restriction of any nature pertaining to or affecting such Property, whether voluntary or involuntary and whether arising by law, contract or otherwise.

"**Marlin Leasing**" means Marlin Leasing Company.

"**Navitas**" means Navitas Credit Corp.

"**Net Disposable Income**" means net cash flow after all of iMed's operating expenses are paid (including payments to creditors in Classes 1-20), which shall include an operating reserve of $850,000 in year 1, increasing thereafter at 8%, as shown in iMed's Plan projections.

"**Notice Parties**" means (a) the Reorganized Debtor, (b) Bankruptcy Counsel, and (c) the Bankruptcy Administrator.

"**Ossur**" means Ossur Americas, Inc.

"**Person**" means any person, individual, corporation, association, partnership, limited liability company, joint venture, trust, organization, business, government, governmental agency or political subdivision thereof, or any other entity or institution of any type whatsoever, including any "person" as such term is defined in Section 101(41) of the Bankruptcy Code.

14

"**Petition Date**" means September 18, 2025, the date on which the Debtor commenced the Bankruptcy Case by filing its voluntary petition under Chapter 11 of the Bankruptcy Code.

"**Philip Medical**" means Philip Medical Capital, LLC

"**Plan**" means the *Joint Plan of Reorganization for (1) Independent MedEquip, LLC, (2) ImedEquip LLC, (3) Viking Medical Supply, LLC, (4) Independent Offices, LLC, (5) MedAlliance LLC, (6) Cloud City Medical, LLC, (7) Physician's Choice Medical, LLC, (8) Central Mobility And Rehab Equipment, LLC, (9) Georgia Medical Supply Of Richland, LLC, (10) Lifeaid Medical Equipment LLC, and (11) Life Medical Supply LLC*, dated as of July 15, 2026, and all Exhibits to the Plan, as the same may be amended, supplemented, modified or amended and restated from time to time in accordance with the provisions of the Plan and the Bankruptcy Code.

"**Plan Documents**" means all documents that aid in effectuating the Plan.

"**Postpetition**" means arising or accruing on or after the Petition Date and before the Effective Date.

"**Prepetition**" means arising or accruing prior to the Petition Date.

"**Priority Claim**" means a Claim that is entitled to a priority in payment pursuant to Sections 507(a)(4), (5) and (7) of the Bankruptcy Code and that is not an Administrative Expense Claim, a Priority Tax Claim, a Secured Claim, a Secured Tax Claim or an Unsecured Claim.

"**Priority Tax Claim**" means a Claim of a Governmental Unit that is entitled to a priority in payment pursuant to Section 507(a)(8) of the Bankruptcy Code and that is not an Administrative Expense Claim, a Priority Claim, a Secured Claim, a Secured Tax Claim or an Unsecured Claim.

"**Professional**" means any professional employed in the Reorganization Case pursuant to an order of the Bankruptcy Court, pursuant to Section 327 or 1103 of the Bankruptcy Code.

"**Projections**" means the cash forecast for the Reorganized Debtor, a copy of which is attached to the Disclosure Statement.

"**Proof of Claim**" means a proof of claim filed with the Bankruptcy Court with respect to a Claim against the Debtor pursuant to Bankruptcy Rule 3001, 3002 or 3003.

"**Property**" means any property or asset of any kind, whether real, personal or mixed, tangible or intangible, whether now existing or hereafter acquired or arising, and wherever located, and any interest of any kind therein.

"**Pro-Rata Share**" means, with respect to any distribution to the Holder of an Allowed Claim in a particular Class or otherwise, a fraction, the numerator of which will be the amount of such Holder's Allowed Claim and the denominator of which will be the sum of all Allowed Claims and all Reserved Claims in such Class and, if applicable, other Classes. The term "Pro-Rata Share"

15

will also be applied in respect of Administrative Expenses, Priority Tax Claims, and Priority Claims as the context requires in the Plan.

"**Rejected Contracts**" has the meaning ascribed to such term in Article 7.1 of the Plan. A list of the Rejected Contracts is set forth in **Exhibit B** attached to the Plan.

"**Reorganization Case**" means the Debtor's bankruptcy case pending before the Bankruptcy Court.

"**Reorganized Debtor**" means the Debtor on and after the Effective Date as reorganized pursuant to the Plan, including any successor thereto by merger, consolidation or otherwise.

"**Reserved Claims**" means all Disputed Claims as of the applicable determination date (a) in the full amount listed in the Schedules, or (b) if a Proof of Claim was timely filed with respect to such Claim, in the face amount of such Proof of Claim, or (c) if the Claim has been estimated by the Bankruptcy Court for the purpose of allowance pursuant to Section 502(c) of the Bankruptcy Code, in the estimated amount. Unless an order of the Bankruptcy Court estimating a Claim provides otherwise, the amount so estimated will apply both for voting purposes and for purposes of computing Reserved Claims. As used in the Plan, the term "Reserved Claims" will not include any Disallowed Claims.

"**SBA**" means United States Small Business Administration.

"**Schedules**" means, collectively, Schedules A/B, D, E/F, G, and H filed by the Debtor in the Bankruptcy Case pursuant to Bankruptcy Rule 1007, as any of such Schedules has been or may hereafter be amended or supplemented from time to time.

"**Secured Claim**" means any Claim of a Creditor that is (a) secured in whole or in part, as of the Petition Date, by a Lien (i) on Collateral and (ii) which is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or (b) subject to setoff under Section 553 of the Bankruptcy Code, but, with respect to both (a) and (b) above, only to the extent of the value of such Creditor's interest in the Estate's interest in such Collateral or the amount subject to setoff, as the case may be. Except as otherwise provided in the Plan, if the value of a Creditor's interest in the Estate's interest in such Collateral or the amount subject to setoff is less than the amount of the Allowed Claim, then such deficiency shall constitute an Unsecured Claim.

"**Secured Creditor**" means any Creditor holding a Secured Claim.

"**Secured Tax Claim**" means a Secured Claim of a Governmental Unit for Prepetition taxes.

"**Security**" has the meaning ascribed to such term in Section 101(49) of the Bankruptcy Code.

"**Southlake**" means Southlake Capital, LLC

16

"**Superpriority Claim**" means any Claim created by a Final Order of the Bankruptcy Court providing for a priority senior to that provided in Section 507(a)(1) of the Bankruptcy Code, including any such Claims granted under Section 364(c)(1) of the Bankruptcy Code.

"**Toyota**" means Toyota Motor Credit Corporation

"**Unimpaired**" refers to a Claim that is not Impaired.

"**United States**" means the United States of America.

"**Unsecured Claim**" means any Claim which is not an Administrative Expense Claim, Priority Tax Claim, Priority Claim, Secured Tax Claim, Secured Claim, or Cure Claim, including (a) any Claim arising from the rejection of an executory contract or unexpired lease under Section 365 of the Bankruptcy Code, (b) except as otherwise provided in the Plan, any portion of a Claim to the extent the value of the Creditor's interest in the Estate's interest in the Collateral securing such Claim is less than the amount of the Allowed Claim, or to the extent that the amount of the Claim subject to setoff is less than the amount of the Allowed Claim, as determined pursuant to Section 506(a) of the Bankruptcy Code, (c) any Claim arising from the provision of goods or services to the Debtor prior to the Petition Date, and (d) any Claim designated as an Unsecured Claim elsewhere in the Plan.

"**Unsecured Creditor**" means any Creditor holding an Unsecured Claim.

"**Volvo**" means Volvo Car Financial Services.

"**Voting Deadline**" means the last day to file, with the Bankruptcy Court, a Ballot accepting or rejecting the Plan as fixed by the Disclosure Statement Approval Order.

"**Voting Instructions**" means the instructions for voting on the Plan contained in the section of the Disclosure Statement entitled "Voting Instructions" and in the Ballot.

"**Windtrust**" means Windtrust Specialty Finance.

Any capitalized term used in the Plan that is not defined in the Plan but that is defined in the Bankruptcy Code or in the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or in the Bankruptcy Rules, as the case may be (with the Bankruptcy Code or the Bankruptcy Rules, as the case may be, controlling in the case of a conflict or ambiguity).

2.2     **Rules of Construction.**

For purposes of the Plan: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) any reference in the Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such contract, instrument, release, indenture or other agreement or document shall be substantially in such form

17

or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or Exhibit means such document or Exhibit as it may have been or may be amended, modified or supplemented; (d) if the Plan's description of the terms of an Exhibit is inconsistent with the terms of the Exhibit, the terms of the Exhibit shall control; (e) unless otherwise specified, all references in the Plan to Articles and Exhibits are references to Articles and Exhibits of or to the Plan; (f) unless the context requires otherwise, the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular Article or section or subsection of the Plan; (g) any phrase containing the term "include" or "including" shall mean including without limitation; (h) all of the Exhibits referred to in the Plan shall be deemed incorporated herein by any such reference and made a part hereof for all purposes; (i) any reference to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; and (j) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply in the construction of the Plan, to the extent such rules are not inconsistent with any other provision in this Article 2.2.

## ARTICLE 3
## TREATMENT OF ADMINISTRATIVE
## EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified in the Plan. The treatment accorded to Administrative Expense Claims and Priority Tax Claims is set forth below in this Article 3.

3.1     **Administrative Expense Claims.**

Except as otherwise provided below, each Holder of an Allowed Administrative Expense Claim (including Allowed Administrative Expense Claims of Professionals) shall be paid (a) on the Distribution Date, an amount, in Cash, by the Reorganized Debtor equal to the Allowed Amount of its Administrative Expense Claim, in accordance with Section 1129(a)(9)(A) of the Bankruptcy Code, or (b) under such other terms as may be agreed upon by both the Holder of such Allowed Administrative Expense Claim and the Debtor or the Reorganized Debtor, as the case may be, or (c) as otherwise ordered by a Final Order of the Bankruptcy Court.

All unpaid fees and charges assessed against the Estate under Chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930, for any calendar quarter ending prior to the Effective Date shall be paid to the Bankruptcy Administrator by the Reorganized Debtor by no later than thirty (30) days following the Effective Date. Following the Effective Date, any fees required to be paid to the Bankruptcy Administrator, pursuant to 28 U.S.C. §1930(a)(6), with respect to the Bankruptcy Case shall be paid by the Reorganized Debtor, until the earlier of (i) the closing of the Bankruptcy Case by the issuance of a Final Decree by the Bankruptcy Court, or (ii) the entry of an order by the Bankruptcy Court dismissing the Bankruptcy Case or converting the Bankruptcy Case to another chapter under the Bankruptcy Code. Any such payment to the Bankruptcy Administrator shall be in the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6) based upon the applicable disbursements for the relevant period and shall be made within the time period set forth in 28 U.S.C. §1930(a)(6). At the time of each such payment, the Reorganized Debtor shall provide to the Bankruptcy Administrator an affidavit indicating the disbursements for the relevant period.

18

All Allowed Administrative Expense Claims with respect to liabilities incurred by the Debtor in the ordinary course of business during the Bankruptcy Case shall be paid by the Reorganized Debtor (a) in the ordinary course of business in accordance with contract terms, or (b) under such other terms as may be agreed upon by both the Holder of such Allowed Administrative Expense Claim and the Debtor or the Reorganized Debtor, as the case may be, or (c) as otherwise ordered by a Final Order of the Bankruptcy Court.

At this time, the list of anticipated Administrative Expense Claims are as follows, with their estimated amounts:

1. Memory Memory & Causby, LLP: $320,000 (estimated through July 2026); IMED has made all requested monthly payments through June 2026;

2. Richard L. DeShazo, CPA: $125,000 (estimated through July 2026); IMED has made all requested monthly payments through June 2026;

3. Warren Averett CPA: $60,000 (estimated through July 2026); IMED has made all requested preliminary payments;

4. Samek & Flynn LLC: $80,000 (estimated through July 2026); IMED has made all requested monthly payments through May 2026;

5. Christian & Small, LLP: $300,000 (estimated through July 2026); IMED has made all requested monthly payments through June 2026;

6. GGG Partners, LLC: $45,000 (estimated through July 2026); IMED has made all requested monthly payments through May 2026;

7. Colliers Alabama: to be determined, once the Debtors' real estate is sold;

8. Sencer Appraisal Associates: to be determined; iMed has paid a $10,000 retainer;

9. BrandWolf Creative: $15,541.00 based on claim filed[2];

10. Enterprise Fleet Management, Inc.: $60,841.88 based on claim filed[3];

11. Drive Medical SPV, LLC: $61.95 based on claim filed; and

12. Airgas USA, LLC: $1,714.44 based on claim filed.

---

[2] BrandWolf Creative filed two administrative expense claims, one of which appears to be duplicate. The Debtors will object to the duplicate claim.
[3] This claim arises pursuant to a lease and will be addressed as an executory contract.

3.2 **Priority Tax Claims**.

Each Holder of an Allowed Priority Tax Claim shall receive from the Reorganized Debtor, on account of such Allowed Priority Tax Claim, regular installment payments in Cash in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code. Notwithstanding the above, each Holder of an Allowed Priority Tax Claim may be paid under such other terms as may be agreed upon by both the Holder of such Allowed Priority Tax Claim and the Debtor or the Reorganized Debtor, as the case may be.

At this time, the list of Priority Tax Claims filed against the Debtors are as follows, with their respective amounts:

1. Alabama Department of Revenue: $552.73;

2. Massachusetts Department of Revenue: $993.86;

3. Internal Revenue Service: $100.00 (against Independent MedEquip, LLC);

4. Internal Revenue Service: $147.08 (against iMedEquip, LLC)[4];

5. Internal Revenue Service: $22,902.51 (against Cloud City Medical, LLC)[5];

6. Internal Revenue Service: $224.70 (against LifeAid Medical Equipment, LLC); and

7. Internal Revenue Service: $136.01 (against Life Medical Supply, LLC).

**ARTICLE 4**
**DESIGNATION OF CLASSES OF CLAIMS AND EQUITY INTERESETS**
**CLAIMS AND EQUITY INTERESTS**

Pursuant to Section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Equity Interests. A Claim or Equity Interest (a) is classified in a particular Class only to the extent the Claim or Equity Interest qualifies within the description of that Class and (b) is classified in a different Class to the extent the Claim or Equity Interest qualifies within the description of that different Class. For purposes of the Plan, the Claims and Equity Interests are classified as follows:

4.1 **Class 1: Allowed Priority Claims, including Prepetition Critical Vendor Claims**.

Class 1 consists of All Priority Claims, including Prepetition Critical Vendor Claims.

4.2 **Class 2: Allowed Secured Claims of Jackson Investment Group, LLC**.

---

[4] The Internal Revenue Service files two claims against iMedEquip, LLC, one of which appears to be a duplicate. The Debtors will object to the duplicate claim and reserve the right to object to the other claim on substantive grounds.
[5] The Debtors have objected to this claim on the grounds that it is not owed. The objection is pending.

20

Class 2 consists of all Allowed Secured Claims of Jackson Investment Group, LLC.

4.3 **<u>Class 3: Allowed Secured Claims of US Small Business Administration</u>.**

Class 3 consists of all Allowed Secured Claims of the US Small Business Administration.

4.4 **<u>Class 4: Allowed Secured Claims of Cadence Bank</u>.**

Class 4 consists of all Allowed Secured Claims of Cadence Bank.

4.5 **<u>Class 5: Allowed Secured Claim of Ford Motor Credit Company, LLC</u>.**

Class 5 consists of all Allowed Secured Claims of Ford Motor Credit Company, LLC.

4.6 **<u>Class 6: Allowed Secured Claim Volvo Car Financial Services</u>.**

Class 6 consists of all Allowed Secured Claims of Volvo Car Financial Services.

4.7 **<u>Class 7: Allowed Secured Claim of Toyota Motor Credit Corporation</u>.**

Class 7 consists of all Allowed Secured Claims of Toyota Motor Credit Corporation.

4.8 **<u>Class 8: Allowed Secured Claim of Marlin Leasing Corporation</u>.**

Class 8 consists of all Allowed Secured Claims of Marlin Leasing Corporation.

4.9 **<u>Class 9: Allowed Secured Claim of Alliance Funding Group</u>.**

Class 9 consists of all Allowed Secured Claims of Alliance Funding Group.

4.10 **<u>Class 10: Allowed Secured Claim of Financial Pacific Leasing, Inc.</u>**

Class 10 consists of all Allowed Secured Claims of Financial Pacific Leasing, Inc.

4.11 **<u>Class 11: Allowed Secured Claim of Navitas Credit Corp</u>.**

Class 11 consists of all Allowed Secured Claims of Navitas Credit Corp.

4.12 **<u>Class 12: Allowed Secured Claim of JB&B Capital, LLC</u>.**

Class 12 consists of all Allowed Secured Claims of JB&B Capital, LLC.

4.13 **<u>Class 13: Allowed Secured Claim of First Citizens Bank and Trust</u>.**

Class 13 consists of all Allowed Secured Claims of First Citizens Bank and Trust.

4.14    **Class 14: Allowed Secured Claim of Southlake Capital, LLC.**

Class 14 consists of all Allowed Secured Claims of Southlake Capital, LLC

4.15    **Class 15: Allowed Secured Claim of Windtrust Specialty Finance.**

Class 15 consists of all Allowed Secured Claims of Windtrust Specialty Finance.

4.16    **Class 16: Allowed Secured Claim of Invaserv, LLC.**

Class 16 consists of all Allowed Secured Claims of Invaserv, LLC

4.17    **Class 17: Allowed Secured Claim of Ameris Bank.**

Class 17 consists of all Allowed Secured Claims of Ameris Bank

4.18    **Class 18: Allowed Secured Claim of Philip Medical Capital, LLC.**

Class 18 consists of all Allowed Secured Claims of Philip Medical Capital, LLC

4.19    **Class 19: Allowed Secured Claim of Ossur Americas, Inc.**

Class 19 consists of all Allowed Secured Claims of Ossur Americas, Inc.

4.20    **Class 20: Allowed Unsecured Claim of Huntington Bank**

Class 20 consists of all Allowed Unsecured Claims of Huntington Bank.

4.21    **Class 21: Allowed Unsecured Claims (Claims Not Otherwise Classified ).**

Class 21 consists of all Allowed Unsecured Claims (Claims Not Otherwise Classified, including all claims secured by junior priority blanket liens for which there is no equity in the Debtor's assets to attach to, and all purchase-money loans that are undersecured and bifurcated by operation of 11 U.S.C. § 506(a)).

4.22    **Class 22: Equity Interests-Membership Interests.**

Class 22 consists of all Allowed Equity Interests-Membership Interests.

**ARTICLE 5**
**TREATMENT OF CLASSIFIED**
**CLAIMS AND EQUITY INTERESTS**

Claims and Equity Interests shall be treated under the Plan in the manner set forth in this Article 5. Except as otherwise specifically provided in the Plan, the treatment of, and the

22

consideration to be received by, Holders of Allowed Claims and Holders of Allowed Equity Interests pursuant to the Plan shall be in full and final satisfaction, settlement, release, extinguishment and discharge of their respective Allowed Claims (of any nature whatsoever) and Allowed Equity Interests.

On May 27, 2026, the Debtor sought to employ Sencer Appraisal Associates (the "**Appraiser**") to value its DME (Doc. No. 335). The Appraiser was approved by the Court on June 30, 2026 (Doc. No. 357). Once the Appraiser finishes its appraisal on the DME, the Debtor anticipates filing a *Motion to Value* or something similar—prior to Confirmation—and then intends to supplement this Disclosure Statement and Plan with the findings of the Appraiser. The Debtor anticipates that the Appraiser's findings will significantly affect the claims of Classes 8-15 and 17-21.

**Notwithstanding the foregoing, for purposes of providing adequate disclosure to creditors, in the projections disclosed on Exhibit A of the Disclosure Statement, it provides scenarios where the value of DME is appraised for 25% of the secured claims; and another scenario where the value of the DME is appraised for 50% of the secured claims. The Debtors reserve the right to amend these amounts, once the Appraiser makes his findings.**

5.1     **Unclassified Claims.**

Holders of Allowed Administrative Expense Claims and Allowed Priority Tax Claims shall receive the treatment set forth in Article 3 of the Plan.

5.2     **Class 1: Allowed Priority Claims, including Prepetition Critical Vendor Claims.**

Class 1 consists of all Allowed Priority Claims. Each Holder of an Allowed Priority Claim shall be paid (a) on the Distribution Date, an amount, in Cash, by the Reorganized Debtor equal to the Allowed Amount of its Priority Claim in accordance with Section 1129(a)(9)(B) of the Bankruptcy Code, or (b) under such other terms as may be agreed upon by both the Holder of such Allowed Priority Claim and the Debtor or the Reorganized Debtor. Class 1 is Unimpaired by the Plan. Each Holder of an Allowed Priority Claim conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan. The only claimants for Class 1 are Motus Nova, NexAir, and ResMed, but only for the remaining amounts of their prepetition critical vendor claims.

**Impaired/Unimpaired:** unimpaired.

5.3     **Class 2: Allowed Secured Claim of Jackson Investment Group, LLC.**

**Claim Amount:** $2,000,000.00 (estimated).

**Amount of Secured Claim:** $2,000,000.00 (estimated).

**Amount of Unsecured Claim:** $0.00.

23

**Type of Security/Security Interest:** First-priority blanket lien on all non-titled personal property of IMED, including priority over purchase-money security interests, plus second mortgage on real property located at 1201 3rd Avenue North, Birmingham, Alabama 35203.

**Disposition of Security/Security Interest:** IMED intends to keep all property, aside from the sale of 1201 3rd Avenue North, Birmingham, Alabama 35203, and the sale of the hospice line of business (see Article 8.1 of the Plan).

**Method of Payment of Claim:** iMed intends to pay the claim off, in full, on the Effective Date. iMed is actively searching for a specialized "take out" lender to do so, to effectively refinance this Claim. For the new "take out" lender, as of the Effective Date, IMED will agree to pay equal monthly installments in the amount of $47,579.86 over 60 months, or as otherwise agreed to by the "take out" lender. The interest rate is anticipated to be approximately 15%. Notwithstanding, once 1201 3rd Avenue North, Birmingham, Alabama 35203 is sold, excess proceeds after closing costs, administrative expenses, and satisfaction of the first mortgage will be paid to the "take out" lender in reduction of the debt. Additionally, once the hospice line of business is sold, the proceeds will likewise be paid to the "take out" lender. And finally, should IMED receive its ERC tax credit—and the "take out" lender prevail that it has a priming lien on same—these funds are to be used to reduce this claim dollar per dollar. Once this claim is satisfied in full, all liens of Jackson Investment Group, LLC are to be assigned to the "take out" lender.

**Impaired/Unimpaired:** impaired.

5.4 **Class 3: Allowed Secured Claim of US Small Business Administration.**

**Claim Amount:** $3,584,041.76 (total of all claims filed).

**Amount of Secured Claim:** $3,584,041.76.

**Amount of Unsecured Claim:** $0.00.

**Type of Security/Security Interest:** Second-priority blanket lien on all non-titled personal property of IMED (but subordinate to purchase-money security interests). May hold senior-priority lien on ERC tax credits owed to IMED.

**Disposition of Security/Security Interest:** IMED intends to keep all personal property other than the sale of the hospice line of business.

**Method of Payment of Claim:** As of the Effective Date, IMED will maintain contract monthly payments until this claim is paid in full. Any excess proceeds from sale of hospice line or recovery of ERC tax credit after the "take out" lender is satisfied will be applied toward the claim. Once the claim is paid in full, all liens of the U.S. Small Business Administration are to be released.

**Impaired/Unimpaired:** impaired.

24

5.5 **Class 4: Allowed Secured Claim of Cadence Bank.**

**Claim Amount:** $3,145,026.01.

**Amount of Secured Claim:** $3,145,026.01.

**Amount of Unsecured Claim:** $0.00.

**Type of Security/Security Interest:** First-priority mortgage on real estate located at 1201 3rd Avenue North, Birmingham, Alabama 35203 (up to $900,000), plus third-priority blanket lien on non-titled personal property of IMED (subject to purchase-money security interests).

**Disposition of Security/Security Interest:** IMED intends to sell the real property located at 1201 3rd Avenue North, Birmingham, Alabama 35203 and its hospice line of business, but otherwise intends to keep its personal property.

**Method of Payment of Claim:** Cadence Bank will be paid up to $900,000 from proceeds of the sale of the real property. As of the Effective Date, IMED will maintain contract monthly payments in the ordinary course. Once the claim is paid in full, all liens of Cadence Bank are to be released.

**Impaired/Unimpaired:** impaired

5.6 **Class 5: Allowed Secured Claim of Ford Motor Credit Company, LLC.**

**Claim Amount:**  a. $4,816.88;
b. $16,517.42; and
c. $3,479.07.

**Amount of Secured Claim:**  a. $4,816.88;
b. $16,517.42; and
c. $3,479.07.

**Amount of Unsecured Claim:** $0.00.

**Type of Security/Security Interest:** purchase-money security interests in vehicles.

**Disposition of Security/Security Interest:** IMED will keep these vehicles and pay these claims in full.

**Method of Payment of Claim:** IMED will maintain contract monthly payments in the ordinary course. Once the claim is paid in full, all liens of Ford Motor Credit Company, LLC are to be released.

**Impaired/Unimpaired:** unimpaired

25

5.7 **Class 6: Allowed Secured Claim Volvo Car Financial Services.**

**Claim Amount:** a. $7,856.39; and
b. $14,047.66.

**Amount of Secured Claim:** a. $7,856.39; and
b. $14,047.66.

**Amount of Unsecured Claim:** $0.00.

**Type of Security/Security Interest:** purchase-money security interests in vehicles

**Disposition of Security/Security Interest:** IMED will keep these vehicles and pay these claims in full.

**Method of Payment of Claim:** IMED will maintain contract monthly payments in the ordinary course. Once the claim is paid in full, all liens of Volvo Car Financial Services are to be released.

**Impaired/Unimpaired:** unimpaired.

5.8 **Class 7: Allowed Secured Claim of Toyota Motor Credit Corporation.**

**Claim Amount:** a. $15,651.27; and
b. $15,651.27.

**Amount of Secured Claim:** a. $15,651.27; and
b. $15,651.27.

**Amount of Unsecured Claim:** $0.00.

**Type of Security/Security Interest:** purchase-money security interests in vehicles

**Disposition of Security/Security Interest:** IMED will keep the vehicles and pay these claims in full.

**Method of Payment of Claim:** IMED will maintain contract monthly payments in the ordinary course. Once the claim is paid in full, all liens of Toyota Motor Credit Corporation are to be released.

**Impaired/Unimpaired:** unimpaired.

5.9 **Class 8: Allowed Secured Claim of Marlin Leasing Corporation.**

**Claim Amount:** $216,092.51.

26

**Amount of Secured Claim:** Filed at $120,000; amount to be determined by the upcoming appraisal and hearing on *Motion to Value*. Notwithstanding, for purposes of disclosure, please see **Exhibit A of the Disclosure Statement**.

**Amount of Unsecured Claim:** the net amount remaining after you subtract the secured claim amount from the claim amount.

**Type of Security/Security Interest:** purchase-money security interest in durable medical equipment.

**Disposition of Security/Security Interest:** Debtors intend to keep.

**Method of Payment of Claim:** Once the Plan becomes effective, the secured portion of this claim is to be paid over one hundred twenty (120) equal monthly installments in an amount to be determined after the appraisal. Interest rate to be 6%. Once the secured portion of this claim is paid in full, the creditor will release all its liens to the collateral. The unsecured portion of this claim will be paid in accordance with Class 21.

**Impaired/Unimpaired:** impaired.

5.10    **Class 9: Allowed Secured Claim of Alliance Funding Group.**

**Claim Amount:**      a. $55,224.58; and
                                    b. $55,137.51.

**Amount of Secured Claim:** Filed at $30,000 for each claim; amounts to be determined by the upcoming appraisal and hearing on *Motion to Value*. Notwithstanding, for purposes of disclosure, please see **Exhibit A of the Disclosure Statement**.

**Amount of Unsecured Claim:** the net amount remaining after you subtract the secured claim amount from the claim amount.

**Type of Security/Security Interest:** purchase-money security interest in durable medical equipment.

**Disposition of Security/Security Interest:** Debtors intend to keep.

**Method of Payment of Claim:** Once the Plan becomes effective, the secured portion of this claim is to be paid over one hundred twenty (120) equal monthly installments in an amount to be determined after the appraisal. Interest rate to be 6%. Once the secured portion of this claim is paid in full, the creditor will release all its liens to the collateral. The unsecured portion of this claim will be paid in accordance with Class 21.

**Impaired/Unimpaired:** impaired.

5.11    **Class 10: Allowed Secured Claim of Financial Pacific Leasing, Inc.**

27

**Claim Amount:**      a. $41,969.21;
                                  b. $45,878.65;
                                  c. $39,285.45;
                                  d. $66,712.62;
                                  e. $28,056.09;
                                  f. $63,651.54; and
                                  g. $23,722.14.

**Amount of Secured Claim:** Each claim was filed as fully secured; amounts to be determined by the upcoming appraisal and hearing on *Motion to Value*. Notwithstanding, for purposes of disclosure, please see **Exhibit A of the Disclosure Statement**.

**Amount of Unsecured Claim:** the net amount remaining after you subtract the secured claim amount from the claim amount.

**Type of Security/Security Interest:** purchase-money security interest in durable medical equipment.

**Disposition of Security/Security Interest:** Debtors intend to keep.

**Method of Payment of Claim:** Once the Plan becomes effective, the secured portion of this claim is to be paid over one hundred twenty (120) equal monthly installments in an amount to be determined after the appraisal. Interest rate to be 6%. Once the secured portion of this claim is paid in full, the creditor will release all its liens to the collateral. The unsecured portion of this claim will be paid in accordance with Class 21.

**Impaired/Unimpaired:** impaired.

5.12    **Class 11: Allowed Secured Claim of Navitas Credit Corp.**

**Claim Amount:** $6,495.52.

**Amount of Secured Claim:** Filed at $5,000; amount to be determined by the upcoming appraisal and hearing on *Motion to Value*. Notwithstanding, for purposes of disclosure, please see **Exhibit A of the Disclosure Statement**.

**Amount of Unsecured Claim:** the net amount remaining after you subtract the secured claim amount from the claim amount.

**Type of Security/Security Interest:** purchase-money security interest in durable medical equipment.

**Disposition of Security/Security Interest:** Debtors intend to keep.

28

**Method of Payment of Claim:** Once the Plan becomes effective, the secured portion of this claim is to be paid over one hundred twenty (120) equal monthly installments in an amount to be determined after the appraisal.  Interest rate to be 6%.  Once the secured portion of this claim is paid in full, the creditor will release all its liens to the collateral.  The unsecured portion of this claim will be paid in accordance with Class 21.

**Impaired/Unimpaired:** impaired.

5.13    **Class 12: Allowed Secured Claim of JB&B Capital, LLC.**

**Claim Amount:** $44,377.25.

**Amount of Secured Claim:** Filed as fully secured; amount to be determined by the upcoming appraisal and hearing on *Motion to Value*.  Notwithstanding, for purposes of disclosure, please see **Exhibit A of the Disclosure Statement**.

**Amount of Unsecured Claim:** the net amount remaining after you subtract the secured claim amount from the claim amount.

**Type of Security/Security Interest:** purchase-money security interest in durable medical equipment.

**Disposition of Security/Security Interest:** Debtors intend to keep.

**Method of Payment of Claim:** Once the Plan becomes effective, the secured portion of this claim is to be paid over one hundred twenty (120) equal monthly installments in an amount to be determined after the appraisal.  Interest rate to be 6%.  Once the secured portion of this claim is paid in full, the creditor will release all its liens to the collateral.  The unsecured portion of this claim will be paid in accordance with Class 21.

**Impaired/Unimpaired:** impaired.

5.14    **Class 13: Allowed Secured Claim of First Citizens Bank and Trust.**

**Claim Amount:**         a. $56,531.00; and
                          b. $182,024.58.

**Amount of Secured Claim:** Each claim filed as fully secured; amounts to be determined by the upcoming appraisal and hearing on *Motion to Value*.  Notwithstanding, for purposes of disclosure, please see **Exhibit A of the Disclosure Statement**.

**Amount of Unsecured Claim:** the net amount remaining after you subtract the secured claim amount from the claim amount.

**Type of Security/Security Interest:** First claim is purchase-money security interest in durable medical equipment.  Second claim appears to assert junior blanket lien in personal property

29

and might not be perfected as a purchase-money security interest. Debtor reserves the right to object to perfection of second claim as purchase-money security interest.

**Disposition of Security/Security Interest:** Debtors intend to keep.

**Method of Payment of Claim:** Once the Plan becomes effective, the secured portion of this claim is to be paid over one hundred twenty (120) equal monthly installments in an amount to be determined after the appraisal. Interest rate to be 6%. Once the secured portion of this claim is paid in full, the creditor will release all its liens to the collateral. The unsecured portion of this claim will be paid in accordance with Class 21.

**Impaired/Unimpaired:** impaired.

5.15 **Class 14: Allowed Secured Claim of Southlake Capital, LLC.**

**Claim Amount:**　　a. $238,416.38;
　　　　　　　　　　b. $48,147.36; and
　　　　　　　　　　c. $24,493.75.

**Amount of Secured Claim:** n/a.

**Amount of Unsecured Claim:** n/a

**Type of Security/Security Interest:** n/a

**Disposition of Security/Security Interest:** Debtors intend to keep.

**Method of Payment of Claim:** Per agreement with Southlake Capital, LLC, the Debtors will lump this secured claim with Southlake's leases and treat all contracts as a master lease.

**Impaired/Unimpaired:** impaired.

5.16 **Class 15: Allowed Secured Claim of Windtrust Specialty Finance.**

**Claim Amount:** $87,224.64.

**Amount of Secured Claim:** Filed at $86,924.64; amount to be determined by the upcoming appraisal and hearing on *Motion to Value*. Notwithstanding, for purposes of disclosure, please see **Exhibit A of the Disclosure Statement**.

**Amount of Unsecured Claim:** the net amount remaining after you subtract the secured claim amount from the claim amount.

**Type of Security/Security Interest:** purchase-money security interest in durable medical equipment.

30

**Disposition of Security/Security Interest:** Debtors intend to keep.

**Method of Payment of Claim:** Once the Plan becomes effective, the secured portion of this claim is to be paid over one hundred twenty (120) equal monthly installments in an amount to be determined after the appraisal.  Interest rate to be 6%.  Once the secured portion of this claim is paid in full, the creditor will release all its liens to the collateral.  The unsecured portion of this claim will be paid in accordance with Class 21.

**Impaired/Unimpaired:** impaired.

5.17    **Class 16: Allowed Secured Claim of Invaserv, LLC.**

**Claim Amount:** $70,836.13.

**Amount of Secured Claim:** $70,836.13, reduce by payments made by iMed during the pendency of the Bankruptcy Case.

**Amount of Unsecured Claim:** $0.00.

**Type of Security/Security Interest:** purchase money security interest in durable medical equipment.

**Disposition of Security/Security Interest:** Debtors intend to keep.

**Method of Payment of Claim:** Debtors intend to make monthly payments in the ordinary course at contract rate.  Once contract payments are completed, Invaserv, LLC will release all liens.

**Impaired/Unimpaired:** unimpaired.

5.18    **Class 17: Allowed Secured Claim of Ameris Bank.**

**Claim Amount:** $45,989.82.

**Amount of Secured Claim:** Filed at $25,000; amount to be determined by the upcoming appraisal and hearing on *Motion to Value*.  Notwithstanding, for purposes of disclosure, please see **Exhibit A of the Disclosure Statement**.

**Amount of Unsecured Claim:** the net amount remaining after you subtract the secured claim amount from the claim amount.

**Type of Security/Security Interest:** purchase money security interest in durable medical equipment.

**Disposition of Security/Security Interest:** Debtors intend to keep.

31

**Method of Payment of Claim:** Once the Plan becomes effective, the secured portion of this claim is to be paid over one hundred twenty (120) equal monthly installments in an amount to be determined after the appraisal. Interest rate to be 6%. Once the secured portion of this claim is paid in full, the creditor will release all its liens to the collateral. The unsecured portion of this claim will be paid in accordance with Class 21.

**Impaired/Unimpaired:** impaired.

5.19    **Class 18: Allowed Secured Claim of Philip Medical Capital, LLC.**

**Claim Amount:** $227,417.12.

**Amount of Secured Claim:** Filed as fully secured; amount to be determined by the upcoming appraisal and hearing on *Motion to Value*. Notwithstanding, for purposes of disclosure, please see **Exhibit A of the Disclosure Statement**.

**Amount of Unsecured Claim:** the net amount remaining after you subtract the secured claim amount from the claim amount.

**Type of Security/Security Interest:** purchase money security interest in durable medical equipment.

**Disposition of Security/Security Interest:** Debtors intend to keep.

**Method of Payment of Claim:** Once the Plan becomes effective, the secured portion of this claim is to be paid over one hundred twenty (120) equal monthly installments in an amount to be determined after the appraisal. Interest rate to be 6%. Once the secured portion of this claim is paid in full, the creditor will release all its liens to the collateral. The unsecured portion of this claim will be paid in accordance with Class 21.

**Impaired/Unimpaired:** impaired.

5.20    **Class 19: Allowed Secured Claim of Ossur Americas, Inc.**

**Claim Amount:** $600.94.

**Amount of Secured Claim:** Filed as fully secured; however, claim lacks documentation supporting a security interest. Debtors will object to secured status of claim.

**Amount of Unsecured Claim:** the net amount remaining after you subtract the secured claim amount from the claim amount.

**Type of Security/Security Interest:** Secured status of claim not supported by documentation.

**Disposition of Security/Security Interest:** Debtors intend to keep.

**Method of Payment of Claim:** Once the Plan becomes effective, the secured portion of this claim is to be paid over one hundred twenty (120) equal monthly installments in an amount to be determined after the appraisal. Interest rate to be 6%. Once the secured portion of this claim is paid in full, the creditor will release all its liens to the collateral. The unsecured portion of this claim will be paid in accordance with Class 21.

**Impaired/Unimpaired:** impaired.

5.21  **Class 20: Allowed Unsecured Claims of Huntington Bank.**

Class 20 consists of all Unsecured Claims filed on the behalf of Huntington Bank (Claims Number 31 and 32 in the underlying bankruptcy case). Although these claims were filed as secured, their UCC statements disclose a blanket lien on personal property. Since Huntington Bank's blanket lien is subordinate to blanket liens in favor of the "take out" lender, the United States Small Business Administration, and Cadence Bank, Huntington Bank's claims shall be deemed unsecured and distributed in accordance with Class 21.

**Impaired/Unimpaired:** impaired.

5.22  **Class 21: Allowed Unsecured Claims (Claims Not Otherwise Classified, including all merchant cash advance loans).**

Class 21 consists of all Unsecured Claims not otherwise classified in the Plan, including all claims secured by junior priority blanket liens for which there is no equity in the Debtor's assets to attach to, and all purchase-money loans that are undersecured and bifurcated by operation of 11 U.S.C. § 506(a). Under the Plan, Holders of Allowed Class 21 Claims shall be paid their Pro-Rata Share of 30% the Debtor's Net Disposable Income for the lesser of (1) receiving these Net Disposable Income amounts for five (5) years; or receiving 100% of their claim during the next five (5) years. The Debtor will make annual payments to Class 21 Allowed Claims beginning one (1) year from the Effective Date and will continue on the same date each year thereafter for a total of five (5) payments over five (5) years. The timing and procedures for, and amount of, distributions to Holders of Allowed Class 21 Claims shall be in accordance with Article 9 of the Plan, the Confirmation Order, and the Projections.

**Impaired/Unimpaired:** impaired.

5.23  **Class 22: Equity Interests-Membership Interests.**

Class 22 consists of all Equity Interests held by the Holders of Membership Interests. Class 22 is Unimpaired by the Plan. The Holder of the Class 22 Equity Interests are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

On the Effective Date, the pre-petition Equity Interests shall be deemed cancelled and extinguished. Thereafter, the Holders of Equity Interests (including the ten percent Equity Interests held by or on behalf of Chadd Hodges) shall receive equity in the same percentages in

33

the Reorganized Debtors in consideration for (a) the contribution of $100,000.00 by Lonnie Dorcey; and (b) their post-petition contribution and continued contribution to the operations of the Reorganized Debtor and assistance to the Reorganized Debtor in obtaining any additional and necessary financing for the continued operations of the Reorganized Debtor (collectively, the "**New Value Contribution**"). To the extent necessary for confirmation purposes, these contributions shall be treated as a New Value Contribution for the new Equity Interests. The new Equity Interests may be issued in the same form of ownership as held prepetition or as otherwise designated by the Holders of the Equity Interests.

**Impaired/Unimpaired:** unimpaired.

## ARTICLE 6
## ACCEPTANCE OR REJECTION OF THE PLAN

6.1 **Each Impaired Class Entitled to Vote Separately.**

Except as otherwise provided in Article 6.4, the Holders of Claims or Equity Interests in each Impaired Class of Claims or Impaired Class of Equity Interests shall be entitled to vote separately to accept or reject the Plan.

6.2 **Acceptance by Impaired Classes.**

Classes 2-4, 8-15, and 17-21 are Impaired under the Plan, and Holders of Claims in such Classes are entitled to vote to accept or reject the Plan. Pursuant to Section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if (a) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. If a Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number of Claims in such Class voting on the Plan. Pursuant to Section 1126(d) of the Bankruptcy Code, an Impaired Class of Equity Interests shall have accepted the Plan if the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Equity Interests actually voting in such Class have voted to accept the Plan.

6.3 **Presumed Acceptance of Plan by Unimpaired Classes.**

Classes 1, 5-7, 16, and 22 are Unimpaired under the Plan. Pursuant to Section 1126(f) of the Bankruptcy Code, such Classes and the Holders of Claims in such Classes are conclusively presumed to have accepted the Plan and, thus, are not entitled to vote on the Plan. Accordingly, votes of Holders of Claims in Classes 1, 5-7, 16, and 22 are not being solicited by the Debtor. Except as otherwise expressly provided in the Plan, nothing contained herein or otherwise shall affect the rights and legal and equitable claims or defenses of the Debtor or the Reorganized Debtor

34

in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

6.4     **Impairment Controversies.**

If a controversy arises as to whether any Claim or Equity Interest, or any Class of Claims or Class of Equity Interests, is Impaired under the Plan, such Claim, Equity Interest or Class shall be treated as specified in the Plan unless the Bankruptcy Court shall determine such controversy upon motion of the party challenging the characterization of a particular Claim or Equity Interest, or a particular Class of Claims or Class of Equity Interests, under the Plan.

**ARTICLE 7**
**TREATMENT OF EXECUTORY**
**CONTRACTS AND UNEXPIRED LEASES**

7.1     **Assumption or Rejection of Executory Contracts and Unexpired Leases**.

Prepetition, the Debtor entered into a number of financing agreements with lenders. Unless otherwise treated differently herein and in the Plan, Debtor takes the position that all equipment loans are financing agreements and not leases. Plan treatment for each of the lender's financing agreements is set forth in Article 5 of the Plan.

Pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, (i) all executory contracts and unexpired leases that currently exist between the Debtor and another Person or Entity and that are listed on **Exhibit A** attached hereto shall be deemed assumed by the Debtor as of the Effective Date, and (ii) all other executory contracts and unexpired leases that currently exist between the Debtor and another Person or Entity and that are not listed on **Exhibit B** attached hereto shall be deemed assumed by the Debtor as of the Effective Date (collectively, the "**Assumed Contracts**"); provided, however, that the Debtor reserves the right, on or prior to the Confirmation Date, to amend **Exhibit A or B** to add any executory contract or unexpired lease thereto or to delete any executory contract or unexpired lease therefrom, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be rejected (if added) or assumed (if deleted). The Debtor shall provide notice of any amendments to **Exhibit A or B** to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on **Exhibit A or B** shall not constitute an admission by the Debtor that such document is an executory contract or an unexpired lease or that the Debtor has any liability thereunder. Any executory contract or unexpired lease that exists between the Debtor and another Person or Entity and that is listed on **Exhibit B** attached hereto shall be deemed rejected by the Debtor as of the Confirmation Date (collectively, the "**Rejected Contracts**"), unless there is pending before the Bankruptcy Court on the Confirmation Date a motion to assume such executory contract or unexpired lease. For purposes of the Plan, (i) all non-compete agreements, confidentiality or non-disclosure agreements and indemnification agreements executed for the benefit of the Debtor shall be deemed to be executory contracts and Assumed Contracts, and (ii) all non-compete agreements, confidentiality or non-disclosure agreements, indemnification agreements and guaranties executed by the Debtor for the benefit of a third party shall be deemed to be executory contracts and Rejected Contracts (even if not listed on **Exhibit B**).

35

7.2     **<u>Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases</u>.**

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Article 7.1 hereof, (ii) the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Article 7.1 hereof, and (iii) the extension of time, pursuant to Section 365(d)(4) of the Bankruptcy Code, within which the Debtor may assume, assume and assign, or reject any unexpired lease of nonresidential real property through the date of entry of an order approving the assumption, assumption and assignment, or rejection of such unexpired lease. The assumption by the Debtor of an Assumed Contract shall be binding upon any and all parties to such Assumed Contract as a matter of law, and each such Assumed Contract shall be fully enforceable by the Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan or an order of the Bankruptcy Court.

7.3     **<u>Inclusiveness</u>.**

Unless otherwise specified on **Exhibit A** or **Exhibit B**, each executory contract and unexpired lease listed or to be listed on **Exhibit A** or **Exhibit B** shall include all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on **Exhibit A** or **Exhibit B**.

7.4     **<u>Cure of Defaults</u>.**

Any lessor, lessee, or other party to an Assumed Contract (except those lessors, lessees, or other parties whose unexpired leases or executory contracts have been previously assumed by a Final Order of the Bankruptcy Court) asserting a Cure Claim in connection with the assumption of any unexpired lease or executory contract under Article 7.1, as contemplated by Section 365(b) of the Bankruptcy Code, must file such Cure Claim with the Bankruptcy Court on or before the Cure Claim Submission Deadline asserting all alleged amounts accrued or alleged defaults through the Effective Date. Any lessor or other party to an Assumed Contract failing to file a Cure Claim by the Cure Claim Submission Deadline shall be forever barred from asserting, collecting or seeking to collect any amounts or defaults relating thereto against the Debtor or the Reorganized Debtor. The Reorganized Debtor shall have ninety (90) days from the Effective Date to file an objection to any Cure Claim. Any disputed Cure Claims shall be resolved either consensually or by the Bankruptcy Court. Except as may otherwise be agreed to by the parties, by no later than one hundred eighty (180) days following the Effective Date, the Reorganized Debtor shall cure any and all undisputed Cure Claims. All disputed Cure Claims shall be cured within one hundred twenty (120) days after the entry of a Final Order determining the amount, if any, of the Debtor's liability with respect thereto or as may otherwise be agreed to by the parties. As of the date of the Plan, the Debtor does not believe there will be any significant Cure Claims.

36

7.5 **Claims Under Rejected Executory Contracts and Unexpired Leases.**

Unless otherwise ordered by the Bankruptcy Court, any Claim for damages arising by reason of the rejection of any executory contract or unexpired lease must be filed with the Bankruptcy Court on or before the Bar Date for rejection damage Claims in respect of such rejected executory contract or unexpired lease or such Claim shall be forever barred and unenforceable against the Debtor or the Reorganized Debtor. With respect to the Rejected Contracts, the Bar Date for filing rejection damage and other Claims with the Bankruptcy Court shall be thirty (30) days after the Confirmation Date. The Plan and any other order of the Bankruptcy Court providing for the rejection of an executory contract or unexpired lease shall constitute adequate and sufficient notice to Persons or Entities which may assert a Claim for damages from the rejection of an executory contract or unexpired lease of the Bar Date for filing a Claim in connection therewith.

All Claims for damages from the rejection of an executory contract or unexpired lease, once fixed and liquidated by the Bankruptcy Court and determined to be Allowed Claims, shall be Allowed Unsecured Claims in Class 21.

7.6 **Insurance Policies.**

All of the Debtor's insurance policies and any agreements, documents, or instruments relating thereto are treated as executory contracts under the Plan. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor or the Reorganized Debtor may hold against any Person or Entity, including the insurers under any of the Debtor's insurance policies.

7.7 **Indemnification Rights.**

All Claims for Indemnification Rights against the Debtor by an Indemnitee for defense and indemnification shall be reinstated against the Reorganized Debtor and rendered Unimpaired to the extent that such Indemnitee is entitled to defense or indemnification under applicable law, agreement or past policy of the Debtor, but only to the extent that any such reinstated Claim for defense and indemnification in response to a claim against such Indemnitee is covered under any of the Debtor's insurance policies. The reinstated Claim against the Reorganized Debtor, and the Reorganized Debtor's corresponding defense and indemnification obligation, shall not be for any deductible or self-insured retention amount and shall not exceed the amount of available insurance coverage.

## ARTICLE 8
## MEANS OF IMPLEMENTATION OF THE PLAN

8.1 **General Overview of the Plan.**

The Plan provides for the continued operation of the Debtor as the Reorganized Debtor. The Plan provides for Cash payments to Holders of Allowed Claims, except Holders of Equity Interests, all as more particularly described in Articles 3 and 5 of the Plan.

37

The Plan shall be implemented on the Effective Date, and the primary source of the funds necessary to implement the Plan initially will be the Cash of the Reorganized Debtor, as shown on the Projections. At the present time, the Debtor believes that the Reorganized Debtor will have sufficient funds, as of the Effective Date, to pay in full the expected payments required under the Plan.

In addition, the Debtor anticipates three (3) significant transactions that will assist with the overall funding of the Plan:

1. <u>Sale of 1201 3rd Avenue North, Birmingham, Alabama 35203</u>. This property is currently for sale. Any sale proceeds after closing costs and related expenses will be paid first to Cadence Bank up to the amount of $900,000 in full satisfaction of its mortgage interest. Any remaining sale proceeds will be paid to a "take out" lender (one that will be assigned the interest of Jackson Investment Group, LLC), up to the amount of its indebtedness, and in full satisfaction of its mortgage interest.

2. <u>Receipt of ERC Tax Credit</u>. The Debtor has applied for an Employee Retention Credit ("**ERC**") with the Internal Revenue Service ("**IRS**"). The Small Business Administration ("**SBA**") and the "take out" lender (by way of assignment from Jackson Investment Group, LLC) have asserted priority to these funds. All rights have been reserved by both parties. Once these funds are received, they will be paid either to the "take out" lender or the SBA to reduce their claims, in the sound discretion of the Bankruptcy Court. iMed reserves the right to interplead these funds if necessary.

3. <u>Sale of Hospice Line of Business</u>. In the latter half of 2026, the Debtor anticipates receiving an offer from private equity groups to sell its hospice line of business. The net proceeds from this sale are likely to be paid to either the "take out" lender, the SBA, or Cadence Bank.

8.2 **Effective Date Actions.**

Subject to the approval of the Bankruptcy Court and the satisfaction or waiver of the conditions precedent to the occurrence of the Effective Date contained in Article 10.2 of the Plan, on or as of the Effective Date, the Plan shall be implemented and the following actions shall thereafter immediately occur:

1. the Reorganized Debtor shall make the Initial Distribution as provided in Article 9.1 of the Plan; and

2. the Reorganized Debtor shall carry out its other Effective Date responsibilities under the Plan, including the execution and delivery of all documentation contemplated by the Plan and the Plan Documents.

8.3 **Vesting of Property of the Estate in the Reorganized Debtor.**

On the Effective Date, except as otherwise expressly provided in the Plan, all Property of the Estate (including the Causes of Action and any net operating losses) shall vest in the

38

Reorganized Debtor free and clear of any and all Liens, Debts, obligations, Claims, Cure Claims, Liabilities, Equity Interests, and all other interests of every kind and nature except the Permitted Liens, and the Confirmation Order shall so provide. The Reorganized Debtor intends to preserve net operating losses to the maximum extent permitted under applicable law. As of the Effective Date, the Reorganized Debtor may operate its business and use, acquire, and dispose of its Properties, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. All privileges with respect to the Property of the Debtor's Estate, including the attorney/client privilege, to which the Debtor is entitled shall automatically vest in, and may be asserted by or waived on behalf of, the Reorganized Debtor.

8.4 **Continued Corporate Existence, Dissolution.**

The Debtor will continue to exist after the Effective Date as a separate corporate entity, with all of the powers of business entities under applicable state law and pursuant to its organizational documents in effect prior to the Effective Date, except to the extent such organizational documents are amended or amended and restated as provided in the Plan or the Confirmation Order, without prejudice to any right to terminate such existence (whether by merger, dissolution or otherwise) under applicable law after the Effective Date.

8.5 **Corporate Action**.

All matters provided for under the Plan involving the corporate structure of the Debtor or the Reorganized Debtor, or any corporate action to be taken by or required of the Debtor or the Reorganized Debtor shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the officers of the Debtor or the Reorganized Debtor.

8.6 **Executive Officers of the Reorganized Debtor.**

Subject to any requirement of Bankruptcy Court approval pursuant to Section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the executive officers of the Debtor immediately prior to the Effective Date (with the exception of the chief restructuring officer) shall be deemed to be the executive officers of the Reorganized Debtor without any further action by any party. Lonnie B. Dorcey shall continue to serve as officer of the Debtor.

On and after the Effective Date, the operations of the Reorganized Debtor shall continue to be the responsibility of the executive officers. Each executive officer of the Reorganized Debtor shall serve from and after the Effective Date until his or her successor is duly appointed and qualified or until his or her earlier death, resignation or removal in accordance with the organizational documents of the Reorganized Debtor.

From and after the Confirmation Date, the executive officers of the Debtor and the Reorganized Debtor, as the case may be, shall have all powers accorded by law to put into effect and carry out the Plan and the Confirmation Order.

39

To the extent that, as of the Effective Date, the Debtor has in place employment, indemnification and other agreements with its officers and employees who will continue in such capacities after the Effective Date, such agreements shall remain in place after the Effective Date, and the Reorganized Debtor will continue to honor such agreements, except as otherwise provided in the Plan. Such agreements may include equity, bonus and other incentive plans in which directors, officers and other employees of the Reorganized Debtor may be eligible to participate.

8.7 **Section 1146 Exemption.**

Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, distribution, transfer or exchange of any Security, or the making, delivery or recording of any instrument of transfer, pursuant to, in implementation of or as contemplated by the Plan or any Plan Document, or the vesting, re-vesting, transfer or sale of any Property of, by or in the Debtor or its Estate or the Reorganized Debtor pursuant to, in implementation of or as contemplated by the Plan or any Plan Document, or any transaction arising out of, contemplated by or in any way related to the foregoing, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangible or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall be, and hereby are, directed to forego the collection of any such tax or governmental assessment and to accept for filing and recording any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

8.8 **Pursuit of Causes of Action.**

On the Effective Date, the Causes of Action shall be vested in the Reorganized Debtor, except to the extent a Creditor or other third party has been specifically released from any Cause of Action by the terms of the Plan or by a Final Order of the Bankruptcy Court. Reorganized Debtor will have the right, in its sole and absolute discretion, to pursue, not pursue, settle, release or enforce any Causes of Action without seeking any approval from the Bankruptcy Court except as provided in Article 8.9. The Debtor is currently not in a position to express an opinion on the merits of any of the Causes of Action or on the recoverability of any amounts as a result of any such Causes of Action. For purposes of providing notice, the Debtor states that any party in interest that engaged in business or other transactions with the Debtor Prepetition or that received payments from the Debtor Prepetition may be subject to litigation to the extent that applicable bankruptcy or non-bankruptcy law supports such litigation. The Reorganized Debtor will fund the costs and expenses (including legal fees) to pursue the Causes of Action.

No Creditor or other party should vote for the Plan or otherwise rely on the Confirmation of the Plan or the entry of the Confirmation Order in order to obtain, or on the belief that it will obtain, any defense to any Cause of Action. No Creditor or other party should act or refrain from acting on the belief that it will obtain any defense to any Cause of Action. ADDITIONALLY, THE PLAN DOES NOT, AND IS NOT INTENDED TO, RELEASE ANY CAUSES OF ACTION OR OBJECTIONS TO CLAIMS, AND ALL SUCH RIGHTS ARE SPECIFICALLY RESERVED IN FAVOR OF REORGANIZED DEBTOR. Creditors are advised that legal rights, claims and rights of action the Debtor may have against them, if they exist, are retained under the

40

Plan for prosecution unless a Final Order of the Bankruptcy Court authorizes the Debtor to release such claims. As such, Creditors are cautioned not to rely on (i) the absence of the listing of any legal right, claim or right of action against a particular Creditor in the Disclosure Statement, the Plan, or the Schedules, or (ii) the absence of litigation or demand prior to the Effective Date of the Plan as any indication that the Debtor or Reorganized Debtor does not possess or does not intend to prosecute a particular claim or Cause of Action if a particular Creditor votes to accept the Plan. It is the expressed intention of the Plan to preserve rights, objections to Claims, and rights of action of the Debtor, whether now known or unknown, for the benefit of the Reorganized Debtor. A Cause of Action shall not, under any circumstances, be waived as a result of the failure of the Debtor to describe such Cause of Action with specificity in the Plan or in the Disclosure Statement; nor shall the Reorganized Debtor, as a result of such failure, be estopped or precluded under any theory from pursuing such Cause of Action. Nothing in the Plan operates as a release of any of the Causes of Action.

The Debtor does not presently know the full extent of the Causes of Action and, for purposes of voting on the Plan, all Creditors are advised that Reorganized Debtor will have substantially the same rights that a Chapter 7 trustee would have with respect to the Causes of Action. Accordingly, neither a vote to accept the Plan by any Creditor nor the entry of the Confirmation Order will act as a release, waiver, bar or estoppel of any Cause of Action against such Creditor or any other Person or Entity, unless such Creditor, Person or Entity is specifically identified by name as a released party in the Plan, in the Confirmation Order, or in any other Final Order of the Bankruptcy Court. Confirmation of the Plan and entry of the Confirmation Order is not intended to and shall not be deemed to have any res judicata or collateral estoppel or other preclusive effect that would precede, preclude, or inhibit prosecution of such Causes of Action following Confirmation of the Plan.

At this time, the Debtor believes the Causes of Action consist primarily of the Avoidance Actions.

The Debtor and the Reorganized Debtor reserve all rights under Section 506(c) of the Bankruptcy Code with respect to any and all Secured Claims.

The Estate shall remain open, even if the Bankruptcy Case has been closed, as to any and all Causes of Action until such time as the Causes of Action have been fully administered and the Causes of Action Recoveries have been received by the Reorganized Debtor.

**8.9** **Prosecution and Settlement of Claims and Causes of Action.**

The Reorganized Debtor (a) may commence or continue in any appropriate court or tribunal any suit or other proceeding for the enforcement of any Cause of Action which the Debtor had or had power to assert immediately prior to the Effective Date, and (b) may settle or adjust such Cause of Action. From and after the Effective Date, the Reorganized Debtor shall be authorized, pursuant to Bankruptcy Rule 9019 and Section 105(a) of the Bankruptcy Code, to compromise and settle any Cause of Action or objection to a Claim in accordance with the following procedures, which shall constitute sufficient notice in accordance with the Bankruptcy Code and the Bankruptcy Rules for compromises and settlements: (i) if the resulting settlement

Case 25-02821-TOM11    Doc 368    Filed 07/15/26    Entered 07/15/26 17:18:37    Desc
Main Document     Page 41 of 60

provides for settlement of a Cause of Action or objection to a Claim originally asserted in an amount equal to or less than $25,000, then the Reorganized Debtor may settle the Cause of Action or objection to Claim and execute necessary documents, including a stipulation of settlement or release, subject to notifying the Bankruptcy Administrator and the Notice Parties of the terms of the settlement agreement; provided, however, that if the Bankruptcy Administrator or the Notice Parties indicate their approval or do not provide the Reorganized Debtor with an objection to the proposed settlement within ten (10) days after it receives notice of such settlement in writing, then the Reorganized Debtor shall be authorized to accept and consummate the settlement; and provided further, however, that if a timely written objection is made by the Bankruptcy Administrator or the Notice Parties to the proposed settlement, then the settlement may not be consummated without approval of the Bankruptcy Court in accordance with Bankruptcy Rule 9019; and (ii) if the resulting settlement involves a Cause of Action or objection to a Claim originally asserted in an amount exceeding $25,000, then the Reorganized Debtor shall be authorized and empowered to settle such Cause of Action or objection to Claim only upon Bankruptcy Court approval in accordance with Bankruptcy Rule 9019 and after notice to the Notice Parties.

8.10    **Effectuating Documents; Further Transactions.**

Prior to the Effective Date, each of the chief executive officer, president, chief financial officer, or secretary of the Debtor (and, on and after the Effective Date, each of the chief executive officer, president, chief financial officer, or secretary of the Reorganized Debtor) shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, mortgages, and other agreements or documents and take such actions as may be necessary or appropriate, to effectuate and further evidence the terms and conditions of the Plan or to otherwise comply with applicable law.

## ARTICLE 9
## PROVISIONS GOVERNING DISTRIBUTIONS

9.1    **Initial Distribution.**

As soon as reasonably practicable (as determined by the Reorganized Debtor) after the Effective Date, the Reorganized Debtor shall make the Distributions required under the Plan to Holders of Allowed Administrative Expense Claims (including Allowed Administrative Expense Claims of Professionals) and Allowed Claims in Class 1 (the "**Initial Distribution**"). Thereafter, the Reorganized Debtor shall make additional Distributions to Holders of Allowed Claims as and when required by the terms of the Plan.

9.2    **Execution and Delivery of Plan Notes and Security Documents.**

On or before the Effective Date, the Reorganized Debtor shall execute and deliver the Plan Documents.

42

9.3     **Determination of Claims.**

From and after the Effective Date, the Reorganized Debtor shall have the exclusive authority to, and shall, file, settle, compromise, withdraw, or litigate to judgment all objections to Claims. Except as to any late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases, if any, all objections to Claims shall be filed with the Bankruptcy Court by no later than ninety (90) days following the Effective Date (unless such period is extended by the Bankruptcy Court upon motion of the Debtor or Reorganized Debtor), and the Confirmation Order shall contain appropriate language to that effect. Holders of Unsecured Claims that have not filed such Claims on or before the Bar Date shall serve the Notice Parties with any request to the Bankruptcy Court for allowance to file late Unsecured Claims. If the Bankruptcy Court grants the request to file a late Unsecured Claim, such Unsecured Claim shall be treated in all respects as a Class 21 Unsecured Claim. Objections to late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases shall be filed on the later of (a) ninety (90) days following the Effective Date or (b) the date sixty (60) days after Reorganized Debtor receives actual notice of the filing of such Claim.

Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtor or Reorganized Debtor, as the case may be, effect service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (b) to the extent counsel for the Holder of a Claim is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or other representative identified on the Proof of Claim or any attachment thereto, or (c) by first class mail, postage prepaid, on any counsel that has filed a notice of appearance in the Bankruptcy Case on behalf of the Holder of a Claim.

Disputed Claims shall be fixed or liquidated in the Bankruptcy Court as core proceedings within the meaning of 28 U.S.C. § 157(b)(2)(B) unless the Bankruptcy Court orders otherwise. If the fixing or liquidation of a contingent or unliquidated Claim would cause undue delay in the administration of the Bankruptcy Case, such Claim shall be estimated by the Bankruptcy Court for purposes of allowance and Distribution. The Debtor or Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtor or Reorganized Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, such estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor or Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate allowance of such Claim. The determination of Claims in Estimation Hearings shall be binding for purposes of establishing the maximum amount of the Claim for purposes of allowance and Distribution. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Procedures for specific Estimation Hearings, including provisions for

43

discovery, shall be set by the Bankruptcy Court giving due consideration to applicable Bankruptcy Rules and the need for prompt determination of the Disputed Claim.

9.4     **Distributions as to Allowed Claims in Class 21.**

Each Holder of an Allowed Unsecured Claim in Class 21 is paid their Pro-Rata Share of 30% the Debtor's Net Disposable Income. The Debtor will make annual payments to Class 21 Allowed Claims beginning 1 year from the Effective Date and will continue on the same date each year thereafter for a total of five (5) payments over five (5) years. The timing and procedures for, and amount of, distributions to Holders of Allowed Class 21 Claims shall be in accordance with Article 9 of the Plan, the Confirmation Order, and the Projections.

Notwithstanding any provision herein to the contrary, no Distribution shall be made to the Holder of a Disputed Claim in Class 21 unless and until such Disputed Claim becomes an Allowed Claim. At such time that such Disputed Claim becomes an Allowed Class 21 Claim, the Holder of such Allowed Class 21 Claim shall receive the Distribution to which such Holder is then entitled under the Plan.

Notwithstanding any provision herein to the contrary, if, on any applicable Distribution Date, the Holder of a Class 21 Claim is subject to a proceeding against it by the Reorganized Debtor under Section 502(d) of the Bankruptcy Code, then Reorganized Debtor (in its sole discretion) may withhold a Distribution to such Holder until the final resolution of such proceeding.

Distributions to a Holder of an Allowed Claim in Class 21 shall be made at the address of such Holder set forth in the Schedules or on the books and records of the Debtor or Reorganized Debtor at the time of the Distribution, unless Reorganized Debtor has been notified in writing of a change of address, including by the filing of a Proof of Claim or statement pursuant to Bankruptcy Rule 3003 by such Holder that contains an address for such Holder different than the address for such Holder as set forth in the Schedules. Reorganized Debtor shall not be liable for any Distribution sent to the address of record of a Holder in the absence of the written change thereof as provided herein.

9.5     **Unclaimed Distributions.**

If a Holder of an Allowed Claim fails to negotiate a check for a Distribution issued to such Holder within sixty (60) days of the date such check was issued, then Reorganized Debtor shall provide written notice to such Holder stating that, unless such Holder negotiates such check within thirty (30) days of the date of such notice, the amount of Cash attributable to such check shall be deemed to be unclaimed, such Holder shall be deemed to have no further Claim in respect of such check, such Holder's Allowed Claim shall no longer be deemed to be Allowed, and such Holder shall not be entitled to participate in any further Distributions under the Plan in respect of such Claim.

If a check for a Distribution made pursuant to the Plan to any Holder of an Allowed Claim is returned to Reorganized Debtor due to an incorrect or incomplete address for the Holder of such

44

Allowed Claim, and no claim is made in writing to Reorganized Debtor as to such check within sixty (60) days of the date such Distribution was made, then the amount of Cash attributable to such check shall be deemed to be unclaimed, such Holder shall be deemed to have no further Claim in respect of such check, such Holder's Allowed Claim shall no longer be deemed to be Allowed, and such Holder shall not be entitled to participate in any further Distributions under the Plan in respect of such Claim.

Any unclaimed Distribution as described above sent by Reorganized Debtor shall become the property of Reorganized Debtor.

9.6 **Transfer of Claim.**

In the event that Holder of any Claim shall transfer such Claim on and after the Effective Date, such Holder shall immediately advise Reorganized Debtor in writing of such transfer and provide sufficient written evidence of such transfer. Reorganized Debtor shall be entitled to assume that no transfer of any Claim has been made by any Holder unless and until Reorganized Debtor shall have received written notice to the contrary. Each transferee of any Claim shall take such Claim subject to the provisions of the Plan and to any request made, waiver or consent given or other action taken hereunder and, except as otherwise expressly provided in such notice, Reorganized Debtor shall be entitled to assume conclusively that the transferee named in such notice shall thereafter be vested with all rights and powers of the transferor under the Plan.

9.7 **One Distribution Per Holder.**

If the Holder of a Claim holds more than one Claim in any one Class or subclass, all Claims of such Holder in such Class or subclass shall be aggregated and deemed to be one Claim for purposes of Distribution hereunder, and only one Distribution shall be made with respect to the single aggregated Claim.

9.8 **Effect of Pre-Confirmation Distributions.**

Nothing in the Plan shall be deemed to entitle the Holder of a Claim that received, prior to the Effective Date, full or partial payment of such Holder's Claim, by way of settlement or otherwise, pursuant to an order of the Bankruptcy Court, provision of the Bankruptcy Code, or other means, to receive a duplicate payment in full or in part pursuant to the Plan; and all such full or partial payments shall be deemed to be payments made under the Plan for purposes of satisfying the obligations of the Debtor or Reorganized Debtor to such Holder under the Plan.

9.9 **No Interest on Claims.**

Except as expressly stated in the Plan or otherwise Allowed by a Final Order of the Bankruptcy Court, no Holder of an Allowed Claim shall be entitled to the accrual of Postpetition Interest or the payment of Postpetition Interest, penalties, or late charges on account of such Allowed Claim for any purpose. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a Disputed Claim becomes an Allowed Claim.

9.10     **Compliance with Tax Requirements.**

        In connection with the Plan, the Reorganized Debtor shall comply with all tax withholding and reporting requirements imposed by federal, state, local and foreign taxing authorities, and all Distributions hereunder shall be subject to such withholding and reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Distribution.

**ARTICLE 10**
**CONDITIONS PRECEDENT TO CONFIRMATION**
**OF THE PLAN AND THE EFFECTIVE DATE**

10.1     **Conditions Precedent to Confirmation of the Plan.**

        The following are conditions precedent to Confirmation of the Plan, each of which may be waived by the Debtor:

        1.     The Bankruptcy Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order in a manner consistent with the provisions of the Plan.

10.2     **Conditions Precedent to the Effective Date.**

        The Plan shall not be consummated and the Effective Date shall not occur unless each of the following conditions has been satisfied following the Confirmation Date or waived by the Debtor:

        1.     A "take out" lender must be found to take out the claim of Jackson Investment Group, LLC; and

        2.     The Confirmation Order shall be a Final Order.

        3.     Each Plan Document shall be in form and substance reasonably acceptable to the Debtor.

10.3     **Notice of the Effective Date.**

        Promptly following the satisfaction, or the waiver by the Debtor, of all of the conditions set forth in Article 10.2, the Debtor shall file a notice (the "**Effective Date Notice**") with the Bankruptcy Court designating the Effective Date. The Debtor shall serve the Effective Date Notice on all of the Notice Parties.

46

# ARTICLE 11
# DISCHARGE, EXCULPATION FROM
# LIABILITY, RELEASE, AND GENERAL INJUNCTION

## 11.1 **Discharge of Claims.**

Except as otherwise expressly provided in the Plan or in the Confirmation Order, the Confirmation Order shall operate as a discharge, pursuant to Section 1141(d) of the Bankruptcy Code, to the fullest extent permitted by applicable law, as of the Effective Date, of the Debtor and its Estate and the Reorganized Debtor from any and all Debts of and Claims of any nature whatsoever against the Debtor that arose at any time prior to the Effective Date, including any and all Claims for principal and interest, whether accrued before, on or after the Petition Date. Except as otherwise expressly provided in the Plan or in the Confirmation Order, but without limiting the generality of the foregoing, on the Effective Date, the Debtor and its Estate and the Reorganized Debtor, and their respective successors or assigns, shall be discharged, to the fullest extent permitted by applicable law, from any Claim or Debt that arose prior to the Effective Date and from any and all Debts of the kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based on such Debt was filed pursuant to Section 501 of the Bankruptcy Code, (b) a Claim based on such Debt is an Allowed Claim pursuant to Section 502 of the Bankruptcy Code, or (c) the Holder of a Claim based on such Debt has voted to accept the Plan. As of the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons and Entities, including all Holders of Claims or Equity Interests, shall be forever precluded and permanently enjoined to the fullest extent permitted by applicable law from asserting directly or indirectly against the Debtor or its Estate or the Reorganized Debtor, or any of their respective successors and assigns, or the assets or Properties of any of them, any other or further Claims, Debts, rights, causes of action, remedies, or Liabilities based upon any act, omission, document, instrument, transaction, event, or other activity of any kind or nature that occurred prior to the Effective Date or that occurs in connection with implementation of the Plan, and the Confirmation Order shall contain appropriate injunctive language to that effect. In accordance with the foregoing, except as otherwise expressly provided in the Plan or in the Confirmation Order, the Confirmation Order shall be a judicial determination of the discharge or termination of all such Claims and other Debts and Liabilities against the Debtor, pursuant to Sections 524 and 1141 of the Bankruptcy Code, to the fullest extent permitted by applicable law, and such discharge shall void any judgment obtained against the Debtor, at any time, to the extent that such judgment relates to a discharged or terminated Claim, Liability, or Debt. Notwithstanding the foregoing, Reorganized Debtor shall remain obligated to make payments to Holders of Allowed Claims as required pursuant to the Plan.

## 11.2 **Exculpation from Liability.**

The Debtor, the Shareholders, and its respective Postpetition officers, including the chief restructuring officer, and the Professionals for the Debtor (acting in such capacity) (collectively, the "**Exculpated Parties**") shall neither have nor incur any liability whatsoever to any Person or Entity for any act taken or omitted to be taken in good faith in connection with or related to the formulation, preparation, dissemination, or confirmation of the Plan, the Disclosure Statement, any Plan Document, or any contract, instrument, release, or other agreement or document created

47

or entered into, or any other act taken or omitted to be taken, in connection with the Plan or the Bankruptcy Case, in each case for the period on and after the Petition Date and through the Effective Date; provided, however, that this exculpation from liability provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party. With respect to Professionals, the foregoing exculpation from liability provision shall also include claims of professional negligence arising from the services provided by such Professionals during the Bankruptcy Case. Any such claims shall be governed by the standard of care otherwise applicable to the standard of negligence claims outside of bankruptcy. The rights granted under this Article 11.2 are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Exculpated Parties have or obtain pursuant to any provision of the Bankruptcy Code or other applicable law. In furtherance of the foregoing, the Exculpated Parties shall have the fullest protection afforded under Section 1125(e) of the Bankruptcy Code and all applicable law from liability for violation of any applicable law, rule or regulation governing the solicitation of acceptance or rejection of a plan. This exculpation from liability provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions of this Article 11.2 shall not release, or be deemed a release of, any of the Causes of Action.

11.3    **General Injunction.**

Pursuant to Sections 105, 1123, 1129 and 1141 of the Bankruptcy Code, in order to preserve and implement the various transactions contemplated by and provided for in the Plan, as of the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons or Entities that have held, currently hold or may hold a Claim, Debt, or Liability that is discharged or terminated pursuant to the terms of the Plan are and shall be permanently enjoined and forever barred to the fullest extent permitted by law from taking any of the following actions on account of any such discharged or terminated Claims, Debts, or Liabilities, other than actions brought to enforce any rights or obligations under the Plan or the Plan Documents: (a) commencing or continuing in any manner any action or other proceeding against the Debtor or the Reorganized Debtor or their respective Properties; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtor or the Reorganized Debtor or their respective Properties; (c) creating, perfecting or enforcing any Lien or encumbrance against the Debtor or the Reorganized Debtor or their respective Properties; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor or the Reorganized Debtor; (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order; or (f) interfering with or in any manner whatsoever disturbing the rights and remedies of the Debtor or the Reorganized Debtor under the Plan and the Plan Documents and the other documents executed in connection therewith. The Debtor and the Reorganized Debtor shall have the right to independently seek enforcement of this general injunction provision. This general injunction provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions of Article 11.3 of the Plan shall not release, or be deemed a release of, any of the Causes of Action.

11.4    **Matching Injunction in Favor of the Guarantors**.

Case 25-02821-TOM11    Doc 368    Filed 07/15/26    Entered 07/15/26 17:18:37    Desc
Main Document    Page 48 of 60

Each creditor whose payments are not in default (subject to a 30 day notice and cure period) under the Plan shall be enjoined and barred from taking any of the following actions: (a) commencing or continuing in any manner any action or other proceeding against the Guarantors; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Guarantors; (c) creating, perfecting or enforcing any Lien or encumbrance against the Guarantors; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Guarantors; (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order; or (f) interfering with or in any manner whatsoever disturbing the rights and remedies of the Guarantors. At the conclusion of payments required under the Plan, the injunction shall become permanent as to creditors whose Allowed Claims were paid in full or as otherwise compromised. The Debtor and the Guarantors shall have the right to independently seek enforcement of this injunction provision. This injunction provision is an integral part of the Plan and is essential to its implementation. In exchange for this matching injunction, the Guarantors agree to toll all statutes of limitation on collection.

**11.5**     **Term of Certain Injunctions and Automatic Stay.**

All injunctions or automatic stays for the benefit of the Debtor pursuant to Sections 105, 362 or other applicable provisions of the Bankruptcy Code, or otherwise provided for in the Bankruptcy Case, and in existence on the Confirmation Date, shall remain in full force and effect following the Confirmation Date and until the Final Decree Date, unless otherwise ordered by the Bankruptcy Court.

With respect to all lawsuits pending in courts in any jurisdiction (other than the Bankruptcy Court) that seek to establish the Debtor' liability on Prepetition Claims asserted therein and that are stayed pursuant to Section 362 of the Bankruptcy Code, such lawsuits shall be deemed dismissed as of the Effective Date, unless the Debtor affirmatively elects to have the Debtor's liability established by such other courts, and any pending motions seeking relief from the automatic stay for purposes of continuing any such lawsuits in such other courts shall be deemed denied as of the Effective Date, and the automatic stay shall continue in effect, unless the Debtor affirmatively elects to have the automatic stay lifted and to have the Debtor's liability established by such other courts; and the Prepetition Claims at issue in such lawsuits shall be determined and either Allowed or disallowed in whole or part by the Bankruptcy Court pursuant to the applicable provisions of the Plan, unless otherwise elected by the Debtor as provided herein.

**11.6**     **No Liability for Tax Claims.**

Unless a taxing Governmental Unit has asserted a Claim against the Debtor before the Governmental Unit Bar Date or Administrative Expense Claim Bar Date established therefore, no Claim of such Governmental Unit shall be Allowed against the Debtor, the Reorganized Debtor or their respective officers, employees or agents for taxes, penalties, interest, additions to tax or other charges arising out of (i) the failure, if any, of the Debtor, any of its Affiliates, or any other Person or Entity to have paid tax or to have filed any tax return (including any income tax return) in or for any prior year or period, or (ii) an audit of any return for a period before the Petition Date.

49

**ARTICLE 12**
**RETENTION OF JURISDICTION**

12.1 **General Retention.**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, until the Bankruptcy Case is closed, the Bankruptcy Court shall retain the fullest and most extensive jurisdiction of the Bankruptcy Case that is permitted by applicable law, including that necessary to ensure that the purposes and intent of the Plan are carried out.

12.2 **Specific Purposes.**

In addition to the general retention of jurisdiction set forth in Article 12.1, after Confirmation of the Plan and until the Bankruptcy Case is closed, the Bankruptcy Court shall retain jurisdiction of the Bankruptcy Case for the following specific purposes:

1. to allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any application for an Administrative Expense Claim, and to determine any and all objections to the allowance or priority of Claims or Equity Interests;

2. to determine any and all cases, controversies, suits or disputes arising under or relating to the Reorganization Case, the Plan or the Confirmation Order (including regarding the effect of any release, exculpation from liability, discharge, limitation of liability, or injunction provisions provided for herein or affected hereby and regarding whether the conditions precedent to the consummation and/or Effective Date of the Plan have been satisfied);

3. to determine any and all applications for allowance of compensation of Professionals and reimbursement of expenses under Section 330, 331 or 503(b) of the Bankruptcy Code arising out of or relating to the Reorganization Case; provided, however, that this retention of jurisdiction shall not require prior Bankruptcy Court approval of the payment of fees and reimbursement of expenses of Professionals incurred after the Effective Date unless an objection to such fees and expenses has been made by the Reorganized Debtor;

4. to determine any and all motions pending as of the date of the Confirmation Hearing (including pursuant to the Plan) for the rejection, assumption, or assignment of executory contracts or unexpired leases to which the Debtor is a party or with respect to which the Debtor may be liable, and to determine the allowance of any Claims resulting from the rejection thereof or any Cure Claims;

5. to determine any and all motions, applications, adversary proceedings, contested or litigated matters, Causes of Action, and any other matters involving the Debtor or the Reorganized Debtor commenced in connection with, or arising during, the Reorganization Case and pending on the Effective Date, including approval of proposed settlements thereof;

50

6.    to enforce, interpret and administer the terms and provisions of the Plan and the Plan Documents;

7.    to modify any provisions of the Plan to the fullest extent permitted by the Bankruptcy Code and the Bankruptcy Rules;

8.    to consider and act on the compromise and settlement of any Claim against or Equity Interest in the Debtor or its Estate;

9.    to assure the performance by the Reorganized Debtor of its obligations under the Plan;

10.    to correct any defect, cure any omission, reconcile any inconsistency or make any other necessary changes or modifications in or to the Disclosure Statement, the Plan, the Plan Documents, the Confirmation Order, or any exhibits or schedules to the foregoing, as may be necessary or appropriate to carry out the purposes and intent of the Plan, including the adjustment of the date(s) of performance under the Plan in the event the Effective Date does not occur as provided herein so that the intended effect of the Plan may be substantially realized thereby;

11.    to resolve any disputes concerning any release or exculpation of, or limitation of liability as to, a non-debtor (including any Professional) hereunder or the injunction against acts, employment of process or actions against such non-debtor (including any Professional) arising hereunder;

12.    to enforce all orders, judgments, injunctions and rulings entered in connection with the Reorganization Case;

13.    to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order, including the Plan Documents;

14.    to determine all questions and disputes regarding title to the assets or Property of the Debtor, the Estate, or the Reorganized Debtor;

15.    to determine any and all matters, disputes and proceedings relating to the Causes of Action, whether arising before or after the Effective Date;

16.    to determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits and similar or related matters with respect to the Debtor arising on or prior to the Effective Date or arising on account of transactions contemplated by the Plan;

17.    to resolve any determinations which may be requested by the Debtor or the Reorganized Debtor of any unpaid or potential tax liability or any matters relating thereto under Sections 505 and 1146 of the Bankruptcy Code, including tax liability or such related matters for any taxable year or portion thereof ending on or before the Effective Date;

51

18. to issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

19. to enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

20. to determine any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or the Plan Documents;

21. to enter such orders as are necessary to implement and enforce the injunctions described herein;

22. to enforce the obligations of any purchaser of any Property of the Debtor;

23. to determine such other matters and for such other purposes as may be provided for in the Confirmation Order or as may from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law; and

24. to enter an order concluding and terminating the Bankruptcy Case.

12.3 **Closing of the Bankruptcy Case.**

In addition to the retention of jurisdiction set forth in Articles 12.1 and 12.2, the Bankruptcy Court shall retain jurisdiction of the Bankruptcy Case to enter an order reopening the Bankruptcy Case after it has been closed.

**ARTICLE 13**
**MODIFICATION OF PLAN AND**
**CONFIRMATION OVER OBJECTIONS**

13.1 **Modification of Plan.**

The Debtor may modify the Plan at any time prior to the entry of the Confirmation Order provided that the Plan, as modified, and the Disclosure Statement meet applicable Bankruptcy Code and Bankruptcy Rules requirements.

After the entry of the Confirmation Order, the Debtor (prior to the Effective Date) or the Reorganized Debtor (on and after the Effective Date) may modify the Plan to remedy any defect or omission herein, or to reconcile any inconsistencies between the Plan and the Confirmation Order, as may be necessary to carry out the purposes and effects of the Plan, provided that (a) the Debtor or the Reorganized Debtor (as the case may be) obtains Bankruptcy Court approval for such modification, after notice to the Notice Parties and a hearing, and (b) such modification does not materially adversely affect the interests, rights, or treatment of any Class of Claims or Equity Interests under the Plan.

52

After the entry of the Confirmation Order and before substantial consummation of the Plan, the Debtor (prior to the Effective Date) or the Reorganized Debtor (on and after the Effective Date) may modify the Plan in a way that materially adversely affects the interests, rights, or treatment of a Class of Claims or Equity Interests, provided that (a) the Plan, as modified, meets applicable Bankruptcy Code requirements, (b) the Debtor or the Reorganized Debtor (as the case may be) obtains Bankruptcy Court approval for such modification, after notice to the Notice Parties and the Class of Claims or Equity Interests materially adversely affected and a hearing, (c) such modification is accepted by (i) at least two-thirds in dollar amount, and more than one-half in number, of the Allowed Claims actually voting in each Class of Claims adversely affected by such modification or (ii) at least two-thirds in amount of Allowed Equity Interests actually voting in each Class of Equity Interests adversely affected by such modification, and (d) the Debtor or the Reorganized Debtor (as the case may be) comply with Section 1125 of the Bankruptcy Code with respect to the Plan, as modified.

Notwithstanding anything to the contrary contained in this Article 13.1 or elsewhere in the Plan, the Plan may not be altered, amended or modified without the written consent of the Debtor (prior to the Effective Date) or the Reorganized Debtor (on and after the Effective Date).

13.2    **Confirmation Over Objections.**

In the event any Impaired Class of Claims or Equity Interests votes against the Plan, and the Plan is not revoked or withdrawn in accordance with Article 14.2, the Debtor hereby requests, and shall be allowed, to modify the terms of the Plan to effect a "cramdown" on such dissenting Class by, inter alia, (a) restructuring the treatment of any Class on terms consistent with Section 1129(b)(2) of the Bankruptcy Code, or (b) deleting distributions to all Classes at or below the level of the objecting Class, or reallocating such distributions, until such impaired senior Classes are paid in accordance with the absolute priority rule of Section 1129(b) of the Bankruptcy Code. The Debtor may make such modifications or amendments to the Plan and such modifications or amendments shall be filed with the Bankruptcy Court and served on all parties in interest entitled to receive notice prior to the Confirmation Hearing. No such modifications shall require any resolicitation of acceptances as to the Plan by any Class of Claims or Equity Interests unless the Bankruptcy Court shall require otherwise. Notwithstanding any provision of the Plan to the contrary, the Debtor reserves any and all rights it may have to challenge the validity, perfection, priority, scope and extent of any Liens in respect to any Secured Claims and the amount of any Secured Claims, the Holders of which have not accepted the Plan.

### ARTICLE 14
### MISCELLANEOUS PROVISIONS

14.1    **No Admissions.**

The Plan provides for the resolution, settlement and compromise of Claims against and Equity Interests in the Debtor. Nothing herein shall be construed to be an admission of any fact or otherwise binding upon the Debtor in any manner prior to the Effective Date.

53

14.2     **Revocation or Withdrawal of the Plan.**

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtor revokes or withdraws the Plan, or if Confirmation of the Plan does not occur, then the Plan shall be deemed null and void in all respects and nothing contained in the Plan shall be deemed to (a) constitute a waiver or release of any Claims against, or Equity Interests in, the Debtor or any other Person, or (b) prejudice in any manner the rights of the Debtor or any other Person in any further proceedings involving the Debtor.

14.3     **Standard for Approval of the Bankruptcy Court.**

In the event any of the matters described herein are brought for approval before the Bankruptcy Court, then any such approval shall mean the entry for an order by the Bankruptcy Court approving the matter using the standards for approval of similar matters by a Chapter 11 debtor in possession.

14.4     **Further Assurances.**

Each of the Debtor and the Reorganized Debtor agrees, and is hereby authorized, to execute and deliver any and all papers, documents, contracts, agreements and instruments which may be necessary to carry out and implement the terms and conditions of the Plan.

14.5     **Headings.**

The headings and table of contents used in the Plan are for convenience and reference only and shall not constitute a part of the Plan for any other purpose or in any manner affect the construction of the provisions of the Plan.

14.6     **Notices.**

All notices, requests or other communications in connection with, or required to be served by, the Plan, shall be in writing and shall be sent by United States first class mail, postage prepaid, or by overnight delivery by a recognized courier service, and addressed as follows:

> <u>To the Debtor or the Reorganized Debtor</u>:
> Lonnie B. Dorcey
> 201 3rd Avenue North
> Birmingham, Alabama 35203
>
> <u>With a copy to</u>:
> Stuart H. Memory
> Post Office Box 4054
> Montgomery, Alabama 36103

Copies of all notices under the Plan to any party shall be given to each of the parties listed above contemporaneously with the giving of such notice. Any of the parties listed above may

change the person or address to whom or to which notices are to be given hereunder by filing a written instrument to that effect with the Bankruptcy Court. Notwithstanding anything to the contrary contained in the Plan, no notice shall be required hereunder to the Committee if it is no longer in existence.

14.7    **Governing Law.**

Except to the extent that federal law (including the Bankruptcy Code or the Bankruptcy Rules) is applicable, or where the Plan or the provision of any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Alabama, without giving effect to the principles of conflicts of law thereof.

14.8    **Limitation on Allowance.**

No attorneys' fees, punitive fees, penalties, exemplary damages, or interest shall be paid with respect to any Claim or Equity Interest except as otherwise expressly provided in the Plan or as Allowed by a Final Order of the Bankruptcy Court.

14.9    **Estimated Claims.**

To the extent any Claim is estimated for any purpose other than for voting on the Plan, then in no event shall such Claim be Allowed in an amount greater than the estimated amount.

14.10   **Consent to Jurisdiction.**

Upon any default under the Plan, the Debtor and the Reorganized Debtor consent to the jurisdiction of the Bankruptcy Court an agree that the Bankruptcy Court shall be the preferred forum for all proceedings relating to any such default.

By accepting any Distribution under or in connection with the Plan, by filing any Proof of Claim, by filing any Administrative Expense Claim or Cure Claim, by voting on the Plan, by reason of being served with notice of the filing of the Reorganization Case or the Confirmation Hearing, or by entering an appearance in the Reorganization Case, Creditors, Holders of Equity Interests and other parties in interest, including foreign Creditors and foreign parties in interest, have consented, and shall be deemed to have expressly consented, to the jurisdiction of the Bankruptcy Court for all purposes with respect to any and all matters relating to, arising under or in connection with the Debtor, the Plan or the Reorganization Case, including the matters and purposes set forth in Article 12 of the Plan. The Bankruptcy Court shall maintain jurisdiction to the fullest extent allowed under applicable law over all matters set forth in Article 12 of the Plan.

14.11   **Setoffs.**

Subject to the limitations provided in Section 553 of the Bankruptcy Code, the Reorganized Debtor may, but shall not be required to, set off against any Claim and any Distribution to be made

55

pursuant to the Plan in respect of such Claim, claims of any nature whatsoever the Debtor or the Reorganized Debtor may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor of any such claim that the Debtor or the Reorganized Debtor may have against the Holder of such Claim.

14.12    **Successors and Assigns.**

The rights, benefits, duties and obligations of any Person or Entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person or Entity.

14.13    **Modification of Payment Terms.**

The Reorganized Debtor reserves the right to modify the treatment of any Allowed Claim, as provided in Section 1123(a)(4) of the Bankruptcy Code, at any time after the Effective Date, upon the consent of the Holder of such Allowed Claim.

14.14    **Entire Agreement.**

The Plan and the Plan Documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions and documents. No Person or Entity shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter thereof, other than as expressly provided for therein or as may hereafter be agreed to by such Person or Entity in writing.

14.15    **Severability of Plan Provisions.**

If, prior to Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtor, shall have the power to alter or interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term or provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable.

14.16    **Controlling Document.**

To the extent the Confirmation Order or the Plan is inconsistent with the Disclosure Statement or any agreement entered into between the Debtor or the Reorganized Debtor and any third party, unless otherwise expressly provided in the Plan or the Confirmation Order, the

56

Confirmation Order and the Plan shall control over the Disclosure Statement and any such agreement. The Confirmation Order (and any other Final Orders of the Bankruptcy Court) shall be construed together and consistent with the terms of the Plan; provided, however, to the extent the Confirmation Order is inconsistent with the Plan, the Confirmation Order shall control over the Plan.

14.17 **<u>Computation of Time</u>.**

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

14.18 **<u>Substantial Consummation</u>.**

The Plan shall be deemed to be substantially consummated within the meaning of Section 1101 of the Bankruptcy Code upon commencement by the Reorganized Debtor of the Initial Distribution described in Article 9.1 of the Plan.

[Remainder of page intentionally left blank]

57

Dated as of July 15, 2026

Respectfully submitted,

/s/ Stuart H. Memory
Stuart H. Memory
Attorney for the Debtors

**OF COUNSEL:**
MEMORY MEMORY & CAUSBY, LLP
P. O. Box 4054
Montgomery, AL 36103
Tel (334) 834-8000
Fax: (334) 834-8001
smemory@memorylegal.com

58

**EXHIBIT A: Assumed Contracts**

1. **Enterprise Rental Cars**
2. **Southlake Capital, LLC**

**EXHIBIT B: Rejected Contracts**